```
 1                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF PENNSYLVANIA
 2

 3   UNITED STATES OF AMERICA,     :Criminal Action No.:
                  Plaintiff,       :2:19-cr-00717-GAM-1
 4   v                             :
                                   :
 5   WILLIAM A. MERLINO            :Philadelphia, Pennsylvania
                  Defendants.      :August 3, 2022 at 9:30 a.m.
 6                                 :
                                   :PARTIAL TRANSCRIPT
 7   . . . . . . . . . . . . . . . .PORTION STARTING AT 3:28:14

 8            TRANSCRIPT OF CRIMINAL JURY TRIAL DAY ONE
                BEFORE THE HONORABLE GERALD A. MCHUGH
 9               UNITED STATES DISTRICT COURT JUDGE

10     APPEARANCES:

11     FOR THE PLAINTIFF

12     USA:                     JOAN E. BURNES, AUSA
                                U.S. ATTORNEY'S OFFICE
13                              615 CHESTNUT ST. SUITE 1250
                                PHILADELPHIA, PA 19106-4476
14                              215-861-8577
                                Email: joan.burnes@usdoj.gov
15

16

17     FOR THE DEFENDANT

18     WILLIAM A. MERLINO:    ROBERT GAMBURG, ESQ.
                              GAMBURG & BENEDETTO
19                            Attorneys at Law
                              1500 John F. Kennedy Boulevard
20                            Suite 1203
                              Philadelphia, PA 19102
21                            215-567-1486
                              Email: Robert@gamburglaw.com
22

23

24

25
```

1   Court Recorder:  Mia Harvey

2   Transcription Service:  Associated Reporters Int'l., Inc.
    10 River Drive
3   Massena, New York 13662

4
    Proceedings recorded by electronic sound recording;
5
    transcript produced by transcription service.

6

7          I N D E X   O F   P R O C E E D I N G S

8   NATASHA BOWENS: Sworn

9   Direct Examination by Ms. Burnes          16
    Cross Examination by Mr. Gamburg          28

10
           E X H I B I T   L I S T
11
    Exhibit ONE                               7
12  Screenshot of Defendant's twitter account

13  Government Twenty-Nine P                   22
    Photo of envelope
14  Government Fifty-Four P                    22
    Photo
15  Government Sixty-Nine P                    22
    Photo
16  Government Eighty-Six P                    22
    Photo

17

18

19

20

21

22

23

24

25

1              (The portion requested commenced at

2      03:28:14)

3              THE COURT:  All right.  Ladies and

4      gentlemen welcome back.  Went a little longer on that

5      break so counsel could move in everything they needed.

6      Please be seated counsel and now as I mentioned we are

7      going to be hearing opening statements beginning with the

8      government, keeping in mind that opening statements are

9      not evidence in the case, but the attorneys view of what

10     the evidence will show.

11             And with that I recognize Ms. Burnes.

12             OPENING STATEMENT

13             MS. BURNES:  Thank you, Your Honor.  This

14     is a case about a scam, about a man who sold a dangerous

15     chemical over the internet as a weight-loss drug.  The

16     chemical is 2,4-Dinitrophenol, you'll hear it called

17     D.N.P.  The chemical is a yellow powder that is toxic to

18     humans.  It's a chemical that's used in herbicides.  It's

19     a chemical that's used in explosives.  And paying

20     customers bought this D.N.P. as a weight-loss drug.  The

21     scam is selling this chemical for human consumption and

22     lying about it.  This case is not a fraud on customers.

23     You will see emails that customers wanted these capsules.

24             The scam is lying and hiding from the

25     F.D.A., the Food and Drug Administration.  The scam is

1           hiding from Customs and Border Protection, from the

2           regulatory agencies designed to keep us safe.  The

3           defendant, William Merlino, sold the 2,4-Dinitrophenol as

4           a diet drug.

5                     But his websites and his marketing and his

6           labeling said agricultural use and fertilizer and not for

7           human consumption.  With your commonsense, you'll learn

8           that this is a scam.  A scam intended to defraud and

9           mislead the F.D.A. and the C.B.P.  You will learn that

10          terms like agricultural use, fertilizer, not for human

11          consumption, that's just a cover-up so he wouldn't get

12          caught selling D.N.P., that drug, for human use.

13                    Good afternoon, members of the jury I'm

14          going to introduce myself again, I'm Joan Burnes, I'm the

15          A.U.S.A. on this case, and together with Special Agent,

16          Bryan Arcari of F.D.A.'s Office of Criminal Investigation

17          and paralegal specialist Kevin Conroy who will be

18          presenting the evidence in this case.  And we thank you

19          for your attention.

20                    This is a case where the defendant, William

21          Merlino operated a business for paying customers and used

22          the name SimCare.  Now, he's a retired doctor and SimCare

23          was a name associated with his private practice.  But make

24          no -- make no mistake.  This was a business about paying

25          customers, not about the medical practice of patients.

1    And from his house in Mays Landing, New Jersey, he

2    operated a business to encapsulate, to put into capsules

3    -- in pill form D.N.P. for human consumption.  He

4    advertised on Twitter, and he used eBay, the internet

5    online sales place to make his sales.

6              You'll see that eBay uses SimCare, marketed

7    hundreds of transactions.  He got his money from them by

8    PayPal, and he shipped his packages from the Mays Landing

9    Post Office using postal Click-N-Ship accounts.

10             And he shipped them from his local post

11   office here into Philadelphia, into other parts of the

12   Eastern District of Pennsylvania, around the country and

13   around the world.  And he sold his D.N.P. on eBay until

14   August of 2018 when eBay removed all sales of D.N.P. from

15   its website.

16             And around that same time, Customs and

17   Border Protection seized bulk D.N.P. that was destined for

18   Merlino's home in Mays Landing, New Jersey.  And after

19   those two things happened, Merlino used his Facebook page

20   to advertise his website.  He called it Fortis Supply and

21   he took orders by direct mail, simcare@gmail.com.

22             You're going to see those emails.  He

23   continued to ship packages from the post office and

24   continued to use PayPal to make his money.  But after eBay

25   stopped sales and after customs seized bulk D.N.P., the

1   defendant started getting more careful in his

2   communications with his customers.

3              And he started labeling his encapsulating

4   products that he shipped to customers with a label that

5   said not for human consumption.  Nothing else had changed.

6   He still encapsulated the powder and offered it as -- as a

7   tablet or pill for an -- for an extra fee.  Now the

8   defendant is charged with a single count, introduction of

9   misbranded drugs into interstate commerce.

10             And misbranding simply means that the false

11  marketing, the false advertising, the labeling that the

12  defendant did to hide from the government, his actual

13  business.  The key to misbranding is the intent to

14  defraud.  And the attempt to defraud and mislead here are

15  the regulatory agencies, the Food and Drug Administration,

16  Customs and Border Protection.

17             The misbranding here is the false claim

18  that this is not for human consumption, that this is

19  agricultural use, that this is fertilizer, when the

20  defendant knew and intended that it be used for human use.

21  That's what his business was, and that's who his customers

22  were, his customers knew.  It was intended as a diet drug.

23  That's why they were buying from him.

24             The evidence will show you that 2,4-

25  Dinitrophenol is a drug because it was intended to operate

1    on the systems of the human body.  And the evidence will

2    show that they were mailed into the Eastern District of

3    Pennsylvania.  The evidence in this case consists of the

4    defendant's own words.

5              We can take a look at Exhibit One.  You

6    will see during this case, a screenshot of the defendant's

7    Twitter account.  The Twitter account is @drbill and he

8    used it to market D.N.P. for sale on eBay.  The tweet

9    posted on January 3rd, 2018 reads, D.N.P. for sale on eBay

10   for weight loss, is not legal in U.S., so listed as

11   fertilizer on eBay.  Hashtag diet, hashtag weight loss.

12   That's the scam because you will see Merlino's own words

13   on eBay and SimCare's records of eBay sales, you can take

14   that down.  Hundreds of sales advertising D.N.P.

15   agricultural use, forty capsules, two hundred milligrams

16   each, D.N.P. fertilizer potted plants fifty by two

17   hundred.

18             You will see the defendant's own words to

19   Customs and Border Protection after they seized his bulk

20   D.N.P.  In an attempt to get the product back from

21   customs, Defendant Merlino wrote a letter to Customs, and

22   he said, material.  He told Customs, D.N.P. is used as a

23   herbicide and for preserving wood.

24             This product cannot be considered a drug as

25   it is toxic to humans.  You will see the defendant's own

1    words in emails.  Because beginning in August of 2018,

2    just as eBay was removing the sale of D.N.P. from its

3    website, Special Agent of F.D.A., Office of Criminal

4    Investigation, Special Agent, Bryan Arcari make undercover

5    purchases of encapsulated D.N.P. from SimCare and received

6    the encapsulated D.N.P. in the mail.

7                    Now, Merlino was careful in those

8    communications.  He was careful in those communications

9    with new customers.  But you will see his emails with

10   long-time customers with loyal customers.  You will see

11   with the trusted customers, when the defendant has

12   (unintelligible).  He discussed capsules.  He discussed

13   dosing.

14                   He discussed with his international

15   customers, the need to label the product as yellow pigment

16   number twelve because that's an approved commercial use.

17   And this is at the very same time that he is shipping the

18   product and putting stickers on saying not for human

19   consumption.

20                   Now in a different -- in addition to the

21   defendant's own words, you'll hear from some witnesses.

22   You will hear from the post office clerk.  And while she

23   doesn't know the defendant's name, she remembers the

24   yellow-tinted man who shipped yellow-tinted packages daily

25   from the Mays Landing Post Office.

1          You will hear from a former employee of

2     Merlino and she recognizes the name SimCare, but she

3     doesn't know how her name ended up on a Click-N-Ship

4     postal account from which hundreds of mailings were

5     shipped.  You will hear from an F.D.A. witness Dr. Arthur

6     Simone who will explain the key steps a person or company

7     has to take if they want to market a drug in the United

8     States.

9          There is animal studies, there is human

10    studies, there is clinical trials, all geared towards the

11    safety and efficacy for an intended use.  And even then

12    the labeling and the labels have to be accurate.  And none

13    of that's happened for D.N.P.  You will see the physical

14    and photographic evidence of the defendant's business.

15         And that's because agents searched --

16    executed a search warrant on the defendant's residence and

17    they seized evidence of his business.  You'll see

18    capsules.  You'll see labels.  You'll see the

19    encapsulating trays used to make pills.  And you'll see

20    pictures of the bulk D.N.P.  Empty containers from the

21    chemical supply company Sigma-Aldrich.

22         And after the evidence of the defendant's

23    scam on the F.D.A., you'll hear about one more set of

24    lies.  Lies he told to avoid trial and to avoid answering

25    these charges in court.  The evidence will show that in

1    August of 2021, after the defendant was charged when he

2    was awaiting trial, he faked pancreatic cancer.

3              He created a doctor's letter and created

4    hospital discharge documents, claiming he had pancreatic

5    cancer.  He told his former lawyer he had pancreatic

6    cancer, and the lawyer sent those and he sent fake

7    documents to his former lawyer who forwarded them to the

8    Court and trial was postponed.

9              And in response to a January 2022 status

10   inquiry Merlino kept up the lie.  And he fabricated

11   another doctor's letter, claiming that he had pancreatic

12   cancer.  You'll hear from the defendant's former lawyer,

13   who will tell you how he received these documents.  You'll

14   see the emails he received from Merlino.

15             And the attorney will tell you that Merlino

16   told him he had cancer.  And then you'll hear from the

17   real oncologist, the one whose name is on the letter, who

18   will tell you, he did not write that letter.  And Merlino

19   was not his patient.  And you'll see the real medical

20   records from a person who had been diagnosed with

21   pancreatic cancer, not defendant, Merlino.

22             This is not a trial about the D.N.P.

23   customers.  The evidence will show the customers wanted

24   these pills.  The government does not need to show that

25   the customer was harmed.  The government does not need to

1      show that customer was defrauded or misled.  It's a trial

2      about the scam on the F.D.A., and on Customs and Border

3      Patrol to hide Merlino's business, selling D.N.P. for

4      human consumption.

5              And so your job at this point is

6      straightforward.  Just listen carefully to the evidence in

7      this case, follow Judge's instructions on the law, and use

8      your commonsense to evaluate what you're hearing.  At the

9      end of this case, I'll get a chance to talk to you again

10     and walk you through some of the most important evidence

11     in this case.

12              And at that time, I will ask you for the

13     only verdict that's warranted and that's the verdict of

14     guilty.

15              THE COURT:  Mr. Gamburg, do you wish to

16     address the jury at this time?

17              MR. GAMBURG:  I do, Your Honor.  May it

18     please the Court?

19              THE COURT:  Proceed.

20              OPENING STATEMENT

21              MR. GAMBURG:  Counsel.  Good afternoon,

22     ladies and gentlemen.  And on behalf of everyone in the

23     Courtroom, we'd like to thank you for taking the time out

24     of your lives, your schedule, your family, your work, your

25     summer, to come and sit and listen to this case.  Because

1    I agree with His Honor, short of military service, this is

2    the single most important function you can serve in a

3    democracy.  And the reason why I say this is because way

4    back when, when our Constitution was written, and our Bill

5    of Rights was written, they realized that they were giving

6    the government awesome powers, very, very awesome powers,

7    the powers to conduct undercover investigations.

8              The power to go in and execute search

9    warrants into the sanctity of one's home.  The authority

10   to bring someone up on charges that aren't warranted.  So

11   what can we do to protect our citizens from these awesome

12   powers?  I have an idea.  We're going to bring people from

13   five counties, six counties, we're going to bring them

14   from all different backgrounds.

15             We're going to bring them from all

16   different life experiences.  We're going to give them a

17   court order from the United States District Court, the

18   very first court in our country, commanding your presence

19   to come and answer what his Honor said, very personal

20   questions from a bunch of strangers and just come into a

21   room and met and it's -- it's prying a little bit.

22             But all everyone wants, this entire court

23   is for fair and impartial jurors like the founders

24   envisioned to come and sit and listen to this case.  And

25   that's why, just like everyone else, the defendant is

1    presumed to be innocent.  He's presumed to be innocent

2    because again, you now get information when you come down

3    Philadelphia to a criminal trial, criminal trial, what did

4    this guy do.

5              It's human nature, right?  You want to

6    look, you want to see, that's why he's presumed to be

7    innocent because you don't know a thing about the case

8    yet.  That's why the burden of proof is the highest in the

9    law, guilty beyond a reasonable doubt.  Because I've never

10   (unintelligible) to be the sharpest knife in the drawer

11   but the product, this D.N.P. is misbranded because on all

12   the labels that you're going to see, it says not for human

13   consumption, that's the evidence.  That's the evidence

14   that you're going to see.  That's the evidence on the

15   packaging material.  That's the evidence in the email.

16             That's the evidence.  You're not going to

17   hear a lot of cross examination.  You're going to hear

18   some cross examination on the former lawyer.  But his

19   Honor is going to give you special instructions on how to

20   deal with that, because I submit to you, ladies and

21   gentlemen, I never understood what this cliche meant, but

22   that's a red herring; not pertinent, not germane to the

23   case.  The case, as Ms. Burnes indicated to you is whether

24   or not these particular items that you're going to see,

25   that you're going to hear, that there is so many pictures

1        up on the screen, that there's going to be emails about

2        whether or not it was misbranding, and it wasn't.

3                        So ladies and gentlemen, I (unintelligible)

4        to you,  when you were brought in for your individual

5        questioning the individual voir dire, you are to decide

6        this case on the evidence that you hear, and the law that

7        the Court gives.

8                        And when you decide this case on the

9        evidence that you hear, and the law that the Court gives,

10       there is only one verdict.  I agree with Ms. Burnes,

11       there's only one verdict.  And that's this defendant is

12       not guilty of misbranding anything.  I thank you again in

13       advance for your time, and for your attention, and for

14       your willingness to serve.

15                        Because there's a lot of doubt in many of

16       our minds that had you not wanted to serve, to take on

17       this awesome responsibility.  You can easily come up with

18       a reason or an excuse, but now that you have agreed to

19       serve, and made this promise to us, that you can be fair

20       and impartial.  And find the evidence as you find it and

21       follow His Honor's instruction on the law, if you keep

22       that promise you will see what the evidence shows.  And

23       that is Dr. Merlino is not guilty of this.  Thank you

24       again.

25                        THE COURT:  All right.  Members of the

1    jury, we're going to try to work in one witness today to

2    make use of the time, so Ms. Burnes I understand you may

3    have a witness available.

4             MS. BURNES:  Yes, Your Honor.  The

5    government calls Natasha Bowens.

6             THE COURT:  All right.  Members of the

7    jury, I mentioned in my preliminary instructions that

8    there's certain kinds of evidence that's introduced for

9    certain purposes.  And let me comment on that now.  At the

10   end of the case, you've heard that there will be evidence

11   about certain conduct on the part of the defendant in

12   advance of trial.

13             I've ruled that you may hear that evidence

14   only to the extent that it may bear on whether there was

15   any consciousness of guilt.  He is not on trial for

16   anything having to do with any misrepresentation.  And

17   you'll hear that evidence and put it in proper perspective

18   when the time comes, all right.  And I'll give you more

19   instruction on that later.

20             THE COURT CLERK:  Please raise your hand.

21   Do you solemnly swear or affirm the testimony you give to

22   the Court and the jury shall be the whole truth and

23   nothing but the truth, so help you God or you so affirm?

24             MS. BOWENS:  I do.

25             WITNESS: NATASHA BOWENS; Sworn

1                      THE COURT CLERK:  Thank you.  Please state

2        your full name for the record.

3                      THE WITNESS:  Natasha Bowens.

4                      THE COURT CLERK:  Please spell your last

5        name.

6                      THE WITNESS:  B-O-W-E-N-S.

7                      THE COURT CLERK:  Thank you.

8                      THE COURT:  All right.  Ma'am, you may have

9        a seat.  And then if you can, pull up close to the

10       microphone and pull the microphone close to you, whatever

11       works.

12                      THE WITNESS:  Okay.

13                      THE COURT:  All right.

14                      MS. BURNES:  May I adjust so I can see the

15       witness too?

16                      THE COURT:  Sure.  Whatever works.

17                      DIRECT EXAMINATION

18                      BY MS. BURNES:

19                      Q.   Good afternoon, Ms. Bowens.  Can you

20       tell the jury where you work please?

21                      A.   Mays Landing Post Office.

22                      Q.   Okay.

23                      MS. BURNES:  Can everyone hear the witness?

24                      THE COURT:  Can we hear it?  Good.

25                      UNIDENTIFIED MALE SPEAKER:

1     (unintelligible).

2                    MS. BURNES:  Okay.  You can pull that mic

3     right up to you.

4                    THE COURT:  It's -- it's not a good design.

5                    BY MS. BURNES:  (Cont'g.)

6                    Q.   Okay.  And can you tell the jury your

7     full-time job title please?

8                    A.   Lead Clerk for the Mays Landing Post

9     Office.

10                   Q.   And how long have you been the lead

11    clerk at the Mays Landing Post Office?

12                   A.   Ten-and-a-half years now.

13                   Q.   What are your responsibilities as lead

14    clerk?

15                   A.   I do scheduling.  I work the front

16    counter, (unintelligible) parcels, sort mail.

17                   Q.   And what's the zip code at the Mays

18    Landing Post Office?

19                   A.   08330.

20                   Q.   When you -- when you say that you work

21    the front counter, what does that mean?

22                   A.   Process packages, letters, whatever

23    the customer brings in.

24                   Q.   Okay.  So when an individual comes

25    into the post office to do a transaction, you're one of

1     the people at the window?

2                    A.   Yes.

3                    Q.   I want to direct your attention to

4     late 2017 and early 2018.  Did you begin to have

5     interactions with a postal customer in the Mays Landing

6     Post Office that stood out to you and your coworkers?

7                    A.   Yes.

8                    Q.   And what were those transactions?

9                    A.   Click-N-Ship their prepaid packages.

10                    Q.   And why -- why did the transaction

11    stand out to you?

12                    A.   They had yellow substance on it.

13                    Q.   Okay.  And what about the customer

14    stood out to you?

15                    A.   He had yellow hair, fingertips was

16    yellow sometimes and that's basically it.

17                    Q.   So he had yellow hair, do you mean

18    blonde hair?

19                    A.   No ma'am.

20                    Q.   Okay.  When you say his finger, his

21    fingertips were yellow?

22                    A.   Yes.

23                    Q.   Okay.  What did you and your

24    coworkers, how did you refer to this particular customer

25    among yourself?

1                      A.   The yellow man.

2                      Q.   And how often did you see the yellow

3      man?

4                      A.   Almost daily.

5                      Q.   And when you saw the yellow man daily

6      at the Mays Landing Post Office, can you tell the jury

7      what was the yellow man doing?

8                      A.   Bringing in prepaid packages.

9                      Q.   And when you say prepaid packages, can

10     you tell the jury what that means?

11                     A.   They print the labels at home which

12     they pay for and then they bring them in to us, we scan

13     them in.  Most people would leave them, but some ask for

14     receipts.

15                     Q.   And in -- in the case of the yellow

16     man having prepaid packages, was that somebody who stood

17     in line and waited to interact with a clerk?

18                     A.   Yes.

19                     Q.   And when you interacted with the

20     yellow man, how -- how far were you from him?

21                     A.   About two feet, two-and-a-half.

22                     Q.   Now in terms of the pattern, you said

23     that that this customer came in daily.  Was there a

24     particular pattern to -- to the yellow man and his

25     packages?

1                    A.    Other than the yellow substance, no.

2                    Q.    Okay.  And could you estimate how --

3          what the range of packages were that he dropped off every

4          day?

5                    A.    It could be one, it could be ten, it

6          could be more.

7                    Q.    Were there occasions when packages

8          were dropped off in the morning and there was a return to

9          drop off more packages in the afternoon?

10                   A.    Sometimes.

11                   Q.    And with respect to the packages

12         themselves, what sort of containers were used to ship?

13                   A.    Priority mail.

14                   Q.    And can you tell the jury what a

15         priority mail envelope is?

16                   A.    We have flat rate, we have boxes, but

17         most of the time it was a flat rate envelope which is

18         about a two-to three- day shipping.

19                   Q.    On occasion did you have to provide

20         priority mail envelopes to this customer?

21                   A.    Well, they are able to get them from

22         the lobby themselves.  They're stacked out and we would

23         just -- if it's somebody that gets a lot we would often

24         ask them if they didn't mind if we get them from the back

25         so they wouldn't take our supplies from the front.

1                    Q.   Okay.  And was the yellow man one of

2          those customers that you would offer --

3                    A.   Yes.

4                    Q.   -- envelopes from the back?

5                    A.   Yes.

6                    Q.   So showing you what's been marked as

7          Twenty-nine P, Fifty-four P, Sixty-nine P and Eighty-six

8          P.

9                    MS. BURNES:  May I approach, Your Honor?

10                   THE COURT:  You may.  And any counsel may

11         approach at any time.

12                   BY MS. BURNES:  (Cont'g.)

13                   Q.   Can you tell the jury what -- please

14         take a look at -- at Twenty-nine P.

15                   A.   Okay.

16                   Q.   And take a look at Fifty-four P.  And

17         take a look at Sixty-nine P and Eighty-six P.  Can you --

18         can you tell the jury what these four exhibits are?

19                   A.   They are prepaid Click-N-Ship

20         packages, three are priority and this one is just a

21         regular envelope.

22                   Q.   Okay.  Are these some of the packages

23         that you were just telling the grand jury, I mean, the --

24         the jury about?

25                   A.   Yes.

1                    Q.   Okay.  Are these -- are these packages

2          that were processed at the Mays Landing Post Office by the

3          yellow man?

4                    A.   Yes.

5                    Q.   Let's take a look then just on the

6          screen at the picture of Government's Exhibit Twenty-nine,

7          if you may just look on your screen, ma'am.  And is that a

8          fair and accurate picture of the -- of the physical

9          envelope in front of you?

10                   A.   Yes.

11                   Q.   And if we move to Government's Fifty-

12         four.  Is that a picture of the envelope that's Fifty-four

13         P?

14                   A.   Yes.

15                   Q.   And Sixty-nine, is that a picture of

16         Government Sixty-nine P?

17                   A.   Yes.

18                   Q.   And Eighty-six.  Is that a picture of

19         Government's Eighty-six P?

20                   A.   Yes.

21                   Q.   Do the pictures fairly and accurately

22         depict the -- the envelopes that you're holding ma'am and

23         their labels?

24                   A.   Yes.

25                   Q.   Okay.

```
 1                      MS. BURNES:  Your Honor, the government
 2          moves admission of Twenty-nine P, Fifty-four P, Sixty-nine
 3          P and Eighty-six P and the associated photos.
 4                      MR. GAMBURG:  No objection.
 5                      THE COURT:  They're admitted and may show
 6          -- may be shown to the jury.
 7                      MS. BURNES:  Thank you, Your Honor.
 8                      BY MS. BURNES:  (Cont'g.)
 9                      Q.   So let's start with Twenty-nine on the
10          screen.  And if -- and if you just want to hold Twenty-
11          nine P, can you just explain now to the jury what sort of
12          postal this is?  This is a priority mail envelope?
13                      A.   No, ma'am.
14                      Q.   Okay.  What sort of envelope is it?
15                      A.   It's just a bubble mailer.
16                      Q.   Okay.  And taking a look at the label,
17          the top of the page has Click-N-Ship.  Can you tell the
18          jury what Click-N-Ship is?
19                      A.   Click-N-Ship are the -- people at
20          home, they pay for it.  They put the labels on and they
21          bring them into the retail counter.
22                      Q.   Okay.
23                      THE COURT:  Let me interrupt one second,
24          counsel.  That monitor appears to be out.  So I notice all
25          the jurors are looking to this end of the box.
```

```
 1                    MS. BURNES:  And that's the moment --.

 2                    THE COURT:  It keen judicial instinct,

 3          figured it out.

 4                    UNIDENTIFIED MALE SPEAKER:

 5          (unintelligible).

 6                    THE COURT:  Excellent.

 7                    BY MS. BURNES:  (Cont'g.)

 8                    Q.   So directing your attention then to

 9          the label on Government's Twenty-nine.  What is the return

10          address on that label?

11                    A.   4630 Catawba Avenue.

12                    Q.   And is there an individual name

13          associated with that return address?

14                    A.   No, it's a business.

15                    Q.   Okay.  And let's take a look at

16          Government Fifty-four.  What is the return address on

17          Government's Fifty-four?

18                    A.   4630 Catawba Avenue.

19                    Q.   Okay.  And what's the business name

20          associated there?

21                    A.   Agro Fortis Supply (phonetic

22          spelling).

23                    Q.   Okay.  And on the first exhibit that

24          was SimCare Associates Limited.  Is that right?

25                    A.   Yes.
```

1             Q.   Okay.  Now, can you tell the jury and

2      perhaps we'll move forward to other exhibits.  Taking a

3      look at Fifty-four, can you -- can you show the jury what

4      you mean about the yellow tint on the envelopes were

5      labeled?

6             A.   On -- I don't know --.

7             Q.   Chose -- chose an envelope, ma'am.

8             A.   Okay.  So yeah, there -- there is a

9      yellow tint, when we were touching it was like a powdery

10     substance.  It wasn't just like the tint of the paper.

11            Q.   Okay.  You could -- you could feel it?

12            A.   Yes.

13            Q.   And -- and you put your hand around

14     the label?

15            A.   Yes.

16            Q.   Okay.

17            A.   They're yellowish.

18            Q.   And that's -- that's where a Click-N-

19     Ship customer would affix the label onto the envelope.  Is

20     that right?

21            A.   Correct.

22            Q.   Okay.  Now, you're holding up

23     Government's Fifty-four.  Is -- is -- has the yellow faded

24     in -- in use since that envelope was processed?

25            A.   I'm sure it has.

1                    Q.   Okay.  In your experience, do you

2       recall the yellow -- how do you recall the yellow?

3                    A.   They -- some were brighter, some were

4       less, but they were definitely more yellow than this.

5                    Q.   Okay.  Let's take a look at -- at

6       Government's Sixty-nine, if you take a look at that

7       envelope, what's the return address on Government Sixty-

8       nine?

9                    A.   4630 Somers Point Road.

10                   Q.   Okay.  Now, is that a different street

11      address than on the first two packages?

12                   A.   Yes.

13                   Q.   And what about the -- the business

14      name?

15                   A.   It's Agro Fortis Supply.

16                   Q.   Okay.  And directing your attention

17      then to Government's Eighty-six.  And what's the return

18      address on --

19                   A.   46 --

20                   Q.   -- that envelope?

21                   A.   4630 Mays Landing Road.

22                   Q.   Is that yet another address?

23                   A.   Yes.

24                   Q.   Now in terms of your contact with --

25      with your customer, who you call the yellow man and his

1 packages.  What if any concerns did you have in processing

2 packages such as these envelopes?

3     A.   We were concerned about the different

4 addresses -- addresses with the same name of the different

5 businesses going on.  So we gave it to our supervisor.

6     Q.   Okay.  And did you have any concerns

7 with respect to the yellow tint?

8     A.   Yes.

9     Q.   What were those concerns?

10     A.   Well, we didn't know what it was, so

11 we -- that's how we reported it to the supervisor.

12     Q.   I want to direct your attention to

13 February 1st of 2019.  Did a postal inspector interview

14 you about the customer whom you described as the yellow

15 man?

16     A.   Yes.

17     Q.   And had you identified a driver's

18 license photo of that customer?

19     A.   Yes.

20     Q.   Did you ever -- in the course of your

21 observations with this customer, did you ever see anyone

22 else with the yellow man processing these transactions?

23     A.   No.

24     Q.   And did you ever see anyone sending

25 mailings on his behalf?

1                     A.    No.

2                     Q.    Now it's been several years, ma'am.

3      Do you recognize anyone in court today?

4                     A.    Yes.

5                     Q.    And can you -- can you tell the jury

6      who you recognize?

7                     A.    The yellow man.

8                     Q.    Where do you -- can you just describe

9      where he's sitting please?

10                    A.    At the front table there in the blue

11     shirt.

12                    MR. GAMBURG:  Indicating the defendant,

13     Your Honor.

14                    THE COURT:  So noted.

15                    MS. BURNES:  Okay.  I have no further

16     questions.

17                    MR. GAMBURG:  May I, Your Honor?

18                    THE COURT:  Of course.

19                    CROSS EXAMINATION

20                    BY MR. GAMBURG:

21                    Q.    Before becoming a supervisor, did you

22     work (unintelligible)?

23                    A.    No, ma'am -- sir.  Excuse me.

24                    Q.    I did look a little feminine.

25                    MR. GAMBURG:   That's all I have, Judge.

1                THE COURT:  All right.  I assume there's no

2     redirect.  And with that --?

3                MS. BURNES:  No, Your Honor.

4                THE COURT:  All right.  Thank you, ma'am.

5     You're excused.  And as I understand it, that will be our

6     only witness for the day.  Is that correct?

7                MS. BURNES:  Yes, Your Honor.

8                THE COURT:  All right.  The first day of

9     trial, it's always very hard for the attorneys to know how

10    far we're going to get.  Sometimes we don't even get the

11    jury.  Sometimes we don't get the opening statement.  And

12    so if we can get one witness done, we're doing well.  So

13    we do get a little bit of an early break tonight.

14               Get a chance to go home.  Remember, please

15    don't start talking about the case.  If somebody says,

16    what do you got?  Say, I'm just on a criminal jury.  I'll

17    be happy to tell you about it later.  And don't be surfing

18    the web or doing any homework, okay.  All you need to know

19    you'll hear inside the four walls of the Courtroom.

20               All right.  And with that, we thank you

21    once again for your service, safe travels.  We'll do our

22    best to get underway right at nine thirty tomorrow

23    morning.  Mr. Henry will have your cell phones if you run

24    into a snag, you'll let us know.  So we're not guessing.

25    And with that, once again, let's all rise in respect for

1    the hard work of the jury.

2                          All right.  Counsel, we're all lined up for

3        tomorrow?

4                          MS. BURNES:  Yes, Your Honor.

5                          THE COURT:  All right.  If you don't need

6        me, then we'll adjourn for the night.  If you do need me

7        you'll let Mr. Henry know and I'll be in my – do my best

8        to be in touch.

9                          MS. BURNES:  Thank you, Your Honor.

10                         THE COURT:  All right.  Good night.

11                         (Off the record at 16:06:49)

12                         CERTIFICATION

13   I, Judith Spriggs, court approved transcriber, certify that

14   the foregoing is a correct transcription from the official

15   electronic sound recording of the proceeding in the above-

16   entitled matter.

17   *[signature]*

18   _____/
     Judith Spriggs
19   Associated Reporters Int'l., Inc.   10th September, 2022

20

21

22

23

24

25