```
 1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF PENNSYLVANIA
 2

 3   UNITED STATES OF AMERICA,     :Criminal Action No.:
                 Plaintiff,        :2:19-cr-00717-GAM-1
 4   v                             :
                                   :
 5   WILLIAM A. MERLINO            :
                 Defendants.       :Philadelphia, Pennsylvania
 6                                 :August 5, 2022 at 9:15 a.m.
                                   :
 7   . . . . . . . . . . . . . . .

 8             TRANSCRIPT OF CRIMINAL JURY TRIAL DAY THREE
                 BEFORE THE HONORABLE GERALD A. MCHUGH
 9               UNITED STATES DISTRICT COURT JUDGE

10     APPEARANCES:

11     FOR THE PLAINTIFF

12     USA:                   JOAN E. BURNES, AUSA
                              U.S. ATTORNEY'S OFFICE
13                            615 CHESTNUT ST. SUITE 1250
                              PHILADELPHIA, PA 19106-4476
14                            215-861-8577
                              Email: joan.burnes@usdoj.gov
15

16

17     FOR THE DEFENDANT

18     WILLIAM A. MERLINO:    ROBERT GAMBURG, ESQ.
                              GAMBURG & BENEDETTO
19                            Attorneys at Law
                              1500 John F. Kennedy Boulevard
20                            Suite 1203
                              Philadelphia, PA 19102
21                            215-567-1486
                              Email: Robert@gamburglaw.com
22

23

24

25
```

```
1   Court Recorder:  Michael Cosgrove/Christian J. Henry

2   Transcription Service:  Associated Reporters Int'l., Inc.
    10 River Drive
3   Massena, New York 13662

4
    Proceedings recorded by electronic sound recording;
5
    transcript produced by transcription service.
6

7          I N D E X   O F   P R O C E E D I N G S

8   EDWARD BORDEN; Sworn
    Direct Examination by Ms. Burnes              6,63
9   Cross Examination by Mr. Gamburg               43

10  ROBERT M. GOLDBERG, MD; Sworn
    Direct Examination by Ms. Burnes              67
11
    ARTHUR SIMONE, MD; Sworn
12  Direct Examination by Ms. Burnes              78
    Cross Examination by Mr. Gamburg              94
13
    BRIAN ARCARI; Recalled
14  Redirect Examination by Ms. Burnes           106

15
           E X H I B I T   L I S T
16  GOVERNMENT
    NINE-Ebay identifier                         118
17  FIFTY-ONE-Photo                              120
    SIXTY-FIVE-Photo                             126
18  SIXTY-SIX-                                   120
    Merlino sold the D.N.P. and distributed capsules
19  ONE HUNDRED SEVENTY-ONE                       17
    Email from Merlino
20  ONE HUNDRED SEVENTY-TWO-Email 8/9/21          26
    ONE HUNDRED SEVENTY-THREE-                    28
21  Letter from Dr. Goldberg
    ONE HUNDRED SEVENTY-FOUR                      35
22  Email to Merlino 8/13/21
    ONE HUNDRED EIGHTY P-Letterhead from office   67
23  ONE HUNDRED EIGHT-FIVE-Medical records       107
    ONE HUNDRED NINETY-ONE                       106
24  Records response to subpoena

25
```

**Associated Reporters Int'l., Inc.   518-465-8029**

```
1                      (The trial commenced at 09:13 a.m.)
2                 THE COURT:  Good morning, Counsel.
3                 MS. BURNES:  Good morning, Your Honor.
4                 MR. GAMBURG:  Good morning, Your Honor.
5                 THE COURT:  Just came in, I understand that
6       counsels have had the opportunity to look at the revised
7       points for charge overnight.  And that Mr. Henry says he
8       doesn't think there's any issues, but if so, let me know.
9                 MR. GAMBURG:  No issues on behalf of the
10      Defense.
11                MS. BURNES:  And no issues on behalf of the
12      Government.  Specifically, Your Honor, I think you invited
13      Government review of the -- of the venue provision and
14      I've no objection to the proposed defense one.
15                THE COURT:  All right.
16                MS. BURNES:  Which is the one you listed
17      first.
18                THE COURT:  We'll use the defense -- the
19      defense version, and -- and I did make some revisions in
20      the language of your points, Ms. Burnes.
21                MS. BURNES:  Uh-huh.  I saw that, Your
22      Honor.
23                THE COURT:  Okay.  So yeah, more by way of
24      clarity and just because it's going to be confusing.  And
25      so I just wanted to make sure you looked at those as well.
```

1      And if so --.

2                      MS. BURNES:  Yes, Your Honor.  I've -- I

3      reviewed everything.

4                      THE COURT:  Good.  Excellent.  Okay.  Good.

5                      MS. BURNES:  And -- and -- and -- and

6      clarity is welcome, and I have no objection.

7                      THE COURT:  All right.  Then I'll -- I'll

8      go back in and keep working on some other cases until we

9      have the Jury.

10                     MS. BURNES:  Yes, Your Honor.

11                     MR. GAMBURG:  Judge, just for the Court's

12     edification.  For Mr. Borden, I do have a few exhibits,

13     but it's really just continuous motion that was filed July

14     26th.  The Government's response, which I don't intend on

15     getting into the body of it, and the Court's order denied.

16                     THE COURT:  Sure.

17                     MR. GAMBURG:  I told Ms. Burnes, maybe that

18     -- that -- that level of specificity, but that's it.

19                     THE COURT:  Understood.

20                     MR. GAMBURG:  That's why.

21                     THE COURT:  All right.  Good.

22                     MS. BURNES:  Thank you.

23                     THE COURT:  Let's go off the record.

24                     (Off the record; 09:14:45 to 09:36:36)

25                     THE COURT:  District of Pennsylvania is now

1          in session.  The Honorable Gerald McHugh presiding.

2                    THE COURT:  All right.  Counsel, I

3          understand the Jury's here.  So we'll get underway.

4                    MR. GAMBURG:  Your Honor, with the Court's

5          permission, I'd like to introduce you (unintelligible)

6                    MR. (not provided):  Good morning, Your

7          Honor.

8                    MR. GAMBURG:  He's an associate.

9                    THE COURT:  Welcome, Mr. (unintelligible).

10                   (Jury enters)

11                   THE MONITOR:  All rise.

12                   THE COURT:  Ladies and gentlemen, welcome

13         back.  Thank you for your prompt attendance and we will

14         get underway with the Government's next witness.

15                   Ms. Burnes.

16                   MS. BURNES:  Your Honor, the Government

17         calls Mr. Edward Borden.

18                   THE MONITOR:  Please raise your right hand?

19         Do you swear or affirm that the testimony you shall give

20         to this court shall be the truth, the whole truth and

21         nothing but the truth, so help you God or you do so

22         affirm?

23                   MR. BORDEN:  I do.

24                   WITNESS; EDWARD BORDEN; Sworn

25                   THE MONITOR:  Thank you.  Please be seated.

1          Please state your name and spell it for the record?

2                    THE WITNESS:  Certainly.  Excuse me.

3     Edward Borden, B as in boy, O-R-D-E-N.

4                    DIRECT EXAMINATION BY MS. BURNES:

5               Q.   Good morning, Mr. Borden.

6               A.   Good morning.

7               Q.   Can you tell the Jury what you do for

8     a living, please?

9               A.   Certainly.  I'm a -- I'm a lawyer,

10    been a lawyer for forty-five years.  My -- what I do most

11    is federal criminal defense work.

12              Q.   And how long have you been doing

13    federal criminal defense work?

14              A.   Off and on for that entire time.

15              Q.   Are you appearing here today in

16    response to a trial subpoena, sir?

17              A.   I am.

18              Q.   And during the course of the

19    Government's investigation, did you produce documents to

20    the Government pursuant to a grand-jury subpoena?

21              A.   I did.

22              Q.   And in addition to those two

23    subpoenas, did the -- did the government seek a court

24    order from a different district court judge ordering you

25    to testify and produce those documents pursuant --?

1                    A.   That's -- that's correct.

2                    Q.   Is it -- I want to direct your

3      attention to the man sitting at the defense table.  Do you

4      recognize William Merlino?

5                    A.   I do.

6                    Q.   And is he a former client of yours?

7                    A.   Yes, I have represented Bill for some

8      time.

9                    Q.   Is it common for you to testify about

10     communications between yourself and a former client?

11                   A.   First time in forty-five years.

12                   Q.   I want to direct your attention to

13     case number nineteen dash seven one seven here in the

14     Eastern District of Pennsylvania.

15                   In December of 2019, after Defendant

16     Merlino was indicted by the grand jury, did you enter an

17     appearance in the criminal matter?

18                   A.   I did.  (Coughs)  Excuse me.

19                   Q.   And after -- after the defendant's

20     arraignment in the criminal matter, was the -- a -- a

21     trial date set shortly after the indictment?

22                   A.   There were a number of -- multiple

23     trial dates set.  I don't -- I don't recall how many, but

24     I'm -- I'm sure there was one set soon after the

25     indictment was returned.

 1                         Q.   Okay.  And direct your attention to

 2      March of 2020.

 3                         A.   Okay.

 4                         Q.   What happened with respect to trials

 5      in the Eastern District of Pennsylvania and ultimately

 6      your practice?

 7                         A.   Sure.  They're -- really all in-person

 8      court proceedings were put on hold and remained on hold

 9      for many months.  And there were general orders entered,

10      postponing all trials, including criminal trials, for

11      extended periods of time.

12                         Q.   And why was that?

13                         A.   Because of the COVID pandemic.

14                         Q.   And so I want to direct your attention

15      to the summer of 2021.  By that time had criminal trials,

16      including Defendant Merlino, were they resuming in this

17      district?

18                         A.   Yes.

19                         Q.   And in the summer of 2021, was this

20      case listed for trial?

21                         A.   It was.

22                         Q.   Was that a trial date in October of

23      2021?

24                         A.   It was a trial date in late October of

25      2021.

1               Q.   And with respect to a trial date, were

2     there various other dates in -- in the scheduling order of

3     a trial and advance of trial?

4               A.   Yes, the judge will normally set a

5     date when -- what are called pre-trial motions must be

6     filed, a date when each side must supply certain

7     information to the other side.  There are a number of,

8     sort of intervening deadlines that are normally set by the

9     trial judge.

10              Q.   And in the -- in July, in the summer

11    of 2021.  In July, did you file a motion with respect to

12    the trial schedule in October?

13              A.   I did.  I filed a motion to postpone

14    the trial based principally on some other trials I had or

15    one trial in particular that I had in New Jersey, that I

16    thought might conflict.

17              Q.   And did the Court grant your motion to

18    postpone the trial?

19              A.   The -- the judge did not.  He listened

20    to what we had to say, listened to what I had to say about

21    the scheduling issues and -- and determined that it was

22    unlikely to conflict.  In the end, he was absolutely

23    correct.  It did not or it would not have, let's put it

24    that way.

25              And so he denied the motion to postpone the

1          October trial of Dr. Merlino.

2                    Q.   So by the end of July, or by early

3          August, you scheduled for trial representing Defendant

4          Merlino in the indictment charging him with introduction

5          of misbranded drugs into interstate commerce?

6                    A.   Yes.

7                    Q.   And what, if any, steps did you take

8          that first week of August 2021 to communicate with your

9          client in advance of trial?

10                    A.   Well, the -- I don't -- I don't

11         remember the exact timing of the motion to -- to postpone

12         the trial, but Bill and I had obviously discussed that

13         ahead of time.  I told him I was going to make that

14         request to the Court.  And I filed the motion.

15                    The judge denied the -- the request.  And I

16         forwarded that order of the Court to Bill by email.  And I

17         should -- and I would just like to note here to be clear

18         that I -- that I understand that the order that required

19         me to testify in the grand jury also applies here, and

20         requires that I give testimony that I would not otherwise

21         give.

22                    Q.   Okay.  Sir, so moving forward to

23         approximately August 6th of 2021.  What, if any, trial

24         scheduling dates are significant about August 6th of 2021?

25                    A.   Well, the -- as I recall, there was a

1    deadline to file pre-trial motions that I think was August

2    6th.

3            Thereafter, as I say, there would have been

4    some other motions about or other deadlines about

5    submitting proposed jury instructions and questions to be

6    asked during voir dire, those sorts of things.

7            And then finally, there was a firm trial

8    date in -- in late October.

9            Q.   Okay.  So after the denial of your

10   motion to postpone the trial, did you speak with Merlino

11   prior to this pre-trial motions deadline on Friday,

12   October 6th -- Friday, August 6th?

13           A.   I think the only -- I -- I tried to

14   reach him.  I -- I, as I said, I emailed him.  The judge's

15   order denying a request to postpone early in August.  And

16   then I attempted to reach him by telephone several times

17   in the next few days to, you know, talk about a variety of

18   things.

19           Filing motions which honest -- honestly, I

20   had made a determination not to file.  I didn't think

21   there was anything to file.  But to discuss that further,

22   just to discuss pre-trial preparations, to discuss fee

23   issues, number of things that we needed to discuss, and I

24   tried to do that over several days and was initially

25   unable to reach him.

1               Q.   Okay.  So let's move forward to when

2      you were able to reach Defendant Merlino.

3               A.   Okay.

4               Q.   Did you have a conversation with him

5      in -- on late Thursday afternoon or early Friday of August

6      6th?

7               A.   Yeah, it was -- I -- I think it's by

8      coincidence, exactly one year ago today was either the 5th

9      or the 6th.  The -- the 5th of August, I think, it was

10     Thursday afternoon.  6th was Friday.  And I finally did

11     reach him by telephone.  I think it was probably Friday

12     morning, just looking back at some things.

13              But I did reach him.  I started to talk

14     about the matters I just mentioned.  And he interrupted me

15     and said, well, I -- I have some bad news.  I have been in

16     the hospital for the last few days.  And just -- was just

17     released yesterday.

18              And I've been diagnosed with pancreatic

19     cancer that has -- they believe has metastasized to my

20     liver.  And I obviously expressed my -- my concern for

21     Bill, known Bill at that point for probably fifteen years.

22              And I was, you know, expressed my concern

23     for him and said that -- that I felt in light of that --

24     that -- that the judge would quite likely postpone the

25     trial, so that his health condition could be addressed or

1          in any event that the judge would quite likely postpone

2          the trial.  And --.

3                      Q.    When --

4                      A.    Okay.

5                      Q.    -- when Merlino told you that he'd

6          been diagnosed with cancer, with pancreatic cancer --

7                      A.    Yes.

8                      Q.    -- that had metastasized to his liver.

9          What did you understand that to mean?

10                     A.    Well -- well, you know, just sort of

11         from general knowledge, I knew that pancreatic cancer was

12         a very very serious diagnosis, a very grave diagnosis that

13         -- as I said, just from general knowledge at that point I

14         believe to be one that did not have a -- well, that --

15         that resulted in -- in death, and most cases relatively

16         quickly if it had metastasized which is what he told me.

17                     Q.    And with that in mind, was it your

18         intent to seek a postponement of the October trial date

19         based on the information that Defendant Merlino gave you?

20                     A.    It was.  I mean, I -- my first thought

21         was that he would probably be in some pretty rigorous

22         treatment at that point.  And I, we did discuss treatment

23         in the call.  But I said, you know, I'm sure at that

24         point, you're -- you're not going to be feeling very well

25         because of whatever treatment you're having.  So I think

```
1    it's likely that the judge would postpone the trial.
2              And he said that he had not made a decision
3    or that -- that he and his doctor had not reached a
4    conclusion about what his treatment would be or whether he
5    would have any.
6              Q.   And what was your understanding about
7    a decision, about whether or not he would have treatment?
8              A.   Again, just sort of general knowledge.
9    But my general knowledge was that -- that sometimes people
10   with that diagnosis choose not to have treatment because
11   it's, I think it can be very invasive, and very often not
12   successful.
13             Q.   What, if anything, did you ask
14   Defendant Merlino so that you could ask the Court for a
15   postponement of the October trial?
16             A.   I told him that in my experience
17   dealing with medi -- medical issues and in court in the
18   past that -- that a judge would normally, if -- if I were
19   to bring something like that up to the Court, the judge
20   would most likely say, well, I'm sure you're being honest
21   with me, Mr. Borden, but I'd like to have something direct
22   from a professional who's involved.
23             And so I told Bill that I thought we -- I
24   thought he should call his oncologist and -- and get some
25   sort of report, didn't have to be long.  And number two, I
```

1      said that in my experience, very often, what's called a --

2      discharge summary at a hospital, from a hospital would

3      have a summary of diagnostic tests and that sort of thing.

4                    And -- and probably a diagnosis on the

5      discharge summary and that -- that should be pretty easy

6      for him to get and that would be helpful as well.

7                    Q.   Because he told you that he had just

8      been discharged from the hospital that --?

9                    A.   That's correct.

10                   Q.   And did you receive that information

11     from Defendant Merlino a letter and a discharge summary?

12                   A.   I did.  Within, I guess a day.  I

13     don't remember exactly.  But within -- within about a day.

14     I got a letter from a Dr. Goldberg whose letterhead showed

15     him to be an oncologist down in the Somers Point area near

16     where Bill lived.

17                   And also, a discharge summary from, as I

18     recall, it was Shore Memorial Hospital.  I don't remember

19     that for sure, but it was from --

20                   Q.   And how did you receive this?

21                   A.   -- a hospital.

22                   Q.   I'm sorry, I interrupted you.  How did

23     you receive this information from the Defendant?

24                   A.   By -- by email from Bill.

25                   Q.   Let's take a look at Government's

1      Exhibit One seventy-one for the parties only.  I approach

2      Mr. Borden.  You can look on your screen, you can also

3      look in the binder.

4                    A.   Got you.  This looks like a disaster,

5      but  -- yeah.  Thank you.

6                    Q.   And can you tell the Court what's

7      depicted at the top of One seventy -- what -- what's

8      depicted at Government's One seventy-one?

9                    A.   Sure.  Well, first page is a -- an

10     email of, I guess, you'd call it cover sheet, show --

11     showing that it was an email from William Merlino to me.

12     The subject was letter and discharge summary.  And it was

13     sent to me on Friday, August 6th, 2021 at two fourteen in

14     the afternoon.

15                    And there -- there was an attachment, which

16     is a -- well, it's - it's title is 2021 dot o eight dot o

17     six Goldberg dot P.D.F.

18                    Q.   And is this the email and the

19     documents you just testified about receiving from

20     Defendant Merlino?

21                    A.   It is.  The -- the first page and the

22     ensuing pages are what I received.

23                    MS. BURNES:  The Government moves admission

24     of Government's One seventy-one.

25                    MR. GAMBURG:  No objection at this time.

1                    THE COURT:  Admitted.

2                    MS. BURNES:  If we can publish that to the

3      Jury.

4                    BY MS. BURNES:  (Cont'g.)

5                    Q.   So Mr. Borden, if you can explain the

6      header of -- of the first page of Government's Exhibit One

7      seventy-one.  Is -- this is an email from William Merlino

8      to you?

9                    A.   Yeah.  And then if you look at the

10     bottom of the page, I don't know that I can show that.  It

11     shows E.B. zero fifty-two at the bottom of page.  That's -

12     - those are Bates numbers that my office put on these

13     documents when we produced them to the Government.  So

14     this is a copy of a printout from our email system.

15                   And at the top, what it shows, apparently,

16     when the system prints out an unknown name, unknown email

17     sender, it just inserts the name of the person rather than

18     the email address.  So that's what -- that's how our email

19     system printed this out.

20                   Q.   Okay.  And if -- if I'm understanding

21     you.  When it says from W. M. Merlino, there -- there's no

22     @gmail.com, for example, because this is an email that is

23     known to your law offices email system.

24                   A.   Correct.

25                   Q.   Did you communicate with Defendant

1          Merlino by email during the course of your representation?

2                         A.   Very -- very much.  That was --

3                         Q.   And likewise --.

4                         A.   -- probably ninety percent of our

5     communication was by email.

6                         Q.   And likewise, the -- the to line

7     @Borden.  That's you?

8                         A.   It is.

9                         Q.   What's the subject of this email?

10                        A.   Letter and discharge summary.

11                        Q.   And the date of the email?

12                        A.   Friday, August 6th, 2021 at two

13    fourteen in the afternoon.

14                        Q.   And the attachment to the email?

15                        A.   Attachment was 2021 o eight o six

16    Goldberg dot P.D.F.

17                        Q.   Okay.  So if we just pull-out again to

18    the first page.  There's -- there's no content in the body

19    of the email.  Is that right?

20                        A.   That's right.  Yes.

21                        Q.   This is a document you were expecting

22    from the Defendant based on the conversations you'd had

23    with him?

24                        A.   It is.

25                        Q.   Let's take a look at the second page

1          of Government's One seventy-one.

2                    A.   Okay.

3                    Q.   Can you tell -- and -- and likewise,

4          all of the pages of Government's One seventy-one contain

5          that E.B. prefix.  Is that right?

6                    A.   They do, yes.

7                    Q.   Okay.  So if -- if we take a look at -

8          - at the second page of One seventy-one.  What is depicted

9          here?

10                   A.   This is a letter that was attached to

11         the preceding page and came to me as part of the package,

12         if you will.

13                   Q.   Let's take a look at the letterhead on

14         this letter.  Whose letterhead does this purport to be?

15                   A.   It says, it's Robert M. Goldberg who's

16         an  -- an oncologist and hematologist in Somers Point.

17                   Q.   And you -- you testified that Som --

18         you knew Somers Point to be near where the Defendant

19         lived?

20                   A.   Correct.

21                   Q.   Let's take a look at the -- the date

22         of the letter and who it's addressed to.

23                   A.   Okay.  That's -- the date's August

24         6th, 21 -- 2021.  And it's addressed to William A.

25         Merlino, M.D.

1                    Q.   And what's the re of the letter

2      regarding?

3                    A.   Well, it says, William A. Merlino,

4      date of birth, that's blacked out.  D.X. which, I believe

5      to be diagnosis, abbreviation for diagnosis, carcinoma of

6      pancreas and then a number which I don't recognize, but I

7      assume it's some kind of medical billing code.

8                    Q.   Okay.  So let's take a look at the

9      body of the -- well, let's take a look at the bottom of

10     the letter.

11                   A.   Okay.

12                   Q.   Does the letter have a -- have a

13     signature?

14                   A.   Yup.  The signature, as I read it, is

15     Bob Goldberg above is Robert M. Goldberg, M.D.

16                   Q.   Okay.  And let's take a look at the --

17     at the body of the letter.  Can you -- who's -- who's the

18     letter addressed to?

19                   A.   It says it's -- in -- as you can see

20     in type, it's addressed to Dear Dr. Merlino, and the --

21     it's purported as if the author has crossed that out and

22     written in Bill.

23                   Q.   Okay.  And what does the author of

24     this letter write in the body of the letter?

25                   A.   You want me just read it?

1              Q.   Yes.

2              A.   Okay.  All right.  This is to confirm

3     our conversation regarding your diagnosis of metastatic

4     carcinoma of the pancreas.  We are presently awaiting the

5     genetic analysis of the tumor sample, and we'll meet to

6     develop a treatment plan.  Please contact me directly on

7     my cell phone with the following phone number if you

8     require additional information.

9              Q.   And this is a letter that you were

10    expecting to receive from the Defendant based on your

11    private conversations.  Is that right?

12             A.   It is.

13             Q.   Let's take a look at the next page of

14    Government's One seventy-one and pages three, four, five

15    and six.  One -- one document.  What's -- what's depicted

16    here.

17             A.   This is what I would call or what I

18    understand to be called a discharge summary which

19    summarizes date of admission, date of discharge, what

20    treatment was received during the period of a person's

21    hospital admission, what diagnosis there would be, what

22    physicians treated the -- the patient, some summary of

23    important lab results.

24             Q.   And this is information that you

25    expected  --

```
 1                        A.   It is.

 2                        Q.   -- to receive from the Defendant?

 3                        A.   It is.

 4                        Q.   Let's take a look at the -- at the top

 5      portion of this record.  From the -- from the heading

 6      through the admission date and time.

 7                        Directing your attention to the top of the

 8      page, who's the patient on this record?

 9                        A.   Well, Merlino being his last name,

10      followed by William.

11                        Q.   Is the lettering in -- in that

12      description, is that a uniform font?

13                        A.   It doesn't seem to me to be.

14                        Q.   Is it something you recognized at the

15      time?

16                        A.   I didn't notice that at the time, no.

17                        Q.   Okay.  And likewise, does this contain

18      a D.O.B. that's redacted, but it does reflect an age.  Is

19      that right?

20                        A.   Correct.  Eighty-four years.

21                        Q.   Okay.  And to your left, this -- this,

22      you -- you see that it's the -- the Shore Medical Center

23      which was a hospital known to you?

24                        A.   Yes.

25                        Q.   Okay.  Let's -- let's take a look.
```

1      What is the -- the date listed in this heading?

2                      A.   It's August 5th of 2021 at

3      approximately six p.m.

4                      Q.   Okay.  That's the -- that's the

5      discharge date on the bottom left?

6                      A.   Yes, yes, I'm sorry.

7                      Q.   Okay.

8                      A.   Is there another date?

9                      Q.   And -- and at the top of the page, is

10     there a date of August 1st?

11                     A.   Yes, it -- it -- what it reads is

12     08/01/2021 attending.

13                     Q.   Let's -- let's take a look at the

14     discharge diagnosis.  And taking a look at the first line,

15     what's -- what's the discharge diagnosis?

16                     A.   It says pancreatic mass, highly

17     suspicious for malignancy.

18                     Q.   Okay.  There's a -- there's a

19     strikethrough on that first line.  Did that appear in the

20     original document that -- that you received from the

21     Defendant?

22                     A.   I -- I don't remember seeing that, but

23     I don't -- we certainly didn't -- we certainly didn't do

24     anything to the documents.  So it must have been there.

25                     Q.   Okay.  These are the documents that

```
1          you produced --
2                       A.   Yes.
3                       Q.   -- off of your computer?
4                       A.   Yes.
5                       Q.   Okay.  And let's -- let's take --
6          let's take a look at the H.P.I. in hospital course.  Can
7          you read to the Jury the -- the first sentence depicted in
8          that?
9                       A.   Sure.  It says, he -- he is a very
10         pleasant fifty-six-year old Caucasian male with a
11         significant past medical history of basal cell carcinoma
12         and depression, who was admitted to Shore Medical Center
13         for -- for pancreatic mass.
14                      Q.   And can you also take -- read the
15         second sentence?
16                      A.   Sentence?
17                      Q.   Yeah, continue.
18                      A.   Sure.  He was in, I guess, it's his
19         usual state of health until approximately three weeks ago
20         when she, it says, developed upper abdominal pain which
21         had persisted.
22                      Q.   Okay.  I'm going to stop you right
23         there.  So the -- the pronouns in the -- in the sentence,
24         the two sentences you just read.  Is -- is -- is there
25         anything about the font that stands out to you today?
```

1                      A.    Yeah, I mean, looking at it today, I

2          note that he seems to be of a -- well, at least larger

3          type than the rest.  Male seems to be consistent with the

4          -- with the other -- the other type.  He, beginning the

5          second sentence looks to me consistent with the -- the

6          font.  And then was in her hurt -- hurst -- well, I can't

7          tell exactly what that word is.  Almost seems to be H-I-E-

8          R.

9                      Q.    Okay.

10                     A.    But whatever it is, that font looks

11         disturbed in some way.  Let's put it that way.

12                     Q.    And directing your attention to the

13         first sentence.  There is a description of the age of the

14         patient.

15                     A.    Right.

16                     Q.    What's -- what's the age of the

17         patient in this record?

18                     A.    It says that the patient is -- is

19         fifty-six-years old.

20                     Q.    Now, the time you received this

21         record, did you notice that?

22                     A.    I did.

23                     Q.    And what did you do about it?

24                     A.    I mentioned that in a phone call with

25         Bill and said that might -- might be good to check on

1    this.  I mean, I was aware that sometimes hospitals get

2    things like gender and age and things like that which

3    seems to be pretty straightforward to get it wrong.  So I,

4    you know, asked him to get -- get somebody in the hospital

5    to correct that.  And he said he would?

6              Q.   Okay.  Directing your -- and -- and

7    did he?

8              A.   He did.  He -- either in an email or

9    in our phone call, he said he would speak to the

10   hospitalist at the hospital which is an attending

11   physician in -- in the hospital.

12             Q.   Directing your attention to

13   Government's Exhibit One seventy-two for the -- for

14   identification only.

15             A.   Okay.

16             Q.   Mr. Borden, is this the email you --

17   you just described?

18             A.   It is.

19             Q.   Okay.  And what's the date of the

20   email?

21             A.   Monday, August 9th, 2021 at eleven

22   forty-five a.m.

23             Q.   Who is it from?

24             A.   It's from William Merlino to me.

25             Q.   And what's the subject?

```
 1                    A.    Medical records.

 2                    MS. BURNES:   The Government moves to admit

 3      Government's Exhibit One seventy-two and publish to the

 4      Jury.

 5                    MR. GAMBURG:   No objection in light of

 6      future witnesses, Your Honor.

 7                    THE COURT:  Admitted.

 8                    BY MS. BURNES:   (Cont'g.)

 9                    Q.    Okay.  Mr. Borden, if -- if you can

10      describe to the Jury what's depicted on -- on Government's

11      One seventy-two.

12                    A.    Sure.  As I said, this is the --

13      excuse me.  This is the email that I received -- or this

14      is an email that I received Monday after that conversation

15      with Bill about the age discrepancy.  And so I got this

16      email Monday morning with -- well, he -- at least here,

17      there's nothing attached.

18                    But I -- I recall that there were -- that

19      there was an attachment which was medical records, or

20      which was another printout of the discharge summary.

21                    Q.    Okay.  Directing your attention to

22      Government's One seventy-three.

23                    A.    Okay.  All right.

24                    Q.    After you got an email from Defendant

25      Merlino saying that he spoke with the hospitalist.
```

1           A.   Oh, all right.  All right.  I -- I

2      misunderstood.  Okay.  I -- I thought the document's text,

3      but -- okay.  I see.  Yes.

4           Q.   Did you -- that afternoon, Monday

5      afternoon.  Did you get another email from Defendant

6      Merlino?

7           A.   I did.

8           Q.   Did it contain a corrected discharge

9      summary?

10          A.   It did.  And another copy of the

11     letter from Dr. Goldberg.

12          Q.   And is -- is that what's depicted at

13     Government's Exhibit One seventy-three?

14          A.   It is.

15          MS. BURNES:  The Government moves admission

16     of Government's One seventy-three.

17          THE COURT:  Mr. Gamburg, any objection to

18     One seventy-three which is the corrected discharge

19     summary?

20          MR. GAMBURG:  No, Your Honor.

21          THE COURT:  Admitted.

22          BY MS. BURNES:  (Cont'g.)

23          Q.   Mr. Borden, similar to Government's

24     One seventy-one, can you just explain to the Jury what's

25     depicted in the -- in the header here?

1                    A.   Sure.  Again, it's a -- says that it's

2        from William Merlino to me.  Again, this is the - how our

3        office email system printed it out.  It says that the

4        subject is the corrected discharge summary, gives the date

5        of August 9th, 2021 and time of one twelve p.m.  And it

6        says that the attachment is 2021/08/06 Goldberg P.D.F.

7                    Q.   And looking below that, is there any

8        text in the body of the email?

9                    A.   There is not -- no, there is not.

10                   Q.   Okay.  And were you expecting this --

11       these follow-up records from --

12                   A.   I was.

13                   Q.   -- Defendant Merlino?

14                   A.   I was.

15                   Q.   Okay.  So let's take a look at the

16       second page of Government's One seventy-three.  It says

17       the same copy of the August 6th, 2021 Goldberg letter that

18       you just testified about?

19                   A.   It is.

20                   Q.   And moving on to the third page of

21       Government's Exhibit One seventy-three.  Does this

22       discharge summary still contain a strikethrough in line

23       one of the discharge diagnosis?

24                   A.   It does.

25                   Q.   Does it still contain -- and then with

1     respect to the next section, the H.P.I. and hospital

2     course?

3                A.   Yes.

4                Q.   What does the discharge documentation

5     now read?

6                A.   He -- he is a very pleasant eighty-

7     four-year-old Caucasian male with a significant past

8     medical history of basal cell carcinoma and depression,

9     who was admitted to Shore Medical Center for a pancreatic

10     mass.

11                Q.   Okay.  And upon receipt of these

12     records from Defendant Merlino, what did you do with them?

13                A.   Well, I did -- did a couple of things.

14     I think the first thing I did was to call the office of

15     Ms. Burnes, who was the prosecutor on the case and leave

16     her a phone message, brief phone message saying -- I -- I

17     don't recall exactly what I said, but it was essentially

18     that my client had a very serious medical condition.  I

19     may have said what it was.

20                And that I would be contacting the Court or

21     I would like to contact the Court with her to address this

22     matter.  I then wrote --.

23                Q.   And Mr. Borden, was that back on

24     Friday when you first --

25                A.   Yes.

1                              Q.    -- received the information?

2                              A.    Yes, it was on -- on Friday, the 6th.

3                              Q.    Okay.  And after contacting the

4          prosecutor's office in the matter, what, if any, other

5          contacts did you make on Friday when you would -- learned

6          this information?

7                              A.    Sure.  Then I dictated a letter to

8          Judge McHugh.  I -- that, as I recall, forwarded one of

9          these two documents to the Court and requested a

10         conference with -- with the Court and the Government to

11         discuss it.

12                             Q.    And upon -- on Monday, upon receipt of

13         the corrected discharge document, did you forward that to

14         the prosecutor's office?

15                             A.    I did.  I did.

16                             Q.    And where -- were there discussions

17         among the parties in -- in the matter with respect to

18         scheduling?

19                             A.    Well, yes, I -- I was able to reach

20         Ms. Burnes on Monday by telephone.  I, you know, talk a

21         little bit more about what I learned.  I remark -- I

22         remarked that there was a discrepancy in the age, I think

23         on the discharge summary.

24                             And I said we had a corrected one and I

25         sent both Dr. Goldberg's letter and the -- as I recall, I

1 sent both Goldberg's letter and the discharge summary to

2 the prosecutor's office, as I said, but not to the Court.

3     Q. Okay.  And what is it that you did

4 forward to the Court?

5     A. Okay.  The only thing I sent to the

6 Court was a copy of Dr. Goldberg's letter.

7     Q. And generally speaking, why -- why was

8 that?  Why did you not forward the additional record?

9     A. I was trying to minimize the invasion,

10 if you will, of Bill's privacy.  I just thought this --

11 this was going to be a very difficult time.  I certainly

12 thought that there was the potential that what I sent to

13 the Court would become part of the public record, just

14 because it's a court record.

15     And I wanted to minimize the -- the amount

16 of information about him personally that I -- I disclosed.

17     Q. Based on all this information, did you

18 forward a postponement of the October trial date?

19     A. Yes, in a -- in a formal -- well, the

20 sequence was that after Ms. Burnes and I spoke, I -- I

21 think later that day received either an email or a phone

22 call from the judge's chambers, saying that the judge

23 would like to have a telephone conference with counsel.

24     I think it was -- later in the week, I

25 think it was Wednesday afternoon it was scheduled.  So

1          that's in terms of scheduling, that's what happened.

2                         Q.   And after the telephone conference,

3          did you file a document with the Court?

4                         A.   I -- I --.

5                         Q.   As an officer of the Court moving for

6          a continuance of the October trial date?

7                         A.   Yes.

8                         Q.   And what was the basis for your

9          request for a postponement of the trial date?

10                        A.   That my client had a serious medical

11         condition that was potentially fatal and unlikely to

12         resolve before the October date?

13                        Q.   Would you have forwarded these

14         documents to the Court and the Government if you didn't

15         believe them to be true?

16                        A.   No.

17                        Q.   Would you have filed a record, a

18         docketed record with the Court based on your client's

19         medical condition, if you didn't believe it to be true?

20                        A.   Certainly not.

21                        Q.   Was -- your request for a postponement

22         of the trial, was that opposed by the Government?

23                        A.   It was not.

24                        Q.   And was your request for a

25         postponement of trial granted by the Court?

```
1                        A.   It was.

2                        Q.   And was trial continued?

3                        A.   The trial was postponed, sort of,

4        without a new date being scheduled because of the nature

5        of the situation.

6                        Q.   Did you -- and the trial is continued,

7        does the Court issue a formal order that lays that out in

8        writing?

9                        A.   It does.

10                       Q.   Did you send that order to Defendant

11       Merlino?

12                       A.   I -- well, my -- as I recall, my legal

13       assistant sent both a copy of the motion that we filed

14       requesting the postponement of the trial and a copy of the

15       judge's order granting it together, either the day of the

16       conference or the next day.

17                       Q.   Okay.  Let's take a look at

18       Government's One seventy-four.  Do you recognize

19       Government's One seventy-four?

20                       A.   I do.

21                       Q.   What is it?

22                       A.   This is an email on -- that -- that

23       was sent and received on Friday, August 13th, 2021.  It

24       was sent by William Merlino and received by me.

25                       Q.   Okay.
```

```
 1                    MS. BURNES:  The Government moves
 2      Government's Exhibit One seventy-four in evidence.
 3                    MR. GAMBURG:  No objection.
 4                    THE COURT:  Admitted.
 5                    MS. BURNES:  And permission to publish to
 6      the Jury.
 7                    BY MS. BURNES:  (Cont'g.)
 8                    Q.   Mr. Borden, this is an email where --
 9      I want to start in the middle of the page with the August
10      12th, 2021 at -- at two forty-three p.m.  Can you --
11                    A.   Okay.  Yup.
12                    Q.   -- tell the -- tell the Jury what's --
13      what's depicted there?
14                    A.   Sure.  This --.
15                    Q.   What was showed at the bottom.  Yeah.
16                    A.   Sure.  This shows that on August 12th
17      at two forty-three, I sent an email -- doesn't say to
18      whom, but I -- that I sent an email, the only text --.
19                    Q.   Is it -- if we scroll to the bottom of
20      the page?
21                    A.   Well, it's on -- it's on the screen.
22      The only text is my -- they call it a signature.  It's not
23      really a signature, but they call it a signature, which is
24      my name and office address, which is automatically
25      inserted in any email I sent.
```

```
 1                    And then at the bottom of the page, it's --
 2       it says that docket thirty-five, order continuing trial
 3       dot P.D.F. is attached.
 4                    Q.   Okay.  And -- and what does that
 5       indicate to you?
 6                    A.   That I attached a copy of the Court's
 7       order, postponing the trial to this email.
 8                    Q.   Okay.  And now going to --.
 9                    A.   Or to the August 12th email that I
10       sent.
11                    Q.   And going back to the top of the page
12       now.
13                    A.   All right.  And top of the page is an
14       email from William Merlino to me on Friday, August 13th at
15       seven thirty-six a.m.  And the text of that is, thank you,
16       sent from Dr. Bill's iPhone.  And that's a reply to the
17       email where I sent the order and motion.
18                    Q.   Okay.  And that's Friday, August 13th
19       of 2021?
20                    A.   It is.
21                    Q.   Did you have any communication with
22       your former client during the fall of 2021?
23                    A.   I don't -- I don't believe I had any
24       conversation with Bill after, you know, after the 13th
25       until after the first of the year of 2022.
```

1                Q.   Okay.  So moving forward to the first

2     of the year in 2022.  What, if any, communications did you

3     have with your former client?

4                A.   Well, I -- I called him sometime

5     shortly after the first of the year, because it was my

6     recollection and it's -- it's not in any court order or

7     anything, but was my recollection that the judge had

8     remarked that he would like to, sort of, have a status

9     report, for lack of a better term, after the first of the

10    year.

11               Q.   Okay.

12               A.   And so I called Bill, both to see how

13    he was on a personal level, and also to say that I, you

14    know, probably would need to report to the Court soon, and

15    wanted to check in, see how he was, you know, how are

16    things going, that sort of thing.

17               Q.   And shortly after that call, did --

18    did you receive a call from the prosecuting officer on the

19    case?

20               A.   Right.  I received a call from Ms.

21    Burnes within a few days of that, you know, saying --

22    asking essentially, the same thing is, sort of, where --

23    where things stand with Dr. Merlino.

24               Q.   And after you received that call, what

25    did you do?

1                        A.   I -- I communicated with Bill, I think

2        by email, and I guess, I should go back.  When I spoke to

3        him first, after the first year, I -- I remarked that it

4        would probably be helpful to have some kind of update

5        again from his physician, not just a report from me, so

6        that he should not rush, but try to get in touch with Dr.

7        Goldberg and get him to send him some sort of summary of

8        Bill's current condition.

9                        And he said he would do that.  So I then --

10       after I spoke to Ms. Burnes somewhere in the first week of

11       the New Year, I wrote an email to Bill saying, you know,

12       you probably should get that report from Dr. Goldberg

13       sooner rather than later.

14                        Q.   And -- and did you get a report from

15       your  -- your client in response to that email, that

16       request?

17                        A.   I did.

18                        Q.   Let's take a look at Government's One

19       seventy-five and Government's One seventy-five is -- is

20       likewise an -- an email thread.  Is -- is this the -- the

21       email thread that you just testified about?

22                        A.   It is.

23                        Q.   And did it come off of the E.D.?  Did

24       it come off of your office computers in -- in response to

25       the grand-jury subpoena?

1                              A.   It did.

2                              MS. BURNES:   The Government moves

3        Government One seventy-five.

4                              MR. GAMBURG:   (unintelligible) subject to

5        the other witness's (unintelligible).

6                              THE COURT:   (unintelligible) it up later,

7        yes.   Admitted.

8                              BY MS. BURNES:   (Cont'g.)

9                              Q.   So let's -- let's take a look at the -

10       - at the middle part of the email at eleven thirty-two

11       a.m.

12                             A.   Okay.

13                             Q.   What's -- what's depicted there?

14                             A.   That is my email of January 6th at

15       eleven thirty-two a.m. to Bill, saying Bill just got a

16       call from Burnes.   So I think it would be good to get that

17       letter, if you would, at --.

18                             Q.   And is -- is that a -- a reference to

19       the  -- to the discussion you just described?

20                             A.   It is.

21                             Q.   Okay.   And looking at the top header,

22       what's -- what's depicted on that header?

23                             A.   That -- that's says it's an incident -

24       - email from Bill Merlino to me, re update, the date of

25       the email is January 8th, 2022 at ten fifty-two in the

**Associated Reporters Int'l., Inc.   518-465-8029**

1    morning, and there's an attachment Goldberg letter to dot

2    P.D.F.

3                     Q.   Okay.  Now did Merlino's email to you

4    contain any other text on the -- on the face of the email?

5                     A.   Did not.

6                     Q.   Okay.  Did it contain an attachment?

7                     A.   It did.

8                     Q.   And directing your attention to page

9    two of the attachment that page two of Government's One

10   seventy-five.  Is -- is this the attachment to the email?

11                    A.   It is.

12                    Q.   And let's -- let's take a look at the

13   -- at the letterhead.  Is it the same doctor that -- that

14   we looked at on the -- on the August 6th letter?

15                    A.   It is.

16                    Q.   Okay.  And directing your attention

17   then to the -- to the date and the sender of the letter.

18   What's the date of this letter?

19                    A.   Date is January 7th, 2022.  And the --

20   it's addressed to William A. Merlino, M.D.

21                    Q.   And is -- is otherwise it's

22   (unintelligible) and the D.X.  Are they the -- the same

23   content as -- as the first letter?

24                    A.   Yeah, I believe, it is without

25   comparing, but I -- I recall it is, yes.

**Associated Reporters Int'l., Inc.   518-465-8029**

1               Q.   So let's -- let's take a look at -- at

2       this letter.  Is this letter signed?

3               A.   Well, there's no handwritten

4       signature, no.

5               Q.   Okay.  And who is this letter

6       addressed to?

7               A.   It's addressed to Bill Merlino.

8               Q.   And -- and who is the salutation

9       addressed to?

10              A.   Oh, reads to whom it may concern.

11              Q.   And what is the -- the di -- the

12      content of this letter?  The diagnose?

13              A.   Sure.  It says the -- that the current

14      diagnosis is adenocarcinoma of pancreas.  It says that the

15      present status is metastatic -- lesions to vertebral spine

16      and pelvis.  That the current treatment is palliative, and

17      it reads, please contact me directly on my cell phone with

18      a phone number, if you require additional information.

19              Q.   Okay.  And were you expecting to

20      receive information of this sort from your client?

21              A.   Yes.

22              Q.   At any point in time, did you tell him

23      to create a document?

24              A.   No.

25              Q.   When you've requested records and

1          information from him, did you tell them to -- fabricate

2          the record?

3                          A.   Absolutely not.

4                          Q.   Tell him to fake a record?

5                          A.   Nope.

6                          Q.   When you -- when you received the

7          letter that's attached to Government's One seventy-five,

8          what did you do with it?

9                          A.   I attached it to, I believe a letter.

10         Yes, a letter to the Court with a copy to the Government.

11         And I -- the substance of the letter was that I was

12         updating the Court on Dr. Merlino's condition and then I

13         requested a further continuance of the trial date.

14                         Q.   Was that request granted?

15                         A.   It was not.

16                         Q.   Did you receive information that Dr.

17         Goldberg had no patient by the name of William Merlino?

18                         A.   I did.

19                         Q.   And shortly after that, did you

20         withdraw from your representation?

21                         A.   Shortly after that, I filed a motion

22         to withdraw, which is what's required.  You can't just say

23         you're not representing somebody anymore.  You need to --

24         to file a request with the Court, and that was eventually

25         granted.

```
 1                      Q.   Did you believe Merlino had been
 2      diagnosed with pancreatic cancer when you forwarded these
 3      records to the Court?
 4                      A.   I certainly did.
 5                      Q.   Would you have supplied that
 6      information to the Court and the Government if you didn't
 7      believe it to be true?
 8                      A.   Certainly not.  I mean, it did --
 9      didn't occur to me that somebody would -- would say that
10      if it wasn't true.  I mean, I -- I just did -- didn't
11      cross my mind.
12                      Q.   Did you ever tell Merlino to fabricate
13      documents and a diagnosis in order to get the trial
14      postponed?
15                      A.   I did not.
16                      MS. BURNES:  I have nothing further, Your
17      Honor.
18                      CROSS EXAMINATION
19                      BY MR. GAMBURG:
20                      Q.   So you -- you re-funded on his fee,
21      right?
22                      A.   I don't think there was any -- any
23      refund thereafter, no.
24                      Q.   Because you were trying to get more
25      money prior to trial, right?
```

```
 1                      A.   I -- yes, we -- I had sent him a
 2      number of communications including a budget during the
 3      summer about -- to ask him to supply us with further
 4      retainer deposits, yes.
 5                      Q.   Did you provide that to Ms. Burnes?
 6                      A.   I did.
 7                      Q.   You did?  Okay.  I'll deal with that.
 8                      A.   Okay.
 9                      MS. BURNES:  I -- I will -- everything that
10      was supplied to Mr. Borden during the course of --
11                      THE WITNESS:  Okay.
12                      MS. BURNES:  -- discovery was provided to
13      the defense.
14                      MR. GAMBURG:  I'll deal with that.
15                      THE WITNESS:  Yeah, I -- I thought I did.
16      If I didn't --.
17                      BY MR. GAMBURG:  (Cont'g.)
18                      Q.   You -- you -- you wanted substantial
19      money, right?
20                      A.   Yes.
21                      Q.   To try the case, correct?
22                      A.   Yes, yes, yes.
23                      Q.   And it's your practice, when you make
24      a continuance request to advise your Defendant, sent him a
25      copy of it, right?
```

1                         A.   Yes, of the motion.  Yes.

2                         Q.   All right.

3                         MR. GAMBURG:  I'll mark this as D One with

4      the Court's permission.

5                         THE COURT:  You may.

6                         MR. GAMBURG:  Judge, I have a copy for the

7      Court.  I have a copy for counsel.

8                         MS. BURNES:  Thank you.

9                         BY MR. GAMBURG:  (Cont'g.)

10                        Q.   Sir, I'm showing you what I've marked

11     as D One.

12                        A.   Yes, sir.

13                        Q.   Take a look at it.  Is this a true and

14     correct copy of your motion to continue the trial that was

15     filed on July 26th of '21?

16                        MS. BURNES:  Objection.  Perhaps that's the

17     (unintelligible) copy, sir.  I have document thirty-one.

18                        THE COURT:  I have document thirty.  So I -

19     - I think --.

20                        MS. BURNES:  Okay.

21                        MR. GAMBURG:  I'm sorry.

22                        THE COURT:  Just the --.

23                        MS. BURNES:  Do you need this one?

24                        MR. GAMBURG:  No.

25                        THE COURT:  Just the photocopy switch.

1          MS. BURNES:  Okay.  Yeah, I -- I have

2     document thirty-one.

3          MR. GAMBURG:  Right.  That -- that's the

4     order.  I'm sorry.  Yup, that's your response.  I

5     apologize.

6          BY MR. GAMBURG:  (Cont'g.)

7          Q.   Did you have the opportunity to review

8     that?

9          A.   I did, yup.

10         Q.   And you have a duty (unintelligible)

11    to the Court, right?

12         A.   I do.

13         Q.   That means you got to be honest with

14    the Court, right?

15         A.   Absolutely.

16         Q.   So -- and you told the Jury already

17    that you practice is to send a copy of the motion to your

18    client, right?

19         A.   Yes, I would say that's true.

20         Q.   And you've (unintelligible), you know,

21    for fifteen years, right?

22         A.   I have.  About that, yup.

23         Q.   Never been at trial before, never had

24    criminal proceedings against you, right?

25         A.   Certainly not.

1                    Q.   His entire life's work is on the line,

2        right?

3                    A.   Certainly, my belief, yes.

4                    Q.   Okay.  So in your motion to continue

5        to trial, you advised the Court that trial was scheduled

6        to commence on Monday, October 25th, correct, of 2021?

7                    A.   Correct, yeah.

8                    Q.   And again, this was filed back in

9        July.  So August, September, October, three months, right?

10                   A.   Yup.

11                   Q.   Prior to the trial date.

12                   A.   Uh-huh.

13                   Q.   Do you agree?

14                   A.   Yes.

15                   Q.   You said that you had a case that was

16       scheduled to begin on September the 13th, right?

17                   A.   Yup.

18                   Q.   Did that case go to trial?

19                   A.   It did go to trial.

20                   Q.   Okay.  You then estimated the length

21       of the trial, correct?

22                   A.   Well, I said that -- I said that the

23       Government estimated that that trial would take a certain

24       length of time.

25                   Q.   Sure.  And then on the next page, your

1      -- the Merlino matter before this court is a complex

2      matter requiring a thorough preparation, right?

3                      A.   Correct.

4                      Q.   So you told the Defendant you owe me a

5      bunch of money and I'm not prepared for trial, right?

6                      A.   No, I didn't -- I didn't say that.

7                      Q.   You asked the Court to continue the

8      trial date.  Didn't you?

9                      A.   I did.  But this is --.

10                     Q.   The reason why you asked the Court

11     that the trial -- to continue the trial date is you had a

12     complex matter that was going to trial in September,

13     right?  Yes?

14                     A.   That was one of several reasons, yes.

15                     Q.   Well, the other reason was that the

16     Merlino matter required -- this complex matter requiring

17     thorough preparation.

18                     A.   Yup.

19                     Q.   Meaning that you weren't prepared.

20                     A.   Well, it -- it doesn't mean that I

21     wasn't prepared.  But this is -- this motion was filed,

22     let's see.  July 26th.

23                     Q.   Right.  We went through that.  Three

24     months.

25                     A.   So -- so was I fully prepared to start

1        the Merlino trial on July 26th?  No.

2                    Q.   Okay.  So that -- so you moved the

3        Court for continuance?

4                    A.   Because I thought, just to be clear, I

5        thought that the other trial, the trial in New Jersey

6        which was also complex would take a long time, might go up

7        to -- might take as long as to be very close to the start

8        of the Merlino trial.

9                    Q.   Okay.

10                   A.   And -- and therefore, I would need

11       more time.

12                   Q.   You told the Court, Judge McHugh that

13       Judge Wilson, who is the chief judge in the District of

14       New Jersey, had scheduled trial dates through October

15       15th, correct?

16                   A.   Correct.  That's true.  Yup.

17                   Q.   And trial in this matter was October

18       25th, leaving -- leaving a ten-day window?

19                   A.   Correct.

20                   Q.   But you essentially told the Court

21       that I need a continuance because it's a complex matter

22       requiring a thorough preparation.

23                   A.   True, yup.

24                   Q.   So in your communications with Dr.

25       Merlino, you basically said, look, you owe me a bunch of

1    money to try this case, right?  And I'm not going to be

2    prepared for it.

3              A.   No, I didn't say you owe me a bunch of

4    money.  I said, here is my estimate of the amount of time

5    and the expenses that will be incurred to prepare for

6    trial.  And asked him to get back to me with what -- what

7    his thoughts were in terms of payment arrangements.

8              Q.   Wasn't that part of your initial fee

9    agreement?

10             A.   I -- the -- no, there was not a

11   specific term in the initial fee agreement about the total

12   fee.

13             Q.   You agreed to undertake representation

14   of an eighty-four-year-old doctor in a criminal matter,

15   the most serious matter there is -- and -- and there's no

16   set fee?

17             A.   Oh, absolutely.  I mean, my fees

18   mostly -- almost always depend on the amount of time

19   spent.

20             Q.   Right.  And --.

21             A.   So -- so --.

22             Q.   Forty-five years of practice, you know

23   how much time is going to be spent getting ready for this

24   case?

25             A.   Oh, Lordy, no, I wouldn't have any --

1      any idea.  The -- the -- any number of things could happen

2      between when my representation of Dr. Merlino in this

3      matter began years before.  And when we went to trial,

4      that would have either added to or subtracted from the

5      amount of time and expense involved.

6                    Q.   You commenced your representation

7      after he was indicted, correct?

8                    A.   On this matter, no.  I commenced my

9      representation well before he was indicted.

10                   Q.   So you even knew what was going on

11     before he was formally charged?

12                   A.   Sure.

13                   Q.   You knew what they would say?

14                   A.   Yes.

15                   Q.   You had some exchange and some

16     discovery with Ms. Burnes?

17                   A.   We did, and we actually, as I recall

18     Dr. Merlino and I actually met with --.

19                   Q.   So you knew exactly what was involved

20     pre-indictment.  He gets indicted prior to the pandemic.

21                   A.   Yes.

22                   Q.   And you had already told us, which we

23     all know, virtually everything stopped for at least a few

24     months, right?

25                   A.   More than that, yup.

1              Q.   And then at -- at least with respect

2      to the Courts, they started doing some virtual work trying

3      to open things up because you got criminal defendants who

4      have rights, correct?

5              A.   Absolutely.

6              Q.   But no live trials, right?

7              A.   Well, there were no live trials and

8      there were no, to my knowledge, there were no video

9      criminal trials.

10             Q.   Right.  But, you know, the Government

11     was working remote.  Some of us were working remote.  Some

12     of -- everyone else was working remote, right?  Yes?

13             A.   Yes.

14             Q.   And again, you told us that the actual

15     formal charging documents -- the indictment, that occurred

16     prior to the pandemic, right?

17             A.   Correct.

18             Q.   So that I imagine the Government Ms.

19     Burnes  very, very diligent with her work.  I would

20     imagine that the Government gave you all the discovery,

21     right?

22             A.   They gave me all the discovery shortly

23     after the indictment, yes.

24             Q.   Sure.  So you had months and months

25     and months and months of no court, no live appearances,

1          plenty of time to prepare the case, right?

2                          A.   Yes, I think that's fair.

3                          Q.   And then certainly by that time, you

4          knew what was involved and you knew what would be involved

5          that the case had to go to trial, right?

6                          A.   I think that's fair.

7                          Q.   Okay.  And it's still no detailed fee

8          agreement as to how the payments were going to be made,

9          right?

10                         A.   That is correct.  There're reasons for

11         that, but that's correct.

12                         Q.   Okay.  So now, the motion is filed to

13         continue the October 25th trial date for the reasons that

14         we already covered.  Ms. Burnes, on behalf of the

15         Government responds and you will agree with me that on

16         August the 3rd of 2021, this honorable court issued an

17         order denying your motion for a continuance.  Do you agree

18         with that?

19                         A.   I agree.

20                         Q.   And the judge indicated that although

21         certainly, and I can attest to it, he -- he strives to

22         accommodate counsel given the environment, the pandemic

23         environment, the trial listings are scarce and he did not

24         want to waste any resources.  Is that correct?

25                         A.   Correct.

1          Q.   And you communicate that to Dr.

2     Merlino, right?

3          A.   I don't -- I don't know whether I

4     communicated those words whether -- what I -- I'm sure I

5     communicated was that the request to continue the trial

6     had been denied.  We discussed the motion before I filed

7     it.  And then I sent him the order denying that request as

8     soon as I got it.

9          Q.   Okay.  And -- and you had known Dr.

10     Merlino for fifteen years.  Did you ever know him to have

11     cancer?

12          A.   No.

13          Q.   Did you ever know -- have known him to

14     be depressed?

15          A.   I -- I -- I've never seen anything

16     that suggested that to me.

17          Q.   And you are a certified civil lawyer,

18     correct?

19          A.   I am.

20          Q.   You've handled accident cases,

21     personal-injury cases, right?

22          A.   I have occasionally handled personal-

23     injury cases, although they're not -- not many.

24          Q.   Your firm handles them, right?

25          A.   Oh, sure.  Absolutely.

1                      Q.   Okay.  And you have a -- a good

2        relationship with other partners, associates in your firm,

3        right?

4                      A.   I like to think so.

5                      Q.   You're familiar with medical records,

6        right?

7                      A.   I mean, as you can tell, I'm sort of

8        generally familiar with what's in a medical record, but

9        I'm not -- I wouldn't say I'm -- that -- that's a

10        strength.  Let's put it that way.

11                      Q.   Okay.  There's certainly people you

12        can ask, right?

13                      A.   For sure.

14                      Q.   And within three days from a

15        continuance being denied is when you first, according to

16        you, received an unsolicited medical record from Dr.

17        Merlino saying that he had pancreatic cancer?

18                      A.   It wasn't unsolicited.  I mean, I

19        asked him to send me medical records, so that I could

20        supply them to the Court.

21                      Q.   Right.  So July 26th continuous

22        request, August 3rd denied.  And then all of a sudden,

23        according to you, phone call not email saying, hey, by the

24        way, I have cancer.  And then you said send me the

25        records, right?

1            A.   Well, the phone calls in which he

2    mentioned that he -- in which he said he had cancer was --

3    was my phone call to him followed by -- or excuse me,

4    which was after several phone calls wherein I tried to

5    reach him.

6            Q.   And again, according to your

7    testimony, you never thought, gee, this is kind of odd,

8    continuance just got requested for the first time.  My

9    client that I've known for fifteen years says he's got

10   cancer.  Didn't think anything of that, right?

11           A.   Well, I thought a great deal of it.

12           Q.   I mean, honestly, you're happy because

13   now you can re-apply for the continuance before Judge

14   McHugh and get this thing pushed off, so you can get your

15   money squared away and your other trial squared away?

16           A.   No, I was not, in any sense, happy.

17           Q.   Okay.

18           A.   All right.

19           Q.   I'm sorry, I didn't want to interrupt.

20   Bill had become not a great friend, but a friend.  We had

21   dinner together once or twice.  I -- I liked him as a

22   person.  It -- in no sense was I happy about hearing that

23   he had pancreas -- had pancreatic cancer.

24           MR. GAMBURG:  Can we put up G One seventy-

25   one, please?  The third page of the exhibit?  And if -- if

1    we can if we can -- and thank you.  If -- if we can

2    highlight just that top part, the discharge summary and

3    the admission date?  Great.  Thank you.

4                    BY MR. GAMBURG:  (Cont'g.)

5                    Q.   So you say it's your practice to -- to

6    communicate, and then in this case, you did communicate

7    your continuance requests to the Court, right?

8                    A.   Yeah, I communicate -- well, certainly

9    I communicated my continuance requests to the Court.  But

10   I -- I also told Bill that I would be doing it.

11                   Q.   okay.  And you'd spoken to him, right?

12                   A.   Yes.

13                   Q.   Okay.  And this discharge document, as

14   an admission date of August the 1st of '21, right?

15                   A.   That's what it says.

16                   Q.   Prior to your continuance being

17   denied.

18                   A.   Yes.

19                   Q.   It has a discharge date of August 5th,

20   '21 after the continuance was denied, right?

21                   A.   I think that -- I just don't recall

22   the exact date when the continuance was denied.

23                   Q.   You were asked to go through this

24   document without objection.  Isn't that what it says,

25   August 5th, 2021?

1          A.   Oh, absolutely, yes.  I just --.

2          Q.   So you didn't think, gee, my friend,

3     my client of fifteen years the guy that I have dinner with

4     a couple of times, he was in the hospital when I made the

5     continuance request.  And he didn't call me.  He didn't

6     say, hey, you know, listen, man, forget about your

7     continuance request for lack of preparation.  I'm in the

8     hospital.

9          A.   Okay.  Well, I -- he wasn't by -- by

10    this document or anything else.  He wasn't in the hospital

11    when I made the request.  I made the request, the exhibit

12    you gave me on July 26th, 2021.

13         Q.   I -- I understand that.  What I'm

14    saying to you, sir, is that when you look at what he sent

15    you, it has an admission date and a discharge summary.

16         A.   I see that.

17         Q.   And you didn't say hey, what about the

18    continuance (unintelligible)?  You got cancer, man?  What

19    are you worried about?

20         A.   Well, I'm not sure I understand the

21    question, but no, I didn't -- first of all, I did not take

22    note of the admission date.  I'll tell you that.  When I

23    looked at this document, I didn't --.

24         Q.   Sure.

25         A.   I didn't take note that he had been

1    admitted that it said he had been admitted on August 1.

2                    Q.   So you've given this document to an

3    attorney for the United States Government.  You're then

4    going to follow-up and submit something to a United States

5    District Court Judge.  You didn't take notice of that?

6                    A.   I did not.

7                    Q.   Did you take notice if we can

8    highlight the H -- well, first of all, we can highlight

9    the H.P.I. in hospital for us.  Did you take notice that

10   it says, he is very pleasant fifty-six-year-old Caucasian

11   male?

12                   A.   I did note that.

13                   Q.   So then, either yourself or you go to

14   one of your partners that does this kind of work or the

15   associates, hey man, can I have a medical authorization

16   that I cannot sign and I'm going to have someone write it

17   down to Shore Memorial because I -- I like Merlino.

18                    But sometimes these clients go off the

19   wall.  Let -- let me go independently verify that he was

20   in the hospital by the simple expediency of filling out a

21   medical authorization.

22                   A.   If -- you're asking whether I did

23   that?  I did not and it did not occur to me to do that.

24                   Q.   Did you think it was odd?

25                   A.   The -- the age discrepancy?  I -- I

1      did think it was odd, but I also have seen lots of medical

2      records where the gender of the patient is wrong.

3               Q.   Including this one?

4               A.   Including this one, yes.

5               Q.   Okay.

6               A.   So it's -- I just know that that

7      happened.

8               Q.   So the age is off by twenty-eight

9      years (unintelligible) into dangerous territory, but for

10     lack of a better word, the gender was wrong, right?

11              A.   Yes.

12              Q.   You've known him for fifteen years.

13     You already told us that you knew of no past medical

14     history of basal cell carcinoma or any other cancer,

15     right?

16              A.   I didn't, but -- but I've had basal

17     cell carcinoma.  And I didn't tell Bill.  So I don't --.

18              Q.   Hope you're not looking at your

19     medical records.  We're looking at his medical records.

20              A.   I understand.  But all I mean is basal

21     cell carcinoma is not a -- it's a relatively common

22     diagnosis that people who spend too much time in the sun

23     get.  And depression, you know, I wouldn't have expected

24     Bill to, you know, tell me that every time he was

25     depressed.  So it --.

1                    Q.   Okay.  So you didn't know about any

2       past history of carcinoma?  You didn't know any past

3       history of depression, right?

4                    A.   Correct.

5                    Q.   After the discharge, there's an August

6       6th letter from Dr. Goldberg, right?

7                    A.   Yup.

8                    Q.   Did you ever reach out and call Dr.

9       Goldberg?

10                   A.   I did not.

11                   MR. GAMBURG:  Can we put up One seventy-

12       two, please?

13                   BY MR. GAMBURG:  (Cont'g.)

14                   Q.   This is now August the 9th, correct?

15       I know it's small, but ... thank you.

16                   A.   Yes, the date on this One seventy-two

17       is August 9th.

18                   Q.   Now clearly, this is in response to a

19       question from you.

20                   A.   It is.

21                   Q.   And what was the question?

22                   A.   Well, the question was -- well, what -

23       - the conversation was that I mentioned to him that I had

24       noticed that the record says that he's fifty-six.  And

25       obviously, that's not correct.  Could he get that

1     corrected?  And this was in response to that.

2            Q.   Why -- why would you have him get it

3     corrected rather than just go to the hospital or the

4     doctor?

5            A.   Because I thought he was in a much

6     better position to do that.  It's his -- it's his medical

7     record.  If there's an error in it, he could get it

8     corrected quite easily.  I get -- for me to get it

9     corrected would require all kinds of bureaucracy.

10           Q.   You wanted this case continued?

11           A.   I wouldn't have moved to postpone it

12     and -- if I did not think it was in Bill's benefit to have

13     the case continued.

14           Q.   And it's -- to Bill's benefit to get

15     the case continued because you weren't prepared?

16           A.   That's not the reason.

17           Q.   So you asked him to correct the

18     medical records, and in response, you received a corrected

19     medical record, correct?

20           A.   Correct.  Sure.

21           Q.   And still took no independent steps

22     whatsoever to verify its -- for its truthfulness, correct?

23           A.   You're right.

24           Q.   Did you go to visit him?  Did you go

25     to talk to him?  Did you see him in person?  Sorry, let me

```
1          withdraw that.
2                         Did you go to speak to him?
3                         A.   I didn't -- did not go to speak to
4          him, no.
5                         Q.   Did you ask him to physically come
6          into the office?
7                         A.   I did not.
8                         Q.   And it's fair to say for four months
9          until January, you took no steps to either meet with Dr.
10         Merlino or independently verify anything?
11                        A.   That's correct.
12                        MR. GAMBURG:  That's all I have, Judge.
13                        MS. BURNES:  A brief re-direct, Your Honor.
14                        THE COURT:  All right.  You may.
15                        RE-DIRECT EXAMINATION
16                        BY MS. BURNES:
17                        Q.   Mr. Borden, the subpoena for records
18         in this case, called for documents from June 2021 to
19         January 2022.  All records and communications regarding
20         seeking trial continuances on behalf of William Merlino in
21         19 C.R. seven one seven.  Is that right?
22                        A.   It is.
23                        Q.   And that's because it's a narrowly
24         tailored request because it's an unusual request to seek
25         records from an attorney about his client?
```

1          A.    That's correct.

2          Q.    That subpoena didn't call for -- for

3   fee information or the fee agreements.  Did it?

4          A.    It did not.  And I, if I may, thinking

5   about this since I've been sitting up here and after Mr.

6   Gamburg's questioning, I -- I do recall that I made a

7   decision that information concerning fee arrangements and

8   budgets and that sort of thing, was not covered by the

9   subpoena.  And therefore, I did not produce that,

10  documents related to that.

11         Q.    Now, after your July request to

12  postpone trial, based on your schedule, after that was

13  denied.  In your forty-five years of practice, have you

14  had continuance requests denied?

15         A.    Many -- yes, I certainly have.

16         Q.    Would you have been prepared for trial

17  in October -- or October 25th of 2021?

18         A.    I would have been fully prepared.

19         Q.    In your forty-five years of practice,

20  have you tried cases back-to-back?

21         A.    Certainly.  Well, I've tried cases

22  where -- the first trial wasn't even over that is the Jury

23  was literally out deliberating and we started another

24  trial.

25         Q.    And describing to the Court that a --

1 a trial is -- is complex and requires communication.  Is

2 that -- is that standard language that you -- that lawyers

3 use and that you use with respect to seeking a

4 postponement of trial?

5       A.   Yes, I mean, that said, I wouldn't --

6 I wouldn't say if it wasn't true, but yes.

7       Q.   In -- in a matter involving

8 misbranding, for example.

9       A.   Correct.

10       Q.   You -- you testified that you've --

11 you've known Merlino for fifteen years.  Would you -- and

12 that he was a friend.

13       A.   Yes.

14       Q.   Would you expect a friend to lie to

15 you about pancreatic cancer?

16       A.   Certainly not.

17       Q.   And you've -- you've represented

18 Merlino for several years as well?

19       A.   I represented him on purely civil and

20 business matters.  No -- nothing like this.

21       Q.   Would you expect a client to fake

22 medical records about pancreatic cancer?

23       A.   I would not.

24       MS. BURNES:  Nothing further, Your Honor.

25       MR. GAMBURG:  Nothing based on that, Your

1    Honor.

2                      THE COURT:  All right.  Thank you, Mr.

3    Borden.  You may step down.

4                      THE WITNESS:  Thank you, Your Honor.

5                      THE COURT:  That brings us to our mid-

6    morning break, members of the jury.

7                      THE MONITOR:  All rise.

8                      THE COURT:  Roughly ten minutes.

9                      (JURY EXITS)

10                     (Off the record; 10:59:56 to 11:13:05)

11                     THE MONITOR:  All rise.

12                     (JURY ENTERS)

13                     THE COURT:  All right -- all right, you're

14    prepared with another witness, Ms. Burnes?

15                     MS. BURNES:  Yes, Your Honor, the

16    Government calls Dr. Robert Goldberg.

17                     THE COURT:  Proceed.

18                     MS. BURNES:  Watch your step as we go, Dr.

19    Goldberg.  Can you step this way.  Watch your step, Dr.

20    Goldberg.  Please remain standing while you're sworn, Dr.

21    Goldberg.

22                     THE MONITOR:  Please raise your right hand.

23    Do you swear or affirm that the testimony you shall give

24    to this court shall be the truth, the whole truth, and

25    nothing but the truth, so help you God or you do so

1      affirm?

2                      MR. GOLDBERG:  I swear.

3                      WITNESS; ROBERT GOLDBERG; Sworn

4                      THE MONITOR:  Thank you, please be seated.

5      Please state your name for the record?

6                      THE WITNESS:  Robert M. Goldberg, M.D.

7                      DIRECT EXAMINATION

8                      BY MS. BURNES:

9                      Q.   Please have a seat, Dr. Goldberg.  Dr.

10     Goldberg, where do you work?

11                     A.   Somers Point, New Jersey.

12                     Q.   And how long have you been a

13     practicing oncologist?

14                     A.   July 1st, 1980, just finished forty-

15     two years and started my forty-third year of practice.

16                     Q.   I'm going to approach with what's been

17     marked as Government's Exhibit One Eighty P.  Can you

18     identify what One Eighty P is?

19                     A.   Yes, this page is my letterhead from

20     my office.

21                     Q.   Okay.  And One eighty is on the

22     screen.

23                     MS. BURNES:  The Government moves admission

24     of Government's Exhibit One eighty and One eighty P.

25                     MR. GAMBURG:  No objection.

1                    THE COURT:  Admitted.

2                    BY MS. BURNES:  (Cont'g.)

3                    Q.   And Dr. Goldberg, let's just take a

4       look at the -- at the top of the page here.

5                    A.   Yes.

6                    Q.   That's your letterhead.  On the left-

7       hand side of your letterhead, what -- what's depicted

8       there?

9                    A.   Has my name Robert M. Goldberg M.D.

10      and I am a diplomat of the American Board of Internal

11      Medicine, that is I'm board certified in both medical

12      oncology sub-specialty and in general internal medicine.

13                   Q.   And in the center of the page, your --

14      your full name?

15                   A.   Yes, it has my name -- actually it has

16      the name of the practice, my name -- the name of the

17      practice is Robert M. Goldberg M.D. P.A., Professional

18      Association, which means I'm incorporated and practice is

19      limited to medical oncology and hematology.

20                   Q.   What is that -- one moment, sir.

21                   A.   And -- go ahead.

22                   Q.   What does that mean, that your

23      practice is limited to medical oncology and hematology?

24                   A.   I don't -- although I'm broad

25      certified in general internal medicine, I don't treat

1      people with diseases such as diabetes, heart disease,

2      emphysema.  I'm qualified to do that but I limit my

3      practice only to folks who have malignant diagnoses and

4      blood disorders.

5                     Q.    Okay.  And so oncology is the

6      malignant diagnosis of cancer?

7                     A.    Medical -- medical oncology is the

8      medical management of patients who have cancers, malignant

9      diseases, tumors, leukemia, lymphomas, myelomas.

10                    Q.    And what's hematology?

11                    A.    Hematology specializes in blood

12     disorders, there's a crossover between that and medical

13     oncology, but it also covers problems like low blood

14     counts or high blood counts, bleeding disorders, clotting

15     disorders.

16                    Q.    And Dr. Goldberg, does your letterhead

17     have your office address and the office phone number?

18                    A.    There is the office address right

19     there, the phone and also my fax number.

20                    Q.    Dr. Goldberg, do you have a patient

21     named William Merlino?

22                    A.    No, I never have, I do not nor have I

23     ever had a William Merlino.

24                    Q.    Have you ever treated William Merlino

25     for cancer?

**Associated Reporters Int'l., Inc.   518-465-8029**

1          A.   No, I've never treated William Merlino

2     for cancer or for anything.

3          Q.   Now, in -- in your office area as a

4     practicing physician in Somers Point, New Jersey, are you

5     familiar with a Dr. William Merlino?

6          A.   I've known of him in practice, I

7     believe, he has retired.  I actually had not seen, spoken,

8     been in his presence for probably fifteen, twenty years

9     and I -- I know he practiced out in the Mays Landing area.

10         Q.   Without disclosing anything

11    substantive, did -- did you have a patient who was a

12    family member of Dr. Merlino?

13         A.   That is correct.

14         Q.   And how is it that you came to have

15    this patient as part of your practice?

16         A.   I have -- I -- I looked at the chart

17    and I saw the referral had been made by the -- referring

18    was Dr. William Merlino.

19         Q.   Now, is it your practice when you

20    receive a referral --

21         A.   Yes.

22         Q.   -- from another doctor, what, if

23    anything, is -- is your practice to acknowledge that?

24         A.   I'm sorry, could you say that again

25    what?

1                    Q.   Do you have a practice acknowledging a

2      referral from another doctor?

3                    A.   Yes, a letter is -- I generate a

4      letter on this letterhead, dear doctor, so and so, I met

5      your patient so and so today in office consultation and I

6      go over the history of what the patient presented with,

7      the physical findings on my physical examination,

8      laboratory findings that are present, also imaging X-ray

9      scans, M.R.I.s, CAT scans and below that comes a paragraph

10     that is impression what I think is going on and

11     recommendations, what to do about it.

12                    Q.   Did you follow that practice with

13     respect to the patient referred to you by Dr. Merlino?

14                    A.   Yes, and with every patient, I must

15     add.

16                    Q.   If we can take down One-eighty.   I

17     want to show you -- direct your attention to what's been

18     marked as Government's Exhibit One seventy-one and we'll

19     look at page two.   So it should appear on your screen.

20     I'm going to approach and put it in your binder as well.

21                    A.   Yes.   All right, thank you.

22                    Q.   One seventy-one, page two at the top

23     of the page says Robert M. Goldberg M.D. P.A.   Is that the

24     name of your practice?

25                    A.   That is correct.

1          Q.   Did you write this letter, sir?

2          A.   No, I did not write that letter.

3          Q.   Let's take a look at -- at the

4    letterhead on one seventy-one P two.

5          A.   If you notice on the second line, it

6    starts limited to medical oncology and hematology, my

7    genuine letterhead says practice limited to medical

8    oncology, this is not my letterhead.

9          Q.   And is -- is the font different on one

10   seventy-one page two than one -- your genuine letterhead,

11   that is one-eighty?

12         A.   Yes, that is correct because where the

13   genuine letterhead is all capitalized and this just has

14   capital letters on the beginning of each word and is not

15   capitalized.

16         Q.   And on your genuine letterhead at

17   Government's Exhibit One eighty, the acknowledgment of --

18   of your certification.  Does that appear on Government's

19   One seventy-one, page two?

20         A.   No, it certainly does not.

21         Q.   Let's take a look and -- and fair to

22   say that prior to being shown this -- this August 6 letter

23   by the Government, had you ever seen it before?

24         A.   No, this is --.

25         Q.   Let -- let's take a look at that --

```
 1        let's take a look at the substance of the letter.  Do you
 2        see that there is a line on the August 6 letter that
 3        begins with D.X.?
 4                    A.    D.X. Carcinoma of Pancreas T3A-N2-M5.
 5                    Q.    What if anything does that mean to
 6        you?
 7                    A.    It means whoever wrote that didn't
 8        know what they were writing because there is no such
 9        entity as M5, we use a stage -- we use a nationwide
10        international staging system for cancer call the T for
11        Tumor, the N for Lymph nodes, and the M for the spread of
12        distant disease call Metastasis.
13                    If there is cancer elsewhere in the body,
14        it is M1, if there is no cancer elsewhere it's M0, there
15        is no M2, M3, M4, M5, that is fraud.
16                    Q.    Dr. Goldberg, if we can pull back on
17        the letter let's -- let's take a look at the bottom of the
18        page.  Does it appear to have a signature?
19                    A.    Yes, it does.
20                    Q.    Is that your signature, Dr. Goldberg?
21                    A.    That is not my signature.
22                    Q.    And if we can pull back out and take a
23        look at the contact line?
24                    A.    I have no idea what that cell phone
25        number is, but it is not my cell phone number.
```

**Associated Reporters Int'l., Inc.   518-465-8029**

1                      Q.    Okay.  So if I just may ask the

2      question then.  Is that your cell phone number?

3                      A.    That is not my cell phone number.

4                      Q.    Now, Dr. Goldberg, I want to show you

5      another doc -- document that's already been marked and

6      admitted into evidence.  This is Government's One seventy-

7      five P two.  And if we can acknowledge that for the doctor

8      top half the page.  Dr. Goldberg, did you write this

9      letter dated January 7th --

10                     A.    No, I did not.

11                     Q.    -- of 2022?

12                     A.    No, I did not write this letter.

13                     Q.    With respect to the letterhead at the

14     top of the page.  Is that your letterhead?

15                     A.    That is not my letterhead.

16                     Q.    With respect to the diagnosis in the

17     middle of the page, does it contain the same error that

18     you just described?

19                     A.    The same error that I just went

20     through before.

21                     Q.    And to the -- to the middle of the

22     page where it says please contact me.  Is that your cell

23     phone number ending eight zero zero two?

24                     A.    That is not my cell phone number.

25                     Q.    And finally, Dr. Goldberg, is this

1    letter signed?

2                A.   No, it -- not only it is not signed

3    but when I finish a letter at the bottom is Robert M.

4    Goldberg, M.D. in this letter there is a new paragraph --

5    two spaces between Robert M. Goldberg M.D. and right below

6    it R.M.G./dragon dictate which is my dictation system and

7    when I dictate letters as I was doing even yesterday, it's

8    immediately below the Robert M. Goldberg, M.D., not two

9    spaces below.

10               Q.   Prior to being shown this letter by

11   the Government, have you ever seen it before?

12               A.   Not until the Government contacted me

13   with in -- in January that was the first when they

14   contacted me and I said what's going on here.

15               Q.   Okay.  And -- and at that time were --

16   were you advised that there was inquiry about you -- your

17   patient William Merlino?

18               A.   That's when I first learned about

19   this.

20               Q.   And were you surprised by that call?

21               A.   Surprised is an understatement.

22               Q.   I want to direct your attention back

23   to Government's Exhibit One seventy-one, page three.  And

24   generally, so as we take a look at the -- at the top of

25   the page -- the top of page three.  Do you practice in

1      Shore Medical Center?

2                     A.   Yes, I am happy to say, I've been

3      president of the medical staff there, set up the division

4      of medical oncology one -- after I arrived in 1980 from

5      Fox Chase and my office is one block away.

6                     Q.   And with respect to the -- the

7      document that -- that's depicted on -- on this page of

8      Shore Medical Center records, is there anything that

9      appears unusual to you with this?

10                    A.   Yup, just starting at the top, there

11     is a typo and the individual's first name is lowercase.  I

12     have never in forty-two years seen that type of typo, this

13     would be the first time ever seen just that it hit me,

14     just looking at it like that.

15                    Q.   And directing your attention to the --

16     to the -- to the bottom of the page, the primary-care and

17     the consulting provider if we can take a look at that?

18     Are you familiar with individuals who have those -- those

19     names?

20                    A.   Primary -- it -- there is an

21     individual in Somers Point with a surname of McMurray but

22     it is Anne, A-N-N-E McMurray and she is either a nurse

23     practitioner or an advance, either an N.P. or an A.P.N.

24     and not an M.D. or a D.O.

25                    Q.   And we can take that down.  Dr.

1     Goldberg, you actually do treat patients for cancer, is

2     that right?

3                A.   That's all I do basically and

4     hematology, yes.

5                Q.   And among cancer diagnoses, how

6     serious is a pancreatic cancer diagnosis for a patient and

7     their loved ones?

8                A.   Pancreatic cancer is dreadful for --

9     the beginning reason is there are no early warning signs.

10    There is no effective screening as there is, for instance,

11    with breast cancer with a mammogram with prostate cancer

12    P.S.A. with lung cancer screening, sadly for pancreatic

13    cancer -- by the time a person has symptoms of it, it is

14    almost entirely too far gone to use the word curable sadly

15    to say.

16               And the mortality of that is -- is

17    dreadful.  It's been dreadful when I started and sadly

18    it's made slower progress than I would have loved to have

19    seen.

20               Q.   And when you say mortality, sir.

21               A.   Death rate.

22               Q.   Dr. Goldberg, having taken a look at

23    these documents, how do you feel about your name, your

24    practice area, and your credential venues being used

25    without your consent?

```
 1                    MR. GAMBURG:  Objection.

 2                    THE COURT:  I'll sustain that.

 3                    MS. BURNES:  I've nothing further, Your

 4        Honor.

 5                    MR. GAMBURG:  No question, Judge.

 6                    THE COURT:  Thank you, Dr. Goldberg.  You -

 7        - may step down.

 8                    THE WITNESS:  Excused?

 9                    THE COURT:  You are, thank you.

10                    MS. BURNES:  Your Honor, the government

11        calls Dr. Arthur Simone.

12                    THE COURT:  All right.  Don't trip on that.

13                    THE MONITOR:  Please raise your right hand?

14        Do you swear or affirm the testimony you shall give to

15        this court should be the truth, the whole truth, and

16        nothing but the truth, so help you God or you do so

17        affirm?

18                    MR. SIMONE: I do so.

19                    WITNESS; ARTHUR SIMONE; Sworn

20                    THE MONITOR:  Thank you, please, be seated.

21        Please state your full name and spell it for the record.

22                    THE WITNESS:  Arthur Simone, A-R-T-H-U-R S-

23        I-M-O-N-E.

24                    DIRECT EXAMINATION

25                    BY MS. BURNES:
```

1                    Q.   Good morning, Dr. Simone.

2                    A.   Good morning.

3                    Q.   And in fact, I'm going to just close

4         that binder in front of you.  Can you tell the Jury your

5         current job, sir?

6                    A.   I am a -- the senior medical advisor

7         in the Office of Unapproved Drugs and Labeling Compliance

8         at the Food and Drug Administration.

9                    Q.   And can you briefly describe your

10        educational background?

11                   A.   I have a bachelor's degree in

12        engineering science, a Master of Science and Doctor of

13        Philosophy in bioengineering, medical degree, Doctor of

14        Medicine, and a certificate in public health.

15                   Q.   And can you describe your early work

16        experience that brought you to the F.D.A.?

17                   A.   Following medical school, I was on the

18        faculty at the University of Pennsylvania as a practicing

19        anesthesiologist.  And actually before that, I did an

20        internship in medicine and surgery at Presby Penn and then

21        an anesthesia residency at Penn State, Hershey.

22                        Then I started as a faculty member at Penn

23        and then went into private practice in Montgomery County

24        and became because of takeovers, a faculty member at

25        Hahnemann M.C.P. and then ultimately Drexel.  And then

1    after that I went to the Food and Drug Administration.

2                   Q.   What are your responsibilities as the

3    senior medical advisor at the Office of Unapproved Drugs

4    and Labeling Compliance?

5                   A.   My primary responsibility is to look

6    at information that I'm provided to determine if a product

7    qualifies as a drug, sometimes I'm asked if it also

8    qualifies as a prescription drug and whether that product

9    is either generally recognized as safe and effective or is

10   it a new drug.  And if it's a new drug, has it been

11   approved.

12                  Q.   And how long have you had this job?

13                  A.   A little over six years.

14                  Q.   Have you had other jobs in the F.D.A.

15   center for drug evaluation and research?

16                  A.   Prior to my current position, I was a

17   clinical reviewer and medical officer in the Office of New

18   Drugs which is the one that's responsible for approving

19   new drug products in the Division of Anesthesia, Analgesia

20   and Critical Care products.

21                  Q.   Dr. Simone, I want to ask you some

22   questions about the F.D.A. regulation of human drugs.  How

23   long has F.D.A. and its predecessors regulated human

24   drugs?

25                  A.   I would say technically since 1906

1          when congress passed the pure food and -- pure food and

2          drug bill, pure food and drug act.

3                    Q.    And is -- is that what prohibited

4          interstate commerce and (unintelligible) food and drugs?

5                    A.    Yes.

6                    Q.    Let's move forward then.  Can you tell

7          the Jury about the creation of the F.D.A. itself in the

8          federal food and drug cosmetic act?  What year was that?

9                    A.    That was 1938.

10                   Q.    And what -- what generally is required

11         of drugs in the Federal Food and Drug Cosmetic Act of

12         1938?

13                   A.    In 1938, one of the biggest elements

14         of the act was that before a drug could be brought to

15         market in the United States, it had to be proven to be

16         safe for its intended uses.

17                   Q.    And act of safety in 1938, what are

18         the amendments in 1962?

19                   A.    A number of things but one of the --

20         the bigger ones was that before a drug could come to

21         market in the United States, it had to be proven safe and

22         effective for its intended uses.

23                   Q.    And what does effective for an

24         intended use mean?

25                   A.    Basically, that the drug claim -- does

1           what it claims to do, so if it's a blood pressure medicine

2           that it actually does lower blood pressure, cholesterol

3           medicine actually lowers cholesterol, things like that.

4                      Q.   So when I just briefly asked you some

5           key questions about the drug-approval process today, what

6           are the key steps that a person or company has to do if

7           they want to manufacture and market a drug in the United

8           States?

9                      A.   The initial step would be to actually

10          come up with the drug product, so you -- you find an

11          ingredient that you think -- a new chemical that you think

12          is going to do something to treat a disease.  And then you

13          make it into the drug form, this chemical is going to be

14          put in a pill or some kind of liquid to be injected, and

15          you develops that product and you set standards for it.

16                     And once you've gotten it to the point

17          where you have the recipe for, what active ingredient,

18          what inactive ingredients, the specifications for them how

19          pure do they have to be, how you're going to manufacture

20          it and just start to come up with the actual drug product.

21                     The second step is to start assessing its

22          safety and that's done in animal studies and we have small

23          groups of animals and they're given low doses of the drug

24          and if they seem to tolerate it well and you analyze the

25          animal, make sure it's not harming kidneys, liver, brain,

1           skin, heart, lungs.

2                        Then you can get another group of animals

3           and increase the dose and that's done until you either

4           find some kind of a harmful effect, toxic effect as we

5           call it or death.

6                        And then once we have information -- and if

7           -- animals actually can have the same disease as humans,

8           you also look to see, does this drug actually work in

9           animals and once you have that information then you come

10          to the F.D.A., if you think you're ready to start doing

11          studies in human beings.

12                        Q.    And -- and if -- what's the next step

13          in the approval process then with F.D.A. after animal

14          studies moving into human beings?

15                        A.    So the human studies are broken down

16          into phases and there are four phases, three of which you

17          complete before you seek approval.  So the first phase is

18          done with healthy volunteers and these are small groups of

19          subject humans that are given different doses of the drug

20          product to look at safety and effectiveness -- I'm sorry,

21          safety and tolerability.

22                        So it's kind of like the animal studies but

23          now in humans and you keep doing that until you reach a

24          point where the humans either do not tolerate it -- you

25          know, you take the pill and it just gives you nausea or

1   vomiting, headache, whatever.  And you said, I can't take

2   this anymore or where you find some kind of toxicity, some

3   kind of harmful effect.

4           So in humans you're -- you're evaluating

5   lung function, heart, kidney, liver function, things like

6   that, that's phase one.  If you do that and you still

7   think the drug is capable of going on, you enter phase

8   two.  Phase two is what we call dose escalation studies,

9   so now you get people that actually have the disease you

10   want to treat and you break them up into small groups.

11          And first group, you give a low dose of the

12   drug to them and you see does it work -- does it lower the

13   blood pressure, cholesterol, treat their infection and can

14   they tolerate it.  And if so, take another group and you

15   go with a slightly higher dose.  And what you're trying to

16   do with these studies is typically the more drug you give,

17   the more of an effect it will have, but the more drug you

18   give the more side effects you have, the more harmful

19   effects.

20          So you're trying to find that sweet spot in

21   the middle where you get the most bang for your buck

22   essentially.  You'll have the most effect with the minimal

23   amount of harm.  And once you've identified that dose then

24   you come to F.D.A. and say here's what we've got so far

25   and -- and just to be clear up to this point, every time

1    you want do one of these studies a protocol is prepared,

2    you know, here is what we're going to do, here's how we're

3    going to do it, here's how we're going to protect our

4    subject, all of that information is submitted to the

5    F.D.A.  We look it over and if we think it's not safe for

6    them to proceed, we can stop the studies otherwise they

7    proceed.

8            Q.   And so what's the next step?

9            A.   So phase three is a big trial.  Now,

10   I've identified this dose that I think is going to really

11   work with the least amount of harm, I have to prove to the

12   F.D.A. that this is going to be safe and effective for the

13   intended use.  So these studies are scientifically divide

14   -- developed and designed to study that and prove usually

15   within ninety-five percent certainty that the drug has the

16   desired effect and these are large-scale studies, this can

17   be hundreds to thousands of patients that are involved in

18   it.

19           Q.   So before a drug can be marketed or

20   sold, in the United States needs to go through this

21   approval process that you just described?

22           A.   What happens when all the studies are

23   completed, a company will submit what's called a new drug

24   application to the Food and Drug Administration.  And this

25   application has all that information in it from

1          information regarding the -- the quality of the drug which

2          is how they make it.  Where do you get your ingredients

3          from, how do you test those ingredients, where are you

4          manufacturing this, we don't inspect those facilities,

5          what are the standards you're using, how are you testing

6          the final product to make sure it's as pure as it's

7          supposed to be and has the right amount of ingredients,

8          that's one part.

9                    The animal-study information is provided

10         and then the human-study information is provided.  And the

11         proposed labelling for the product is also provided.

12         That's all part of the new drug application.  And

13         technically, F.D.A. doesn't approve an active ingredient

14         and we don't approve a drug product.

15                    It's the new drug application that we

16         approve because that has all this information related to

17         that product.  And technically, nothing can change

18         regarding that product without F.D.A. clearance first.

19                    Q.   Dr. Simone, so final approval involved

20         more than just the active ingredient in the drug?

21                    A.   That's correct.

22                    Q.   Is that correct?  Now, you mentioned

23         labelling --

24                    A.   Yes.

25                    Q.   -- label and labelling, can you -- can

1          you explain to the Jury what a label is in this context?

2                         A.   So every drug product comes in, what's

3          called an immediate container.  So if it's pills, it's the

4          little jar with the pills in it.  If it's an injectable

5          drug, it's that little vial that glass container that has

6          the -- the drug itself in it.  The label is whatever piece

7          of paper is adhered to that immediate container.

8                         Q.   And does -- is there certain

9          information that needs to go on the label?

10                        A.   Yes.

11                        Q.   What type of information is that?

12                        A.   The name of the drug, the active

13         ingredient or ingredients that are contained in the drug,

14         the amount of those ingredients that are contained in the

15         drug.  If it's a prescription drug, it has to have Rx only

16         on the label.  The name of a manufacturer, package or --

17         or labeler for the drug has to be on there.  Usually, a

18         lot number or batch number has to be on there and an

19         expiration date.

20                        Q.   When you make reference to the

21         manufacturer, is that the manufacturer of some key

22         ingredient or the manufacturer of the actual drug product?

23                        A.   Of the actual finished drug product.

24                        Q.   And -- and why is that?  Why is that

25         F.D.A. needs to know where the drugs are actually

1      manufactured?

2                 A.   We needed a name of one of those

3      entities so that if there's ever a problem with the drug

4      and someone calls in, we know who to contact.  So if I've

5      taken a pill and, or if one of my patients takes the pill

6      and dies and the family member says we had this drug for

7      years and no problem.

8                I can call F.D.A. and say hey, we have this

9      medication and this patient died.  And they'll say well,

10     who made it and what's the batch number and expiration

11     date.  And then the F.D.A. can actually go back to whoever

12     is responsible for that product to see what's going on.

13              Q.   So you've talked about the label

14     placed on the container, can you tell the Jury what

15     labelling is?

16              A.   Labeling is any information that's

17     provided by the -- the seller of the drug to the public

18     and labelling includes the label.

19              Q.   Okay.  When you say information

20     provided by the seller of the drug, can labelling include

21     websites?

22              A.   Yes.

23              Q.   Can it include Twitter?

24              A.   Yes.

25              Q.   Can it include Facebook?

1                    A.   Yes.

2                    Q.   Can it include emails directly from

3       the seller to the customer?

4                    A.   Yes.

5                    Q.   And is there a requirement that the

6       labelling is truthful and not misleading?

7                    A.   Yes.

8                    Q.   Is that requirement for just the

9       customer or for you at F.D.A.?

10                   A.   Can you rephrase that, please?

11                   Q.   Uh-huh.  Is there a requirement that

12      the labelling be truthful and not misleading to the

13      regulator such as yourself at F.D.A.?

14                   A.   I'm still not sure I understand --

15                   Q.   Okay.

16                   A.   -- what you're asking.

17                   Q.   Sure, to the -- to the extent that you

18      review labelling prior to approving any new drug?

19                   A.   Yes.

20                   Q.   Okay.

21                   A.   Yes.

22                   Q.   And is it important that -- that the

23      labelling, meaning the website, the communication, all of

24      the representation from the seller to the customer that

25      they be truthful and not misleading?

1           A.   Yes, but to be clear on one point

2      that's the initial labelling is reviewed by F.D.A. before

3      as part of the approval process, but after that any

4      misbranding or misrepresentation of the product is

5      something that F.D.A. is concerned about and will take

6      action on.

7           Q.   Okay.  And --?

8           A.   That's part of my labelling compliance

9      part of the office job.

10          Q.   Okay.  And that's -- and that's part

11     of the -- that's part of your work?

12          A.   Yes.

13          Q.   Okay.  Can you tell the -- the Jury

14     you -- you said that you have to, at the Office of

15     Unapproved Drug and Labeling Compliance, you have to

16     determine whether a product is -- is a drug?

17          A.   Yes.

18          Q.   And -- and what's the initial steps or

19     analysis that you use?

20          A.   Usually they'll provide me, they being

21     other members of my office or outside people, information

22     and it's the labelling for the product and based on the

23     intended uses that are listed in that labelling, I make

24     the determination as to whether or not it qualifies as a

25     drug.

1                    Q.   Okay.  And it -- with respect to

2          intended use, what -- what are the -- the two key intended

3          usages that -- that you review?

4                    A.   Broadly speaking, I -- I look to see

5          if it's making some kind of a disease claim and for

6          disease claims we include whether this is intended to

7          treat, diagnose, cure, mitigate or prevent disease.  And

8          the other type of qualifier for a drug is if it's

9          something other than food that affects the structure or

10         function in the body of man.

11                   Q.   Okay.  And you said that you review

12         labelling, is that correct?

13                   A.   Yes.

14                   Q.   Okay.  So that includes the label

15         that's on the container, but it also includes all of those

16         other things you described, websites?

17                   A.   Yes.

18                   Q.   Advertisement?

19                   A.   As long as it's under the control of

20         the person sell -- or the company selling the drug.

21                   Q.   Okay.  As long as it comes from the

22         person or company selling the drug?

23                   A.   Correct.

24                   Q.   Does a product in this -- in this case

25         call 2,4-Dinitrophenol, are you -- and it -- it -- it's

1          commonly called D.N.P., are you familiar with D.N.P.?

2                         A.   On a high level, yes.

3                         Q.   Okay.  And -- and what's your

4          understanding of what D.N.P. is?

5                         A.   It's -- it's a chemical that -- that

6          has a lot of use in industrial, or a lot of industrial

7          purposes for its use, and it has been used occasionally in

8          medicine.

9                         Q.   And when you say occasionally in

10         medicine, how -- how long ago was it used occasionally in

11         medicine?

12                        A.   Well, before the -- back in the 1800s

13         -- but well before the pure Food and Drug Act.

14                        Q.   Okay.

15                        A.   Or the -- I'm sorry, the -- the first

16         act for F.D.A. so --.

17                        Q.   And prior to the passage of the Food,

18         Drug and Cosmetic Act that which -- which require drugs to

19         be proven safe before they were marketing were the medical

20         usage recorded of D.N.P.?

21                        A.   Yes, they were.

22                        Q.   Back in the thirties?

23                        A.   Yes.

24                        Q.   And what -- what historical issues

25         were reported with D.N.P. back in the thirties?

1                    A.   When used for medical purposes --

2                    Q.   Yes.

3                    A.   -- the -- the typical medical purpose

4    back then was weight loss.  And it was also used

5    industrially to -- to make munitions, explosives, it was

6    used industrially as a dye, as a wood preservative and for

7    film developing.  So people that worked in those

8    industries also had exposure to 2,4-Dinitrophenol and --

9    and they experienced problems with it.

10                 And those problems ranged from anything to

11    blindness, trouble with body organs and death.

12                Q.   And when -- when -- was D.N.P. one of

13    the drugs considered by Congress before passing the

14    federal Food and Drug Cosmetic Act in 1938?

15                A.   Yes, the -- the Food and Drug

16    Administration that – at that time was giving

17    presentations to congress to talk about, these are the

18    issues that we're seeing with products, here's -- here's

19    the kind of action you need to take to help us basically

20    do a better job, and 2,4-Dinitrophenol was part of that

21    presentation.

22                Q.   And -- and what, if anything, -- well,

23    strike that.  Are there any drugs approved in the United

24    States containing D.N.P.?

25                A.   Approved products, no.  There -- there

1    has never been a product that's gone through the approval

2    process and --

3                     Q.   Containing D.N.P.

4                     A.   -- containing -- yeah, 2,4-

5    Dinitrophenol.

6                     Q.   Okay.  And what would F.D.A. concerns

7    be about unapproved D.N.P. being sold as a drug for human

8    consumption?

9                     A.   Our concerns really haven't changed

10   much since that presentation back in 1938.  We did

11   something that was called the chamber of horrors for

12   congress where we talk about drugs and the risks

13   associated with them and a concern for Dinitrophenol is

14   that -- it's -- it has a significant amount of toxicity

15   and a risk of death when used in humans.

16                    Q.   I have no further questions, Dr.

17   Simone.

18                    CROSS EXAMINATION

19                    BY MR. GAMBURG:

20                    Q.   2,4-Dinitrophenol was just approved

21   for an N.D.A., wasn't it?

22                    A.   No.

23                    Q.   It was not?

24                    A.   No, it wasn't.

25                    Q.   Not by (unintelligible)?

```
 1                        A.   No, it has not been approved for new

 2        drug application.

 3                        Q.   You sure?

 4                        A.   I am sure.

 5                        Q.   Do you want to step out for a second

 6        and check with anyone?

 7                        A.   I've already looked.  To be clear that

 8        company has submitted investigation on new drug

 9        applications to the Food and Drug Administration.  It has

10        not submitted a new drug application.

11                        Q.   Has -- has the testing been rejected?

12                        A.   I don't know that I'm allowed to speak

13        about that.  That's considered proprietary information.

14                        Q.   It's proprietary.  So the F.D.A. is

15        considering the use of that in humans, no?

16                        A.   The F.D.A. has been given an

17        application by a company that wants to study it in humans.

18                        Q.   They want to study it for Alzheimer's,

19        right?

20                        MS. BURNES:  Objection.

21                        THE COURT:  Not seeing the relevance, Mr.

22        Gamburg.

23                        MR. GAMBURG:  He just -- I could address at

24        sidebar, I could address it right now.

25                        THE COURT:  We'll take a break brief
```

1          sidebar.

2                          (Sidebar)

3                          THE COURT:  Got the noise.

4                          MR. GAMBURG:  Uh-huh, it sounds like a

5          (unintelligible).

6                          THE COURT:  (unintelligible).

7                          MS. BURNES:  Okay.

8                          MR. GAMBURG:  Judge, because the Government

9          got into the toxicity (unintelligible) it was approved, he

10         says it wasn't approved but it's in the chain of command,

11         so if there's (unintelligible) this company will do this

12         the whole time and -- and Merlino concerns.

13                         THE COURT:  Well, let's get back to legal

14         relevance, all right?

15                         MR. GAMBURG:  Yes, sir.

16                         THE COURT:  At the present time and

17         certainly at the time when the defendant was distributing

18         it, it was not approved.

19                         MR. GAMBURG:  Okay.

20                         THE COURT:  And -- and that is the

21         statutory violation charge here.  And the fact that there

22         might, at some point, be an approval based upon a rigorous

23         scientific process does not alter whether or not Mr.

24         Merlino had violated the statute during the time period

25         requested.

1             MR. GAMBURG:  Okay.

2             THE COURT:  With -- with respect to the

3    reference of toxicity simply to put in perspective what

4    the concerns are and so I will sustain the objection.

5             MS. BURNES:  Thank you.

6             MR. GAMBURG:  Thank you, Your Honor.

7             MS. BURNES:  And for the record, Your

8    Honor, it's so that we don't find ourselves to, been at

9    sidebar which the -- the -- the article to which you

10   describe is so -- so early in the process --

11            MR. GAMBURG:  Just -- just --.

12            MS. BURNES:  -- that the F.D.A. cannot make

13   --

14            MR. GAMBURG:  Just -- just let Ms. Burnes

15   stop (unintelligible) before I stop her --

16            MS. BURNES:  Okay -- okay.

17            MR. GAMBURG:  -- that's all I have.

18            THE COURT:  Understood.

19            MR. GAMBURG:  Thank you, Your Honor.

20            (Sidebar concluded)

21            THE COURT:  I sustain the objection on

22   grounds of relevance, ladies and gentlemen.

23            MR. GAMBURG:  Thank you, Your Honor, with

24   that, I have no further questions.

25            THE COURT:  All right, Mr. Gamburg.  Any

1      re-direct?

2                    MS. BURNES:  No, Your Honor.

3                    THE COURT:  All right, you may step down,

4      Doctor, thank you.

5                    THE WITNESS:  Thank you, Your Honor.

6                    THE COURT:  Ms. Burnes, would now be a

7      convenient time for us to break for lunch?

8                    MS. BURNES:  Yes, Your Honor.

9                    THE COURT:  All right, I have no idea

10     whether lunch is here, but nonetheless, since I have an

11     idea where our schedule is, it's just occurred to me that

12     this would be a good breaking point.  And so with that,

13     once again as if by magic Mr. Henry appears and we'll

14     (unintelligible) back.

15                    THE MONITOR:  All rise.

16                    (JURY EXITS)

17                    THE COURT:  All right, Counsel, let's just

18     be seated for a minute to get our bearings.  Government, I

19     believe you have moved already contemporaneously the

20     exhibits that you wish into evidence, is that correct?

21                    MS. BURNES:  Your Honor, I did my best.

22                    THE COURT:  All right, over the lunch break

23     why don't you just check your notes and confer with Mr.

24     Gamburg so we have sort of an agreement as to what is the

25     record of the case, all right?

1                    MS. BURNES:  Yes, Your Honor.  I do know --

2        I do have final short testimony --

3                    THE COURT:  Right.

4                    MS. BURNES:  -- by special agent --

5                    THE COURT:  Right.

6                    MS. BURNES:  -- Arcari.

7                    THE COURT:  Yeah.  I -- I -- and I'll be

8        candid, I -- I forget that but I don't think that will

9        inhibit so I thought it was still a good sense at the

10       moment of where we stand just logistically, all right.  So

11       confer about the exhibits.

12                   MS. BURNES:  Yes.

13                   THE COURT:  I previously said for reasons

14       that we discussed earlier in terms of sequence that I

15       would let you recall special agent within limited

16       parameters and we'll proceed to do that.  And then I'll --

17       I'll turn to Mr. Gamburg.  When the Government rest, Mr.

18       Gamburg --

19                   MR. GAMBURG:  Judge --

20                   THE COURT:  -- my – I'll just get a sense

21       from you of your plans going forward.

22                   MR. GAMBURG:  Right.  First Judge, I did

23       mark as D One, I did not intend to move that.

24                   THE COURT:  It's fine.

25                   MR. GAMBURG:  Just in case there was any

1      issue with that.  Judge, I don't think my position -- I do

2      not have any witnesses, I've discussed the potential

3      character witnesses with Dr. Merlino, but I made strategic

4      decision not to call them.

5                  THE COURT:  Right, I'll note.  Yeah, you --

6      you've already experienced -- you've already very

7      experienced lawyer, Mr. Gamburg --

8                  MR. GAMBURG:  Correct.

9                  THE COURT:  -- and you know the pros and

10     cons --

11                 MR. GAMBURG:  Correct.

12                 THE COURT:  -- of such witnesses.

13                 MR. GAMBURG:  Correct.

14                 THE COURT:  And so I -- I -- and I'm sure

15     you have conferred with your client about that.

16                 MR. GAMBURG:  And -- and finally, Your

17     Honor, Dr. Merlino does not intend on testifying so I

18     intend on resting right after the Government.  I do, as I

19     told Your Honor this morning, I don't know if Dr. Merlino

20     was present or not, but I do have a Rule 49 though --.

21                 THE COURT:  Understood.

22                 MR. GAMBURG:  I do have a case which I'll

23     share with the Court as well as counsel at the time that

24     we get to that.

25                 THE COURT:  All right.  Well, did you want

1     to -- want to give me the citation in advance just so I

2     can have an informed view of the precedent.

3              MR. GAMBURG:  Yes, Your Honor, it's not 3rd

4     Circuit case, it's United States versus Gas Pipe,

5     Incorporated 997 F.3d 231 specifically Your Honor, I tried

6     to find the page number within the case.  But it deals

7     with for all of the Government and specifically, Your

8     Honor, it deals with -- court's indulgence.

9              THE COURT:  Whatever (unintelligible), Mr.

10    Gamburg.

11             MR. GAMBURG:  Section titled 18 USC Section

12    371 which was not charged in this indictment.

13             THE COURT:  All right but you -- you feel

14    that there may be discussion there that -- that sheds

15    light on the charges here.

16             MR. GAMBURG:  No, Your Honor, it -- it --

17    it goes to fraud on the F.D.A. which is what the

18    Government opened the door, they didn't charge fraud on

19    the F.D.A., they charged misbranding and it deals with the

20    ultimate end user is my position.

21             THE COURT:  I -- I -- yes, I -- I

22    understand.

23             MR. GAMBURG:  But --

24             THE COURT:  Yeah.

25             MR. GAMBURG:  -- but the case has the exact

1      specific language, not for human consumption.

2                    THE COURT:  Right.

3                    MR. GAMBURG:  Which is why either myself

4      and my office pulled it and on the other case which I

5      intend to rely on it (unintelligible) by analogy is a 3rd

6      Circuit case and that's United States versus Goldberg 538

7      F.3d 280.

8                    THE COURT:  538 F.3d 280, okay.

9                    MR. GAMBURG:  Yes, sir.

10                   THE COURT:  Okay, great.

11                   MR. GAMBURG:  Thank you, Your Honor.

12                   THE COURT:  All right, yeah, I'll -- I'll

13     try to do my homework just so I'm in a position to -- to

14     understand the argument, Mr. Gamburg.

15                   MR. GAMBURG:  But getting back to the

16     Courts, I think, original question we don't

17     (unintelligible) evidence for the defendant.

18                   THE COURT:  Right.  And -- and -- and

19     again, it's not my practice to inquire into the

20     discussions between counsel and the client, you're a very

21     experienced lawyer and I'm sure you've had a thorough

22     discussion with Dr. Merlino.

23                   MR. GAMBURG:  Thank you.

24                   THE COURT:  And I say that in Dr. Merlino's

25     presence here on the record in open court.  So with that,

1      we'll take a lunch break, come back and let me -- let me

2      check with Mr. Henry whether the lunch for the jury had

3      arrived.

4                  MS. BURNES:  Okay.

5                  THE COURT:  Did lunch arrive Chris, I

6      thought it might have.

7                  MR. CHRIS:  Yeah, just in time actually.

8                  THE COURT:  All right, so I didn't screw up

9      our schedule, great.

10                 MR. GAMBURG:  One o'clock, Your Honor?

11                 THE COURT:  Yeah, one o'clock, and then

12     we'll do that then I -- I think we'll proceed right to

13     closings after the -- after you rest.  Why don't we do

14     this, Mr. Gamburg, for flow purposes.  Rather than break

15     again, right after the agent testifies, why don't we do

16     closings and then we'll take up your motions.

17                 MR. GAMBURG:  Sure.

18                 THE COURT:  And this is again, the

19     government -- you would agree there is no waiver in that

20     and it's without prejudice to my power to grant a motion

21     even after closings.

22                 MS. BURNES:  Yes, Your Honor.

23                 THE COURT:  All right.  So the record's

24     protected but I think that way we take a break right after

25     closings and then -- well then I (unintelligible) proceed

```
1        the charge (unintelligible) if I created the motion so

2        again --

3                    MR. GAMBURG:  Yes.

4                    THE COURT:  -- we -- we would still be at a

5        point in the proceedings which makes sense, that's all I'm

6        looking for, so, right?

7                    MS. BURNES:  Yes, Your Honor.

8                    MR. GAMBURG:  One other logistical question

9        for Chris, is the Courtroom going to be open maybe at

10       twelve thirty or --

11                   THE COURT:  We -- we --

12                   MR. GAMBURG:  -- so we can get in here.

13                   THE COURT:  We can make that happen and

14       even if -- if it's not you can ring the bell, we'll let

15       you in.

16                   MR. GAMBURG:  Okay.

17                   MR. CHRIS:  Yeah, that's fine.

18                   MR. GAMBURG:  Thanks.

19                   THE COURT:  One way or the other, we'll get

20       you in.

21                   MR. GAMBURG:  Thank you, Your Honor.

22                   THE COURT:  Sure.  All right.  And thanks

23       to our marshals for their service.

24                   MR. CHRIS:  No problem, Your Honor.

25                   (Off the record; 12:02:39 to 13:03:51)
```

```
1                    (Off the record conversations)

2                    (Off the record; 13:04:20 to 13:06:38)

3              THE COURT:  All right.  We'll get back to

4       work.  Ms. Burnes, do you have any more witnesses?

5              MS. BURNES:  Yes, Your Honor, the

6       government recalls Special Agent Bryan Arcari for a

7       limited purpose.

8              THE COURT:  All right, thank you.  Members

9       of the Jury, it's within the discretion of the judge to

10      let a party recall witnesses.  At an earlier stage in the

11      case  I discussed with both counsel that some evidence

12      should come in before we heard certain testimony from the

13      special agent.  So without objection from the defense,

14      we're recalling him at this stage, okay.  And with that,

15      you may proceed.

16             MS. BURNES:  Thank you, Your Honor.

17      Special Agent Arcari --.

18             THE COURT:  And you're still -- you're

19      still under oath sir, as you --.

20             THE WITNESS:  I understand.  I understand,

21      Your Honor.

22             MS. BURNES:  Mr. Conroy, can -- can we

23      bring up Government's Exhibit One seventy-one page two

24      which is already in evidence.

25             BRYAN ARCARI; Previously sworn
```

1                        REDIRECT EXAMINATION

2                        BY MS. BURNES:

3                        Q.    Special Agent Arcari, during the

4          course of your investigation, did you -- did you request a

5          subpoena for records for the cell phone number depicted on

6          page two of Government's One seventy-one?

7                        A.    Yes, I did.

8                        Q.    And that's the number ending in eight

9          zero zero two?

10                       A.    That's correct.

11                       Q.    And directing your attention to

12         Government's Exhibit One ninety-one.  Are these the

13         records received in response to a subpoena for the

14         subscriber information for that phone number ending in

15         eight zero zero two?

16                       A.    Yes, they are.

17                       MS. BURNES:  Your Honor, the government

18         moves Government's Exhibit One ninety-one into evidence.

19                       MR. GAMBURG:  No objection.

20                       THE COURT:  Admitted.

21                       MS. BURNES:  That can be published to the

22         Jury please.

23                       BY MS. BURNES:  (Cont'g.)

24                       Q.    And directing your attention to the

25         top of the page; the left-hand side, the account details.

1    Who is the account holder for the phone number ending in

2    eight zero zero two?

3              A.   William A. Merlino.

4              Q.   And what's the address?

5              A.   4612 Somers Point, Mays Landing, New

6    Jersey 08330.

7              MS. BURNES:  Okay, thanks.  You can take

8    that down, Mr. Conroy.

9              BY MS. BURNES:  (Cont'g.)

10             Q.   And directing your attention back to

11   Government's Exhibit One seventy-one page three.  During

12   the course of your investigation, having -- having

13   received this -- this document, did you subpoena Shore

14   Medical Center for documents associated with the M.R.N.

15   number listed on page three of Government's One seventy-

16   one?

17             A.   Yes, I did.

18             Q.   And directing your attention to

19   Government's One eighty-five.  Are these the records

20   received from Shore Medical Center for the -- for the

21   medical record number that you just identified?

22             A.   Yes, they are.

23             MR. BURNES:  Your Honor, the Government

24   moves admission of Government's Exhibit One eight five?

25             MR. GAMBURG:  No objection, Your Honor.

1                    THE COURT:  Admitted.

2                    BY MS. BURNES:  (Cont'g.)

3                    Q.   Now, if we can take a look at

4    Government's Exhibit One seventy-one, page three and

5    Government's Exhibit One eighty-five, page nine.  Special

6    Agent Arcari, the left-hand side of your screen is the

7    Shore Medical Center document that has the patient name

8    William Merlino on it.  Is that right?

9                    A.   That's correct.

10                   Q.   Okay.  And on the right-hand side that

11   -- are those copies of the Shore Medical Center records

12   that were subpoenaed in this case?

13                   A.   Yes, they are.

14                   Q.   And the patient name is redacted.  But

15   for the record, is it a patient going by M.N. that -- in

16   records that were provided to the -- to the defense

17   regarding that?

18                   A.   Yes, that's correct.

19                   Q.   And directing your attention then to

20   the -- the top section.  What is the M.R.N. number, the

21   medical record number on the legitimate documents on the

22   right-hand side of the page?

23                   A.   Six zero seven eight three six four.

24                   Q.   And on the left-hand side, what is the

25   medical record -- medical record number?

1                          A.   Six zero seven eight three six four.

2                          Q.   Now, directing your attention to the -

3        - to the right-hand side in the legitimate record, what is

4        the age depicted of the patient?

5                          A.   Fifty-seven years old.

6                          Q.   And what is the gender of the patient?

7                          A.   Female.

8                          Q.   And directing your attention to the

9        left-hand side of the page, what is the age of the Merlino

10       document?

11                         A.   Eighty-four years.

12                         Q.   And what's the gender of the patient?

13                         A.   Male.

14                         Q.   And finally, on the -- on the right-

15       hand side of the page, what is the discharge date?

16                         A.   June 4th, 2021.

17                         Q.   And on the Merlino document, what is

18       the discharge date?

19                         A.   August 5th, 2021.

20                         Q.   Now, directing your attention to the

21       middle of page nine.  Well, we can -- we can start at the

22       top with the -- with the discharge diagnosis.  On the

23       right-hand page, the legitimate record from Shore Medical

24       Center, is there a strikethrough on - on line one?

25                         A.    There is not.

1                    Q.   Okay.  On the -- that nine items, one

2         through nine on the discharge diagnosis, do they appear on

3         the left-hand page, of the Merlino documents?

4                    A.   They are similar.

5                    Q.   Okay.  And as to H -- H.P.I. in

6         hospital codes.  On the legitimate medical record, what is

7         -- what is the full sentence of -- of the hospital

8         (unintelligible) say?

9                    A.   She is a very pleasant fifty-six year

10        old Caucasian female with a significant past medical

11        history of basal cell carcinoma and depression, who was

12        admitted to Shore Medical Center for pancreatic mass.

13                   Q.   And what's the next sentence?

14                   A.   She was in her usual state of health

15        until approximately -- approximately three weeks ago when

16        she developed upper abdominal pain, which has persisted.

17                   Q.   Now, Special Agent Arcari this -- this

18        says the patient is a fifty-six year old, Caucasian

19        female.  Whereas at the top of the page, there's an

20        indication of fifty-seven years.  When -- when is the

21        narrative in the middle of the page that you just read?

22        Is that from last summer?

23                   A.   That's correct.

24                   Q.   And when were the records retrieved in

25        this investigation?

1            A.   This summer.

2            Q.   This year?

3            A.   Yes.

4            Q.   Okay.  And if you can just continue,

5       what's the -- the third sentence in the H.P.I. at hospital

6       codes on that legitimate medical record?

7            A.   She was admitted to the hospital for

8       further evaluation and treatment.

9            Q.   And if you could just move down to the

10      -- the last sentence of that paragraph.  She will require

11      --.

12           A.   She will require tissue diagnosis for

13      confirmation.

14           Q.   Okay.  So let's take a look at the

15      left-hand document, the Merlino document, the H.P.I. at

16      hospital codes.  And what does the full sentence there,

17      read?

18           A.   He is a very pleasant fifty-six-year-

19      old Caucasian male with a significant past medical history

20      of basal cell carcinoma and depression, who was admitted

21      to Shore Medical Center for pancreatic mass.

22           Q.   What's the next sentence?

23           A.   He was in his usual state of health

24      until approximately three weeks ago, when she developed

25      upper abdominal pain, which has persisted.

1          Q.   And let's take a look just at that --

2     that last sentence of that paragraph.

3          A.   He will require tissue diagnosis for

4     confirmation.

5          Q.   And finally, Special Agent Arcari, on

6     the left-hand side with the Merlino document, the primary-

7     care provider and consulting provider what's -- what's

8     listed as the primary-care physician?

9          A.   M. McMurray, M.D.

10         Q.   And taking a look at the Shore Medical

11    Center website on the right-hand side, what is listed as

12    the primary-care physician?

13         A.   Ann McMurray A.P.N.

14         MS. BURNES:  Thank you Judge no further

15    questions.

16         THE COURT:  Any questions?

17         MR. GAMBURG:  No questions, Your Honor.

18         THE COURT:  All right, you may step down.

19         THE WITNESS:  Thanks.

20         THE COURT:  Ms. Burnes, are there any other

21    witnesses that the government wishes to present?

22         MS. BURNES:  No, Your Honor.

23         THE COURT:  All right.  And over the lunch

24    break, did you get the opportunity to review the various

25    Exhibits and make sure everything has been moved for

1   admission that needs to be?

2               MS. BURNES:  Yes, Your Honor.

3               THE COURT:  And are there any outstanding

4   objections, Mr. Gamburg on any Exhibits?

5               MR. GAMBURG:  No, Your Honor.

6               THE COURT:  All right.  Anything further,

7   Ms. Burnes?

8               MS. BURNES:  No, Your Honor, the government

9   rests.

10              THE COURT:  All right.  Members of the Jury

11  I'm sure you may recall in my introductory instructions, I

12  said that a defendant in a criminal case never has any

13  obligation to present evidence to present witnesses or to

14  testify.  So now, I'll turn to Mr. Gamburg.  Mr. Gamburg,

15  do you choose to present any witnesses or other evidence?

16              MR. GAMBURG:  No, Your Honor, on behalf of

17  the defendant we respectfully rest.

18              THE COURT:  All right.  So ladies and

19  gentlemen of the Jury, that completes the factual record

20  in the case, all right.  And we're now at the point where

21  you'll get to hear closing argument from the attorneys.

22  After that we'll take a short break and then I will give

23  you instruction on the law.

24              As I said at the outset, argument is

25  important because it gives you a perspective on the

1          evidence that you've heard and it gives you the views of

2          the parties to the action.  But is -- it is, as I said at

3          the outset, not the evidence.  The evidence is what you

4          saw, what you recall, what you heard, this is the

5          attorneys' interpretations of that evidence.

6                     And with that, I ask you to give attention

7          to both sides.  Ms. Burnes.

8                          CLOSING ARGUMENT

9                     MS. BURNES:  Thank you, Your Honor.  Mr.

10         Conroy, Exhibit One.  If we could zoom in.  Good

11         afternoon.  This is simple case.  This is a case about a

12         man who disagreed with the law, who decided he wasn't

13         going to follow the law.  This is a case about a man who

14         sold a dangerous chemical over the internet as a weight-

15         loss drug.

16                     And this is a case about a man who lied

17         about those drugs, who hid his intent from the regulatory

18         authorities, the F.D.A., the Customs and Border Patrol,

19         the government agencies intended to keep us safe.  The

20         tweet posted January 3rd, 2018 reads, D.N.P. available on

21         eBay for weight loss is not legal in U.S. so listed as

22         fertilizer on eBay, hashtag diet, hashtag weight loss.

23                     That's the scam intended to defraud and

24         mislead.  That's the intent for the drug to be for human

25         consumption, for the business of selling D.N.P. to

1      customers.  And by labelling it both on the package and on

2      his website, as something else.

3                  Now, on behalf of the United States and

4      opposing this case, I too want to thank you for your time

5      and attention that you've spent over the past few days.

6      And although it's a relatively short case, it's an

7      important one.  It's a criminal case, it's important to

8      all of the parties.  And it's also a criminal case, which

9      is important to our system of justice.

10                 In your deliberations, you'll be

11     considering (unintelligible) count and you'll have to

12     recall the testimony and evidence in this case.  So if my

13     argument inadvertently misstate a fact, it's your

14     recollection controls because you're the Jury.  You find

15     the facts.  That's true if Mr. Gamburg misstates the fact,

16     that's true even if His Honor misstates the fact because

17     you're the Jury, your recollection controls, you find the

18     facts.

19                 And the most powerful tool in your toolbox

20     as a jury that the twelve of you bring here to this room

21     is your commonsense.  With your commonsense, you'll see

22     that the defendant introduced mislabeled drugs into

23     interstate commerce.  Now, you'll hear from His Honor the

24     Court on the law.  And the law is that the government must

25     prove each element of this case beyond a reasonable doubt.

1                      That's our burden.  And we accept that

2        burden, we welcome that burden, that is the law.  And as

3        you evaluate the evidence in this case, you'll see that

4        we've met our burden with each element.  The judge will

5        instruct you on proof beyond a reasonable doubt.  And if I

6        state anything different about the law, follow His Honor's

7        instructions.  But proof beyond a reasonable doubt means

8        prove beyond -- it does not mean proof beyond all possible

9        doubt.

10                     It does not mean to a mathematical

11       certainty.  Possible doubts or doubts based on conjecture,

12       speculation or hunch are not reasonable doubts.  It's not

13       (unintelligible), it's not speculation and it's not

14       sympathy.  There is no doubt in this case that the

15       defendant caused the introduction of a drug into

16       interstate commerce.  That's the third element that you're

17       going to be instructed in the law.

18                     And that's because you heard the testimony

19       on this.  And the testimony is fairly uncontroverted,  the

20       defendant went into the Mays Landing post office virtually

21       every day during the course of his business.  And handed

22       over parcels to be shipped out.  And you saw the records

23       from Inspector Piasecki with the -- with the two Click-N-

24       Ship accounts used in the mailing of all of those parcels.

25       They were parcels that went from New Jersey, parcels that

1    went to the Eastern District of Pennsylvania, in the case

2    of the purchases, that you heard testimony about.

3                    Parcels that went all over the country and

4    around the world.  But the shipping of the drugs from New

5    Jersey into the Eastern District of Pennsylvania,

6    satisfies the interstate commerce the one in this case.

7    And you'll also get an instruction about venue, then you

8    think that some part of the crime occurred here in the

9    Eastern District of Pennsylvania, the same evidence,

10   Springfield, Pennsylvania, as Special Agent Arcari,

11   testified, is here in the Eastern District of

12   Pennsylvania.

13                    There's no doubt.  And in discussing, in

14   reviewing the evidence in this case, you'll review all of

15   the evidence, you'll review the tweet from January 3rd of

16   2018 where the defendant admits that D.N.P. available on

17   eBay for weight loss is not legal in the U.S. so listed as

18   fertilize on eBay.  And if we take a look at Government's

19   Two, a month later, at the top of the page SimCare, has

20   offered for sale forty D.N.P. crystalline capsules for

21   agricultural use, hundred and twenty-five milligrams each.

22   And this is from February 3rd of 2018.

23                    The defendant did exactly what he tweeted

24   about posting for sale on eBay D.N.P. for diet, for weight

25   loss, for human use.  He put pictures of capsules on his

1    sales.  He described them as capsules.  And you're

2    entitled to consider all of that.  You're entitled to

3    consider all of that as to whether or not this is a drug.

4    Because a drug is simply something that's intended to

5    affect the body of man affect a person.

6                    But it's an old statute, (unintelligible)

7    body of man at some point this afternoon, I expect.  Now,

8    this is in February of 2018.  You've seen the eBay

9    records.  You've seen summaries of the PayPal records.

10   You've seen summaries of Click-N-Ship records.  This

11   conduct started in November of 2017.  And that's the date.

12   That's the first date and (unintelligible) charged in the

13   indictment.

14                    In November of 2017, this defendant started

15   his business.  Shipping D.N.P. in interstate commerce that

16   was misbranded.  Shipping D.N.P. intended for human use.

17   And as we take a look at government's Exhibit Nine, page

18   three; SimCare, which is the defendant's eBay identifier,

19   SimCare had D.N.P. transactions from November of 2017

20   through August of 2018.

21                    That's three hundred and seventy-four total

22   sales.  Because this was a business.  These were paying

23   customers who wanted this D.N.P.  And a seller who wanted

24   to sell the D.N.P. encapsulated as a diet drug for human

25   consumption.  But he knew -- he told you this tweet, he

1        knew it was illegal.  So he had to call it something else

2        to hide his business.

3                    Now, in August of 2018, you've heard

4        evidence about several things happening.  One of those

5        things is that Special Agent Bryan Arcari, made an

6        undercover purchase of D.N.P.  And in fact, it was one of

7        the last transactions that was available on -- on eBay.

8        So if we take a look at Government's Twenty-nine.  And in

9        fact, we can take a look at Government's Twenty-seven.

10       You heard the testimony, you saw the evidence.  After

11       contacting -- after ordering from eBay, responding to an

12       ad for D.N.P., the special agent was directly contacted by

13       email by SimCare asking if he wanted to have the product

14       encapsulated.

15                    If he wanted to pay extra to have it

16       encapsulated and the agent agreed and paid the extra fee.

17       That encapsulation is an important piece of evidence in

18       this case.  And that's because the first element that

19       you'll hear the Court instruct you on for a misbranding

20       case is the fact that 2,4-Dinitrophenol is a drug.

21                    And a drug simply means intended for human

22       use.  And if something is intended for use as Dr. Simone

23       told you in the diagnosis, cure, mitigation, treatment or

24       prevention of disease or intended to affect the structure

25       of any function of the body.

1          You get to look at all of the statements,
2     all of the claims, all of the information that Merlino
3     provides.  As long as it comes from the seller that's
4     something that you get to use your commonsense.  And your
5     commonsense tells you you've seen the tweets.  He intended
6     for human use.  You've seen the hashtag; diet, weight loss
7     -- weight loss.  You see the picture it's distributed in
8     capsules for humans to consume.
9          Let's look at Exhibit Fifty-one, this is
10     another purchase of D.N.P.  It's distributed in capsules.
11     And let's take a look at Exhibit Sixty-six, Merlino sold
12     the D.N.P. and distributed it in capsules.  All of these
13     things go to intended use.  All of these things tell you
14     with your commonsense that D.N.P. is a drug in this case.
15          There is no doubt as to the first element
16     of this.  And if you had any questions at all, you can
17     look at the emails with one email trusted customer.
18     Because after he tweeted about it in January, after he put
19     it on for sale in February, he emailed with Jack Knapman.
20     Let's look at Twelve A.  In March and this is the email
21     that begins in the middle of the page Tuesday, 13th March,
22     below that.  That's the response.
23          But well -- on the second page Merlino says
24     in the past, when this was a legal diet medication in the
25     U.S. and over-the-counter, he's talking about the dosing.

1      He's talking about intended human use.  This is a drug.

2      And as we go back to the first page, Mr. Conroy the top of

3      the page, his customer is intending it for human

4      consumption too.

5             I have a question when D.N.P. was used for

6      human consumption, he put it in the past.  But the

7      customer -- he knew his customers were going to consume

8      this as a drug.  There is no doubt that D.N.P. was a drug.

9      And that's the first element that you have to evaluate.

10            Now, the second element is that the D.N.P.

11     -- I should say the next element is interstate commerce.

12     We've discussed that.

13           But the next element is that this D.N.P.

14     drug was misbranded.  And there is no doubt in this case

15     that it is misbranded.  Here's where you use your

16     commonsense.  Here's where you evaluate all of the

17     evidence.  And here's where you get to look at the

18     contradictory statements that Merlino makes during the

19     course of his fraud.

20           That's -- that's the evidence of the crime.

21     That's the evidence to mislead and (unintelligible) the

22     F.D.A., as we'll talk about, but it's also the evidence of

23     misbranding in this case.  And that's because, let's take

24     a look at Fifty-two, when the defendant ships a package

25     with a label, saying not for human consumption, that's

1          false.  That's misleading in any particular.

2                          Why is it false?  Because this label wasn't

3          intended for the consumer, he knows that his customers are

4          buying the drug for human use.  You see the emails, you

5          see the correspondence, the whole purpose of his business

6          was for human consumption.  Not for human consumption

7          makes this label misbranded.

8                          But that's not all.  Let's take a look at

9          Government's Forty-five.  And at the top of the page

10         Government's Forty-five is one of the (unintelligible) you

11         saw on the defendant's website for Agro Fortis Supply.

12         And the advertisement here is 'welcome to Agro Fortis

13         Supply, leading supplier of D.N.P. fertilizers.'  You

14         heard from Dr. Simone, you heard from Special Agent Arcari

15         as to why he gathered this evidence.

16                         A website in this case is labelling.  A

17         website is part of the information that comes directly

18         from the seller Merlino to his customer.  And by calling

19         his D.N.P. fertilizer on the website when he intended

20         these drugs for human use, that's the misbranding.  That's

21         the crime.

22                         Human consumption was the whole point of

23         defendant's business.  Customers followed him from eBay to

24         Agro Fortis Supply to simcare@gmail.com.  He sent blast

25         emails to his customers to increase sales.  He sent emails

1   to customers in Canada and Romania and customers in the

2   U.S.

3               In fact, you saw several emails with a

4   particular customer, David Freek in Canada, who identified

5   himself as a distance runner.  He was a loyal customer.

6   And when Merlino was talking to his loyal -- loyal

7   customer who wanted this D.N.P. for human consumption, who

8   wanted to distribute it to others who wanted it for human

9   consumption that's where you see the intended use of the

10   drug, that's where you see the misbranding.

11               That's where they discussed that it's going

12   to be called something else to hide the business, to hide

13   the sin.  That's where they discussed using yellow pigment

14   number twelve to get through customs for foreign

15   countries.  The whole point of this business is human

16   consumption.

17               And when Merlino put fertilizer on his

18   website or when he put not for human consumption on his

19   label, that's the misbranding.  And there is no doubt as

20   to the fourth element, the intent to defraud or mislead.

21   Because the intent to defraud or mislead here is not the

22   customer.

23               The intent to defraud or mislead is the

24   F.D.A. and C.D.P.  It's the regulators.  And you get to

25   look at the entire course of conduct and the entire course

1    of evidence.  In November of 2017 the defendant used a

2    Click-N-Ship account in the name of his former employee,

3    Nancy O'Brian.

4                  But he also had SimCare and he had his

5    office address and used that Click-N-Ship account without

6    asking permission to use her name to ship his daily

7    packages from Mays Landing and around the world and around

8    the country.  And most importantly, into the Eastern

9    District of Pennsylvania.

10                 And he intended this D.N.P. to be used for

11   human consumption.  You saw that evidence.  And he had

12   eBay transaction after eBay transaction November,

13   December, January, February, you saw not just the Click-N-

14   Ship mailing and not just the eBay transactions but the

15   PayPal transactions.

16                 We can take a look at Government's Ten, the

17   PayPal transactions.  On the fourth page, shows you by

18   month that he did dozens of transactions.  On any given

19   month in November of 2017, twelve D.N.P. PayPal

20   transactions for six hundred and seventy-five dollars.  By

21   January of 2018 it was seventy-seven D.N.P. PayPal

22   transactions five thousand seven hundred and eighteen

23   dollars that month.

24                 In February forty-four transactions, in

25   March

1            fifty-seven transactions and in July there

2      are zero transactions.  Now we don't know what happened in

3      July,  other than he received a letter from Customs and

4      Border Patrol telling him it was illegal to importt D.N.P.

5      into the United States.  We know that a bulk shipment of

6      D.N.P. was seized in May from -- from Memphis.

7            And you saw from the search -- search that

8      this is somebody who maintained bulk D.N.P. in his home.

9      And then in August there are thirteen PayPal transactions

10     and they drop off in September because that's when eBay

11     removed D.N.P. from its website.

12           By October of 2018, there are fourteen

13     transactions and by November of 2018, there are fifty-one

14     transactions.  These records take us all the way up to

15     January of 2019.  We know that in fact, there were

16     transactions after that because the special agent did a

17     transaction on January 31st that resulted a shipment on

18     February 1st.

19           You can consider the volume and the

20     regularity in considering the defendant's intent, this was

21     not a mistake.  This was not an accident.  This was the

22     business.  This was the plan.

23           And in considering the intent to defraud

24     and mislead that's when you take a look, among other

25     things that the eBay records to see Government's Ten --

1    I'm sorry, Nine.  That the sales on page three, four Mr.

2    Conroy, five sale after sale after sale, listed as D.N.P.

3    for agricultural use.

4                    That's not for the customer, that's for the

5    regulators.  That's for customs.  The evidence in this

6    case consists of the physical evidence and the photos that

7    you've seen of it, of these transactions of these

8    undercover buys.  And you're able to evaluate this label,

9    not for human consumption.

10                   The intent to defraud and mislead is not

11   the customer, the customer knew what they were getting.

12   The customer knew what they were buying.  It's to hide the

13   business, hide the true purpose of this sale.

14                   Government's Exhibit Sixty-five which is

15   the third U.C. buy.  This is the package with the yellow

16   tinted label that Special Agent Arcari recovered at the

17   post office, after Inspector Piasecki watched him drop off

18   packages that day.  This is the package that was received

19   in Springfield, Pennsylvania.

20                   This package doesn't contain a sticker at

21   all.  It doesn't contain a label at all.  That's

22   additional evidence for you to consider.  The package was

23   ordered off of the Agro Fortis Supply site.  The package

24   was ordered as fertilizer.

25                   The information on the packages, which as

1    you heard from Dr. Simone, it's very important information

2    to the F.D.A.  That legitimate drugs, approved drugs, have

3    information right on the container, the label and there

4    are all -- and there are safety and efficacy reasons for

5    that.  Merlino didn't do that.

6              Merlino conducted his business, shipping

7    D.N.P. encapsulated for human use month after month after

8    month.  The records in evidence in this case and the

9    indictment -- indictment charges up to March of 2019.  And

10    that's because at that time as you heard the testimony,

11    Special Agent Arcari and other members of law enforcement

12    conducted a search warrant on the defendant's business.

13              And you saw pictures of that lab.  You saw

14    pictures of the yellow tinted wall.  You saw pictures and

15    you have evidence of the capsules, of the reds, of the

16    whites, of the greens, and of the pill press.  All

17    evidence that was seized to support his business selling

18    D.N.P. to willing customers over the internet.

19              But you also heard additional evidence

20    today, you heard evidence that after Merlino was indicted.

21    And after -- and when he's charged in this case, was set

22    for trial after a pandemic delay.  The defendant created

23    and fabricated false medical records.  He faked pancreatic

24    cancer.

25              He told his attorney he had pancreatic

1    cancer.  And when asked for documentation of that

2    pancreatic cancer, he fabricated a letter from a

3    legitimate doctor.  And he fabricated a discharge document

4    from a legitimate patient.

5             And his Honor will instruct you that

6    Merlino is not charged with a crime associated with that

7    activity here today.  That evidence is something you can

8    consider as consciousness of guilt.  You get to consider

9    who does that?  Who, when faced with a court date, faced

10   with an opportunity to submit to his lawyer

11   (unintelligible).

12             Who fabricates records and sends them to

13   his lawyer knowing they're going to be submitted to the

14   Court and to the government.  You can consider that

15   evidence in whether the defendant is guilty of

16   introduction of misbranded drugs into interstate commerce.

17             Because you're the Jury, you get to

18   evaluate those facts and follow the law as advised by the

19   judge.  Now there was a lot of discussion in this case

20   that somehow the label not for human consumption was true.

21             And therefore, the case can't be a

22   misbranding case.  It was questions along those lines.

23   And so listen to the Judge's instruction, about labelling,

24   about intention to defraud, about intended use.  Intended

25   use is one of the keys here.  Because there's plenty of

1    products available on the internet or in a store that are

2    not for human consumption.

3              You could go out today and buy a gallon of

4    bleach.  And that's not conduct that will trigger any sort

5    of review by the F.D.A.  If you're using the bleach to

6    clean your house.  But if you sell the bleach, if you sell

7    the bleach in a capsule, if you sell it in an eyedropper,

8    if you sell it for the purpose of assisting macular

9    degeneration.  If you say -- if the seller on his website

10    says put your glasses down and use my bleach.

11              That perfectly legitimate product becomes a

12    drug because it's about intended use.  The seller is

13    intended that it be in affect the body of man or to

14    diagnose or cure or mitigate a disease.  And that's

15    (unintelligible).  That's what the evidence shows in this

16    case, that the D.N.P., while a perfectly legitimate

17    product, which has chemical, industrial chemical

18    properties.  When it's advertised as a diet drug, when

19    it's advertised for weight loss, when it's advertised in

20    capsules, when there are discussions about dosing, how

21    often, how much, how many.  That's a drug intended for

22    human consumption, that's the business.  And then you

23    label it that says otherwise is misbranding.

24              This is a simple case.  This is a case

25    about a scam, about a man who sold this dangerous chemical

1   over -- as a weight-loss drug.  He sold it to willing

2   customers.  He called it fertilizer, he called it

3   agricultural use.  And all that as a cover-up so he

4   wouldn't get caught selling his drugs for human use.  And

5   based upon all of this evidence, there's no doubt that

6   William Merlino is guilty.

7           THE COURT:  All right Mr. Gamburg.

8           CLOSING ARGUMENT

9           MR. GAMBURG:  Thank you, Your Honor.  May

10  it please the Court, Counsel.  Good afternoon, ladies and

11  gentlemen.  The F.D.A. ought to go to every supermarket

12  every 7-Eleven, every Wawa and take all those

13  (unintelligible) all those canisters and get them off the

14  shelf.  Because I'm not saying (unintelligible).

15          But certainly when I was in high school, I

16  saw a lot of kids that couldn't wait to go to that shop.

17  And they weren't trying to get the Cool Whip.  They were

18  trying to get the nitrous oxide.  You ever go into the

19  store and see canister for nitrous oxide and they saw

20  boxes upon boxes upon boxes.  As if someone was making

21  whipped cream for the entire city of Philadelphia.

22          And they sell and they sell them and they

23  sell them.  So what does that have to do with this case?

24  Pull up G One-thirty-six.  There it is, they import it,

25  imported by an American company, imported in bulk.  What

1      is it?  D.N.P.  And it's funny when it's 2,4-

2      Dinitrophenol, from a big giant company.  For R&D use

3      only, whatever that means, suddenly, the agent tells you

4      that the F.D.A. doesn't regulate.

5                  What?  I almost stopped in my tracks -- I

6      did stop in my tracks.  I went back to the table.  So I

7      needed a chance to think does it even worth asking another

8      question?  Is it regulated or is it not regulated?

9                  Why are we here?  Good afternoon, ladies

10     and gentlemen.  And again, on behalf of the Court, we

11     would like to thank you for taking the time out of your

12     lives and your schedule to sit and listen to this case.

13     And I agree if my recollection of the facts is any

14     different than your recollection, it's your recollection

15     that governs.

16                  If I say anything -- if I say anything

17     about the law will be very limited because this is one of

18     the finest jurist in the country.  Certainly the building.

19     And I know he got the law right because he gave us the

20     opportunity to review it.  We all huddle up, we discuss it

21     then the Court makes the decision what's right and His

22     Honor -- His Honor (unintelligible).

23                  He mentioned some very interesting things

24     in the beginning when you all first see that and come into

25     this building all the time and don't really pay much

1       notice to them.  After the Court pointed out I did -- I

2       blanked out and I looked.  Most of those things about the

3       Jury system because it's -- it's you, ladies and

4       gentlemen, you're going to decide when you apply the facts

5       to the law in this case.

6                    You're going to decide whether or not this

7       amounts to a violation of the charge for which he is

8       charged within the indictment.  And as his Honor told you

9       that the indictment is not in evidence.  What is the

10      formal charge and the formal charge is misbranding that

11      the defendant misbranded what this was.

12                   Now, you also heard evidence from his

13      former lawyer and the Court is going to advise that was

14      not chargeable.  This evidence was put forth to show

15      consciousness of guilt.  That's the government's theory of

16      this evidence.  But the Court is also going to instruct

17      you that there could be other reasons for this conduct.

18                   Now, ask yourself, ladies and gentlemen, at

19      the time, you're an eighty-four-year-old retired doctor,

20      you're eighty-four-year-old retired doctor who got charged

21      with the full force of the United States government.  His

22      entire life spent helping people to the best of his

23      ability, and you are charged by the federal government

24      with a violation of the crime -- criminal activity.

25                   And you go out and you hire a lawyer that

1   you have known for fifteen years, all right sir, help me

2   with this case.  And we get to three months before the

3   trial of his life, three months and the lawyers says hey

4   Doctor, you owe me a bunch of money, and I'm not prepared.

5   Okay.  I'm going to file a motion, he said judge this

6   obligation -- that obligation.  I'll say the way he said

7   it, but we all know, I have other obligations, Your Honor,

8   and this is a complex case and I need time to prepare.

9           For a normal person that means I'm not

10  prepared.  (unintelligible) says, listen, we're coming out

11  of a pandemic.  We're trying to get citizens who aren't

12  concerned about their safety at the time that it's

13  scheduled.  We don't know how people are going to react to

14  being around other people that they don't know.

15          We've been told for months, if not years,

16  social distance, stay away, wear masks, wash your hands

17  try to be careful who you're around, you don't know, now

18  we're asking people from five different counties, six

19  different counties to come to our courtroom and to try and

20  keep an open mind while you're worrying about the

21  pandemic.

22          Be there listen to a criminal case being

23  around people that you don't know.  I can't waste these

24  resources and you guys are extremely valuable.

25  (unintelligible) just to let you know how important this

1      is why we need you.  (unintelligible) July 26, August 3rd,

2      lawyer wants money.  My lawyer is not prepared when we saw

3      it, but the most disturbing part to me is that he did

4      notice the errors.  Sends an email, there is no

5      independent investigation, which is a duty to the Court.

6                      Guy asked me for leave to go to work.  You

7      better -- better have my office call that work and verify

8      that employment.  This is a doctor's record that he had

9      time and did nothing.  He didn't even notice the

10     discrepancy.  Didn't even notice the discrepancy and that

11     he never saw the eight dot, he never get this.  So yeah,

12     that -- it's not consciousness of anything.

13                     That's consciousness of I want a fair shake

14     at this trial.  And I want a lawyer that's prepared and

15     not worried about whether or not he's getting paid.  I

16     want to clear my name.  So now, let's look at the real

17     evidence in this case and the judge is certainly going to

18     instruct you on the law.

19                     And certainly the Judge who is in control

20     of the law.  The label is display printed upon the

21     container the label is the written printed graphic

22     materials that come with it.  Defendant wasn't defrauding

23     his customers.  He was defrauding the F.D.A.

24                     Can you put G Twenty-eight, please?  We

25     have a delay.  Now, if the F.D.A. doesn't regulate 2,4-

1    Dinitrophenol, then we're done.  And that was testified

2    to, but let's look at one chart.  Is it 2,4-Dinitrophenol?

3    Yes.  Is it a hundred and thirty-three milligrams diluted?

4    Yeah.  Was it expired December 1st, 2020?  That's about

5    right.

6              Isn't that for human consumption?  That's

7    correct.  So when he's asked by the undercover special

8    agent, what is the proper dosage?  One capsule for one

9    gallon of water, depending on the results.  Did you check

10   that -- is that about right?  Didn't look.  Why not?  Is

11   it fertilizer, weed killer?  Okay.  Did you try for it?

12   Nope, didn't check.

13             I mean, it's got to have some legitimate

14   purpose.  We already know that certain companies get

15   imported because we have it there.  Right there, so it

16   wasn't regulated.  So what is misleading about that?  Is

17   there anything misleading about that?

18             The third bag that didn't have the label,

19   the third on the cover file was already -- an existing

20   companies already beginning to move.  In fact, the doctor

21   went steps further by attaching the medical documentation,

22   the medical literature, the same medical literature he

23   applied to when he got -- when his two point one kilos

24   seized by customs.  He wrote them a letter he attached the

25   exact same medical package documentation to that letter as

1     he provided a link to or supplied with the 2,4-

2     Dinitrophenol.

3               So what is misleading?  And certainly what

4     is mislabeled beyond a reasonable doubt the kind of doubt

5     that would cause us to pause or hesitate before making an

6     important life decision.  This is the most twisted logic

7     to try to get someone that I have ever seen.  And the

8     reason why I say that is because look, if you feel as if

9     this is improper, then regulate it, put it on a drug

10    scheduled, put it with marijuana, with cocaine, with

11    fentanyl, with whatever other drug that you see fit.

12              And charge it the way it's supposed to be

13    charged.  That's the bottom line.  This charge is not

14    appropriate.  The labelling is correct.  The documents

15    that he provided were correct.  The answer to any

16    questions were correct.  The form that he had people fill

17    out to say that they are not ingesting it was correct.

18    There is nothing wrong with the labelling, there is

19    nothing wrong with the substance.  There is nothing wrong

20    with the defendant's conduct.

21              And that's why you're here.  Your verdict -

22    - your verdict should be governed by the -- this verdict

23    should be governed by the law as the Court gives you.  And

24    once you apply the facts, as you find them, to the law as

25    the judge gives you there is only one verdict in this

1    case, one verdict and that is that Dr. Merlino is not

2    guilty of any of these charges.

3              I thank you again for your time.

4              THE COURT:  Members of the Jury the

5    government now has a right of rebuttal and that's because

6    it has the burden of proof.  So in a civil case, the party

7    bringing the case to plaintiff has a rebuttal because they

8    have the burden of proof in a criminal matter.  Because

9    the government has the burden of proof it also gets a

10   chance to make final remarks.  And so with that Ms.

11   Burnes, do you have any rebuttal to offer?

12              REBUTTAL

13              MS. BURNES:  Members of the Jury keep your

14   eye on the ball and keep your commonsense.  You don't

15   check it at the door when you walk in here.  This is not a

16   case about Wawa selling COVID.  And it's a case about

17   seller selling D.N.P. for human consumption.  Is Wawa sold

18   nitrous oxide in capsule form in its stores and advertise

19   the nitrous oxide for weight loss, that's an F.D.A. case.

20              It's about the seller's intended use.  It's

21   the reason that the customers are buying it.  The

22   misbranding here, as we take a look at Government's Forty-

23   four is about defrauding the F.D.A.  Here, the seller

24   calls it fertilizer.

25              When he knows because you've seen the

1    emails with David Freek, you've seen the emails from Jack

2    Knapman, you've seen the emails with his other repeat

3    customers.  This is for diet, weight loss, human

4    consumption.  And when you evaluate his intent to consider

5    how he knew what he was doing was wrong.  You can take a

6    look at how careful an (unintelligible)) he was in his

7    communications with the special agent.

8              Use your commonsense, the first buy at the

9    end of the eBay sales, never got the Material Safety Data

10   Sheet.  And that's what counsel just referred to as the

11   medical documentation.  Take a look at Government's

12   Eighty-four.  When you're talking to the government, you

13   say 'oh wow D.N.P.'  It's an industrial chemical.  It's

14   not for human consumption.  It's dangerous.  Nothing

15   medical about that that.  This is not a case about

16   patients.  This is not a case about medical practice.

17   This is a business, these are customers and that material

18   safety data sheet is what got sent to the Pittsburgh

19   purchase which was made at Special Agent Arcari's

20   direction by his colleague.

21             That's the third purchase in the chronology

22   of envelopes that we looked at.  And what's significant

23   about that, is that on the email with a new customer, in

24   December of 2018, Merlino attached the Medical Safety Data

25   Sheet.  Special Agent Arcari, who started his purchases in

1    August of 2018 never got that.  In December of 2018, the

2    special agent on the Pittsburgh buy, got the disclaimer,

3    got the acknowledgement, got the sham form saying this is

4    not for human consumption, I am twenty-one years of age,

5    the encapsulation is for plants.

6              Use your commonsense, you've seen all the

7    evidence, you get to put it in the order that it was

8    developed.  He never sent that disclaimer to a repeat

9    customer, he sent it to someone new.  Not for human

10   consumption is the misbranding in this case because the

11   entire point of the business was for human consumption.

12             Fertilizer (unintelligible) it's the

13   misbranding in this case because the entire point of the

14   business was human consumption.  And the Material Safety

15   Data Sheet that was sent to customs, the D.N.P. for

16   agricultural use listed on eBay, all of those things are

17   to lie and hide and disguise his conduct from getting

18   caught -- from getting caught by the regulators.  The Food

19   and Drug Administration and Customs and Border Control.

20             And when you consider all of this evidence,

21   there was only one (unintelligible) and that's guilty.

22   Thank you.

23             THE COURT:  All right, members of the Jury,

24   we're reaching the point where I really need to earn my

25   pay and instruct you on the law.  But before we do that,

1    I'll give you a short ten-minute break to refresh

2    yourselves.  And when you come back, I will instruct you

3    on the governing legal principles, all right.  With that

4    again let's all rise in recognition of the Jury's hard

5    work.

6                     (Off the record, 14:14:19 to 14:15:61)

7                     THE COURT:  We're back on the record just

8    to place in perspective, again where we are for time

9    management and logistical purposes.  We deferred argument

10   on Rule 29 motion to after closings with the Government's

11   agreement that it would not assert any type of waiver.

12                    And this would be the opportunity for the

13   defense to make its arguments.  And then if I -- I am

14   persuaded and grant the motion then I would not proceed to

15   charge the Jury.  And so with that, Mr. Gamburg, you may

16   proceed.

17                    MR. GAMBURG:  Yes, Your Honor.  Judge,

18   first off, again, I support, accurately said this is

19   defense motion for judgment of acquittal pursuant to

20   Federal Rule 29.

21                    And Judge, I'd point out that the

22   indictment specifically charges that from in or about

23   November 2017, to in or about March 2019, defendant with

24   the intent to defraud and mislead introduced them to

25   interstate commerce delivered for introduction into

1        interstate commerce and caused the introduction delivery

2        for introduction into interstate commerce, within the

3        State of New Jersey to the Commonwealth of -- Pennsylvania

4        2,4-Dinitrophenol a drug that was misbranded for having

5        labels that was false and misleading.

6                        Then in particular specifically by

7        (unintelligible) was fertilizer and/or not for human

8        consumption, (unintelligible) to be used and consumed as a

9        human drug in violation of 21 U.S.C. 331(a), 352(a) and

10       333(a)(2).  The government then went basically saying that

11       the F.D.A was the defrauded party.

12                       And Judge if that was the case, then

13       defendant should have been charged under Section 371 for

14       offenses against the United States Government, he was not.

15       So I don't see how that theory can possibly, to quote my

16       cousin (unintelligible).

17                       Secondly, Your Honor, with respect to

18       misbranding.  There is a case of a settlement I gave the

19       Court to cite, as well as, Counsel for the government

20       prior to beginning my argument, which deals with the

21       identical language that was used in -- in our particular

22       case (unintelligible) with the Court's indulgence. I won't

23       belabor the issue.

24                       THE COURT:  Is it -- this is the Goldberg

25       case.

```
 1                      MR. GAMBURG:  Yes, sir.

 2                      THE COURT:  Right.  I -- I -- after I went

 3         back in chambers, I had actually pulled and read Goldberg,

 4         even in advance of trial.

 5                      MR. GAMBURG:  Okay.

 6                      THE COURT:  So I'm familiar with the facts

 7         and I was familiar with the holding, and then I had the

 8         opportunity to re-visit it over the lunch break.

 9                      MR. GAMBURG:  Right.  And there's not a

10         doubt in my mind that the Court's familiar with those

11         facts so based on that, Your Honor, I would argue that the

12         Government has failed to meet its burden and the

13         (unintelligible) regulatory.

14                      THE COURT:  All right, Mr. Gamburg, thank

15         you.

16                      MR. GAMBURG:  Thank you.

17                      THE COURT:  Ms. Burnes?

18                      MS. BURNES:  Your Honor, under Rule 29, if

19         I may remain seated?

20                      THE COURT:  Sure.

21                      MS. BURNES:  Under Rule 29, the Court must

22         determine whether any rational trier of fact could find

23         proof of the Defendant's guilt beyond a reasonable doubt

24         based on the evidence presented at trial, viewing the

25         evidence in the light most favorable to the government.
```

1          And with respect to the full elements of

2    the crime charged that is introduction of misbranded drugs

3    into interstate commerce.  The government clearly meets

4    that burden to survive Rule 29.  That is if there's

5    sufficient evidence at the charged substance 2,4-

6    Dinitrophenol is a drug.

7          There's significant evidence that the

8    intended use in this case was for the to -- to affect the

9    body and -- and to affect, to cure, mitigate, or treat

10   disease.  That -- that evidence goes from the Defendant's

11   own statements to the encapsulation to his communications.

12         Second that the drug was misbranded.  The

13   evidence here is -- is that the not for human consumption

14   is misbranded because the product was in fact intended for

15   human consumption.  And that labelling it as fertilizer on

16   -- on the website which is a labelling used because it's

17   controlled by the seller.  That -- that's ample evidence

18   of that with respect to the screenshot, with respect to

19   the sales, with respect to the volume.

20         Interstate commerce.  Sufficient evidence

21   of -- of that in terms of the mailings and with the intent

22   to defraud or mislead and this goes directly to my -- my

23   counterpart's claim.  It is the law under United States

24   (unintelligible) and then the -- the circuit cases that

25   follow that, including United States versus Alice

1 (phonetic spelling), which is the 4th Circuit United

2 States versus Bradshaw, which is the 11th Circuit --

3 Circuit that the intent to defraud or mislead as a person.

4    And that such persons can include the

5 United States and its agencies with regulating the sale of

6 drugs as well as other identifiable government agencies.

7 And so the -- the case is properly charged under the

8 theory, which has been articulated from the beginning of

9 the case and is replicated throughout the case law among

10 the subjects, which is to say, among the Circuits, which

11 is to say that persons under the statute with the intent

12 to defraud or mislead can include the F.D.A. and the

13 C.B.P.

14    With respect specifically, under some sort

15 of claim that this case should have been charged under 371

16 that's -- that's the I -- I was not able to pull up the --

17 the cases that specifically addressed that.  But this is

18 a, that's a conspiracy statute with respect to, you know,

19 defraud the United States.

20    The question here for the -- for the Court

21 under Rule 29 is whether or not there was sufficient proof

22 for the case to get to the Jury under the elements of --

23 of the crime charged and (unintelligible).

24    THE COURT:  All right.  Anything further

25 from you, Mr. Gamburg?

1          MR. GAMBURG:  No, Your Honor.

2          THE COURT:  All right, with -- with respect

3     to the -- the Government's choice of which statutory

4     provision what to proceed under I think that's within the

5     discretion of the Government.  And -- and the only issue

6     is really whether under the -- the charges in the

7     indictment they have set forth a case that -- that is

8     sufficient under the standard for Rule 29.

9          I think the Goldberg case is significantly

10    distinguished for Mr. Gamburg because what I saw there is

11    a lack of deception and a lack of -- of sleight of hand,

12    so to speak, that I think is fairly in the record here

13    when one looks at the Twitter feed and compares that to

14    other things and given the email traffic as well.  So it's

15    on a factual basis that I distinguish Goldberg.

16          With respect to the -- the legal question.

17    I don't think there's a controlling 3rd Circuit case, but

18    I think the Government is correct that the unanimous

19    weight of authority among the circuits is that an intent

20    to defraud the F.D.A. and not an attempt to -- is

21    sufficient and there is not a separate requirement that an

22    individual consumer be in any way misled or defrauded.

23          And -- and so I -- I commend you, Mr.

24    Gamburg, going on your analysis of the issues but I'm

25    constrained to -- to rule against you and deny the motion.

1            MR. GAMBURG:  Thank you, Your Honor.

2            THE COURT:  All right.  So what we'll do

3    now is I'll take, you can take a few minutes but we'll try

4    to reconvene as quickly as we can and charge the Jury.

5            MR. GAMBURG:  Can I ask you question off

6    the record.

7            THE MONITOR:  Off the record.

8            (Off the record; 14:23:45 to 14:33:34)

9            JURY CHARGE

10            THE COURT:  All right, Counsel you may be

11    seated.  The jury may have noticed this.  This is the

12    first time since you began your service, I did not rise in

13    your honor and that's because for the next half hour or so

14    I'm the most important person in the Courtroom.  So if --

15    if I may, let me go and instruct you on various points of

16    law.

17            I'm going to begin with what's essentially

18    a review which was only a couple of days ago.  So this

19    will be familiar.  But I'll begin by talking about your

20    role and my role.  Obviously, as I said at the outset,

21    your role and your role alone will (unintelligible) to

22    decide the facts of the case.

23            And it's your role, and your role alone to

24    decide on the verdict of the case.  Don't take anything

25    I've said, done any expression on my face to suggest I

1    have a view.  I don't and it's not my role.  My only role

2    is to instruct you on the law at this point having already

3    presided over the trial itself.

4                    And it's your obligation to follow the law

5    as I instruct you.  And I'm going to be explaining to you

6    the legal principles that will govern your decision.  And

7    -- and let me tell you at the outset, with respect to the

8    critical legal principles.  The definition of the offense

9    and the elements of the offense and what must be comprised

10   in any verdict.

11                   I will send out with you that written

12   portion of my instructions, okay.  So you will have a

13   guideline with which -- which you can follow.  And you

14   also have a verdict slip that will be very specific.  All

15   right.

16                   So I know that jurors are sometimes afraid

17   we're going to get it.  And you know, we're going to

18   understand everything that Judge is saying and between

19   what I say now and what I've provided to you I'm sure that

20   you will.

21                   And as I said at the outset, it's your

22   obligation to follow the law whether you agree with it or

23   not, that's my obligation to follow the law whether I

24   agree with it or not.  Your verdict has to be unanimous

25   which is to say all of you must agree on either a verdict

1      of guilty or agree on a verdict of not guilty, or there

2      will be no verdict.  All right.

3                So it must be the unanimous verdict, of all

4      jurors.  And as I said at the outset, we rely upon you in

5      good faith, to have an exchange of views among yourselves

6      as to the evidence you've heard.  What it means and what

7      your verdict should be.  Up till now, I said, don't

8      communicate with anyone.

9                And similarly, when you're deliberating

10     there will be no communication with you.  And Mr. Henry

11     will take electronic devices.  And if there's to be any

12     communication that will come in writing from the

13     foreperson, to me through Mr. Henry and then I will

14     respond to any question that you have.

15               And up to this point, obviously, we said

16     don't do any outside homework.  The same follows and I

17     don't think you'll have any way to do any outside work

18     while you're there deliberating in the Jury room.  But

19     it's so important that the verdict be yours and yours

20     alone.  We rely on you to perform your duties fairly and

21     impartially.

22               And as I said before, sympathy, prejudice,

23     fear, none of that should matter.  And you should not be

24     influenced by any person's race, color, religion,

25     nationality, ancestry, gender, sexual orientation,

1      profession, occupation, economic circumstances, position

2      in the community, nothing matters but the facts as you

3      find them and the law as I give it to you.

4                During their closing arguments, Counsel

5      said, if their recollection of the evidence is different

6      than yours, yours controls.  And similarly, if I happen to

7      mention the fact which I doubt I will, that would be your

8      recollection of the evidence that matters, not mine,

9      because I play no role in deciding the facts of the case

10     and no role in deciding the -- the verdict.

11               You need not be concerned with any

12     punishment provided by law for the charge with which the

13     defendant is on trial.  That is exclusively my

14     responsibility when the time comes.  That does not rest on

15     your shoulders and should not be considered by you as to

16     what a potential sentence might be if you were to find the

17     defendant guilty.

18               You need only concern yourself with guilty

19     or not guilty.  And then if you were to find the defendant

20     guilty, responsibility would pass back to me.  At the

21     outset of the case, we talked about what evidence is and

22     what it isn't.  I'll go through that quickly because it's

23     fairly recent.

24               The evidence obviously is the testimony

25     that you've heard.  You've now seen many other forms of

1    evidence in terms of documents and screen captures and

2    records.  You've seen physical evidence.  And there have

3    been stipulations in this case where the parties agreed,

4    we'd say the following is true.

5            I think the best -- best example that is,

6    as to lab tests, we didn't have to call a technician to

7    say this is what the substance was, as to the various

8    emails and other documents.  How do we know this is from

9    Google?  Well, because the parties have stipulated, all

10   right, and so that they've agreed to.

11           What is not evidence, the charges

12   themselves are not evidence.  The statements and

13   arguments, the lawyers are not evidence.  We haven't had a

14   lot of objections.  We have very experienced good counsel

15   here.  But the few objections there were that's not part

16   of the evidence.  I didn't need to strike any testimony,

17   so you don't need to concern yourself with that.

18           And obviously, only what you have heard

19   within the four walls of the courtroom is something you

20   should consider.  We've said this before, and at the risk

21   of repeating myself, we rely on your judgment and

22   commonsense.  You bring your life experience to this

23   courtroom and you make decisions the same way you would in

24   important matters in your own life.  And you follow your

25   reasoning and your commonsense in deliberations and

1      finding the facts and in reaching a verdict.

2                          Rules of Evidence control what it is that

3      you've heard and really we -- we haven't had a lot by way

4      of evidentiary disputes; two or three things I made a

5      ruling on and it's only what I allowed in evidence that --

6      that you should consider.  And at the risk of redundancy,

7      again, the lawyer's arguments and statements are

8      important.  But you are who matters inside the courtroom.

9                          At the outset of the case, I talked about

10     direct evidence and circumstantial evidence.  And direct

11     evidence is somebody who says this is what I saw.  This is

12     what I heard.  This is what the document says.

13     Circumstantial evidence is based upon a variety of other

14     facts.  These are certain things that follow and that we

15     think are true.

16                         And as I said at the outset, in a

17     courtroom, direct and circumstantial evidence have the

18     same value.  And so if you take certain facts and you put

19     them together and reason and commonsense tells you well,

20     based on these facts, other things are true, that's

21     acceptable.  And indeed, we rely on juries to do that.

22                         Because as a general rule in a case, not

23     everything is within the realm of what a witness saw and

24     you have to put together all of the various pieces of

25     information which you have received.  I think I gave you

1    the umbrella example, at the outset of the case.  I gave

2    you a parenting example now.

3              I have four kids, and depending upon how

4    old you are, you may know that Tupperware makes these

5    popsicle things.  You can put the grape juice in with

6    things and freeze them and you got yourself a popsicle.

7    So one Saturday morning they're watching their cartoons

8    which used to be a thing on Saturday morning, again,

9    depending on how old you are.

10             And I'm in the freezer, and I noticed

11   there's a popsicle missing.  I said, all right, who ate a

12   popsicle before breakfast?  Not me, not me, not me.  I

13   said stick out your tongues.  A-ha.  We had a purple

14   tongue.  I found that I deduced that, in fact, this was

15   the culprit, that is circumstantial evidence.  All right,

16   just a humorous but I think instructive example of what it

17   means.

18             Now sometimes, you'll look at that evidence

19   and people will have different reactions.  My wife said,

20   wait a minute, I gave an infant Tylenol, it was great.

21   And then there could be a discussion.  Turns out that

22   wasn't the case.  They weren't, you know, they hadn't

23   eaten that popsicle.

24             But you can sometimes have facts from which

25   people draw different and sometimes even opposite

1    conclusions.  All right.  But it's up to you to consider

2    reason and commonsense and what you think follows from all

3    of the evidence that you have heard.  And so you may take

4    into account everything that I've allowed you to hear as

5    evidence, the testimonies, the documents, the exhibits,

6    and you may consider the direct evidence and the

7    circumstantial evidence and give it equal weight.

8                 The Government must prove the defendant

9    guilty beyond a reasonable doubt.  But the government is

10   not required to present all possible evidence related to

11   any case or to produce all possible witnesses who might

12   have some knowledge of facts about the case.  And as I've

13   said, the defendant never has any burden to present any

14   evidence.

15                So the question is simply, only the

16   evidence that you have heard, are you persuaded the

17   government has proven the case beyond a reasonable doubt.

18   In this case, we've had summaries of evidence that have

19   been before you.

20                And there's a rule that says where the

21   underlying records and documents are made available to the

22   other side and then summarized in the form of an exhibit

23   and admitted into evidence that that's proper for the Jury

24   to consider.  And so we have done that here because of all

25   of the various records whether they would be financial

1      records or transaction records or emails.  And that is

2      something that has been admitted into evidence and you may

3      consider in the case.

4              I've already talked about the stipulations

5      that the parties have entered into.  Actually, you can

6      even reject a stipulation.  So if the parties were to

7      stipulate something that you found totally not believable,

8      you would not be bound by that.  And I mentioned that but

9      otherwise, you take into account the fact that the parties

10     agree certain things are true.  And you may consider that

11     as having been established in the record of the case.

12             The Defendant has pleaded not guilty to the

13     charges.  And as I said before, he's presumed innocent,

14     when we started this record.  Rather, he started this

15     trial with a clean slate and and no evidence against him

16     and that presumption of innocence remains today, even as

17     you're about to deliberate.

18             And the Government must overcome that

19     presumption of innocence and prove its case beyond a

20     reasonable doubt.  And you, therefore, are obligated

21     because of the presumption of innocence.  If the

22     Government has failed to meet that burden, and it hasn't

23     proven the case beyond a reasonable doubt, then, that

24     means the defendant should be found innocent.

25             The presumption of innocence, as I said,

1          means the defendant never has a burden to present evidence

2          or to testify in the case and the burden of proof remains

3          on the government throughout.  As I said before, and this

4          is fundamental to our system of criminal justice, that the

5          government must prove guilt beyond a reasonable doubt.

6                    And so when I get to the definition of the

7          offenses I will be talking about the elements of the

8          offenses.  You've heard some of that in argument and the

9          government must prove each element beyond a reasonable

10         doubt.  Defendant may never be convicted based simply on

11         suspicion or conjecture or guesswork, but only based on

12         evidence that establishes their guilt beyond a reasonable

13         doubt.

14                   Proof beyond a reasonable doubt does not

15         mean prove beyond all possible doubt, or prove to a

16         mathematical certainty.  Possible doubts are doubts based

17         on conjecture, speculation and guesses or hunches are not

18         the same as reasonable doubt.

19                   A reasonable doubt is a fair doubt based on

20         reason, logic, commonsense or life experience.  It is a

21         doubt that an ordinary reasonable person has after

22         carefully weighing all of the evidence and it's a doubt of

23         the sort that would cause him or her to hesitate before

24         taking action in a matter of importance in his or her own

25         life.

1          A reasonable doubt may arise from the

2     evidence.  It may arise from a lack of evidence.  It may

3     arise from the nature of the evidence.  If now, having

4     heard all the evidence, you were convinced that the

5     Government has proven every element of the offense charged

6     beyond a reasonable doubt then you should return a verdict

7     of guilty for the offense.

8               However, if you have a reasonable doubt

9     about one or more of the elements of the offense charged

10    then you must return a verdict of not guilty on the

11    offense.

12              As I said before, I will be defining the

13    elements for you and then sending them out to the Jury

14    room with you as well.

15              There is only one defendant before you.

16    And the only question before you is whether the Government

17    here has proven William Merlino guilty of the charge in

18    the indictment.  You're not called upon to return a

19    verdict of guilt or innocence as to anyone else.

20              And so it's simply irrelevant if you felt

21    there was someone else, who should in some way be

22    implicated.  All that is before you is whether -- as to

23    this defendant on these facts, the government has proven

24    its case beyond a reasonable doubt.

25              During the trial, you heard about various

1    witnesses and you were shown the investigative techniques

2    used by the Government.  There is no legal standard as to

3    what particular investigative techniques law enforcement

4    must use.  So here we've heard about undercover buys and

5    search warrants and everything.

6              Those are the (unintelligible) that

7    followed in this case but there's no requirement that it

8    used any specific technique and investigating a potential

9    crime.  Again, the only question is based upon the

10   investigation they did and the evidence they gathered,

11   have they proven this defendant's guilt beyond a

12   reasonable doubt.

13             Going to go back and review some of the

14   tips about assessing witnesses.  All right, and

15   credibility of witnesses.  Credibility is just a fancy

16   word for, do I believe this person?  Do I think that the

17   testimony was accurate?  You may believe everything a

18   witness says, part of what a witness says or none of it.

19             And as I said at the beginning, look at the

20   behavior and the manner of the witness.  You look at the

21   explanations they give.  You look at the other evidence in

22   the case and you see whether or not it supports what the

23   witness has said or in some way contradicts it.  Talk

24   about did the witness have the opportunity to know what

25   they're testifying about.  Did they see it?  Did they hear

1   it?  Do they have the knowledge necessary to say what

2   they're saying?  You look at the quality of what they're

3   saying and their understanding of what they're talking

4   about.

5          Obviously, you consider how they present

6   themselves, their appearance, their demeanor, their

7   behavior and their manner while testifying.  It's always

8   relevant.  Well, does this witness have an interest in the

9   outcome of the case, it's really bias or prejudice that

10  they have.

11         Does the witness have any relation to a

12  party in the case?  And then we get to the point of well,

13  was there anything that was consistent or inconsistent

14  with what the witness previously said or with the other

15  evidence.

16         And as I said at the outset, if there are

17  inconsistencies in a record and it will be up to you

18  whether there are or not in this case, that doesn't mean

19  that somebody is not being truthful.  It can be

20  differences in the way that people will remember things,

21  differences in the way that people will assess

22  information.  And it's up to you to decide, are there

23  inconsistencies?  If there are, do they matter?  And if

24  they matter, what do I make of it?  Again, you can take

25  all of that into account.

1          You are not required to accept testimony

2     simply because it was not contradicted.  And you're not

3     required to accept testimony, even if the witness was not

4     in any way challenged on cross examination.  It's up to

5     you to decide what to believe from any witness that you

6     heard.  And really, the technique surrounding it is

7     irrelevant.

8          It's just how do you assess this individual

9     and their testimony and their evidence?  And do you find

10    it worthy of belief?  And after you've made a judgment

11    about whether, yeah, I think that witness is believable.

12    It's up to you to decide what importance you give to their

13    evidence.  Is it significant?  Does it carry a real

14    weight?  Or is it something that doesn't really have a lot

15    of meaning in the overall picture of the case?

16         The weight of the evidence to prove any

17    fact does not necessarily depend upon the number of

18    witnesses who testify or the quantity of the evidence that

19    was presented.  But what is more important than number or

20    quantities, was the witness believable and how much weight

21    do you give to their testimony and the other evidence in

22    the case.

23         As I said in jury selection in the criminal

24    case, you hear from government agents and law enforcement.

25    And so here you've heard testimony from government

1    employees and -- and government agents.  The fact that a

2    witness is employed in law enforcement does not mean that

3    his or her testimony, necessarily deserves more or less

4    consideration or greater or lesser weight than any other

5    witness.

6              At the same time, it's quite legitimate for

7    defense counsel to question the believability of a law

8    enforcement -- enforcement witness on the ground.  Well,

9    do they have a stake in the outcome of the case.  A

10   personal professional interest in the outcome of the case.

11             Again, such witnesses do not get more

12   credibility, less credibility.  They are assessed like any

13   other individual who takes an oath and testifies before a

14   jury.  And it's up to you to decide what you make of the

15   testimony that you've heard.

16             In the points of charges that I've

17   discussed with counsel, not all are going to apply so I'm

18   going to skip over fifteen because we did not go in that

19   direction.  But within this case, Dr. Merlino did not

20   testify, and his attorney elected not to present evidence.

21   And so we come back to the fundamental premises of our

22   justice system.  And that is that a defendant has an

23   absolute right under the Constitution, not to testify and

24   also not to present any evidence.

25             And that again, and I'm repeating, but I

1    repeat, because it's important.  The burden of proof

2    always rests with the prosecution.  And it never shifts to

3    the defendant.  And no defendant is ever required to prove

4    that he's innocent.

5                    So as I said, during jury selection, you

6    may not attach any significance to the fact that the

7    defendant did not testify.  You can't hold it against him.

8    You can't draw any negative inference against him because

9    he chose it not to testify.  And therefore, do not

10   consider for any reason that as a fact in your

11   deliberations, right?

12                   And if it comes up, just remind one

13   another.  Now we can't -- we can't go there because

14   everyone as a citizen has a right not to testify.

15                   Counsel, Seventeen and Eighteen I don't

16   think really apply either and so we're going to move now

17   to instruction Nineteen.

18                   You have heard testimony that after the

19   crime alleged was committed that William Merlino created

20   false and fraudulent records in the name of a legitimate

21   medical doctor and a hospital representing that he had

22   been diagnosed with and was being treated for pancreatic

23   cancer.

24                   You've also heard testimony that he

25   presented these fraudulent records to his prior counsel,

1    who in turn submitted them to prosecution and -- and to

2    the Court.  If you believe that William Merlino engaged in

3    such conduct then you may consider this conduct along with

4    all the other evidence in deciding whether the Government

5    has proven beyond a reasonable doubt that he committed the

6    crime charged.

7              Engaging in such conduct may indicate that

8    Merlino thought he was guilty of the crime charged and was

9    trying to avoid punishment.  On the other hand, sometimes

10   an innocent person may engage in conduct that seems

11   suspicious but for which there is an explanation.

12             Whether or not evidence as to falsifying

13   medical records causes you to find that the defendant was

14   conscious of his guilty of the crime charged, and whether

15   that indicates he committed the crime charged is entirely

16   up to you as the sole judges of the facts.

17             And similarly, you must conclude that he

18   did falsify records.  But you must bear in mind that

19   William Merlino is not on trial for anything to do with

20   whether he falsified medical records.  And you may

21   consider this evidence only if you find it relevant to his

22   consciousness of guilt on the charges brought against him

23   here.

24             You've also heard testimony that the

25   defendant made certain statements outside the Courtroom to

1    government officials and authorities in which he claimed

2    that his conduct was consistent with innocence and not

3    with guilt.  The government claims that these statements

4    are false.

5              If you find that the defendant made a false

6    statement and that can be in writing, as well as an

7    interview of some kind, in order to direct the attention

8    of law enforcement away from him or the government away

9    from him, you may but are not required to include the

10   defendant believed that he was guilty.

11             It is reasonable to infer that an innocent

12   person does not usually find it necessary to invent or

13   fabricate an explanation or a statement to establish his

14   innocence, but that is for you to decide.  You may not

15   however, conclude on the basis of this alone that the

16   defendant is in fact guilty of the charge, of the crime

17   for which he is charged.

18             You must decide whether or not any evidence

19   about such statements shows that he believed that he was

20   guilty and the significance if any to be attached to that

21   evidence.  And in your evaluation, you should consider

22   that there may be reasons fully consistent with innocence,

23   that could cause a person to give a false statement that

24   he did not commit a crime.

25             Fear of law enforcement, reluctance to

1    become involved or simple mistake may cause an innocent

2    person to give such a statement or explanation.

3              Counsel, I don't think twenty-one is

4    relevant either.  And nor do I think twenty-two.

5    Similarly, twenty-three.

6              All right, twenty-four.  Again, this is a

7    little bit of a repeat, but all these principles are

8    important.  And under your oath as jurors you're not to be

9    swayed by sympathy, bias, prejudice, fear of public

10   opinion or your own views as to the propriety or social

11   desirability of this conduct.  And you were to be guided

12   solely by the evidence in the case.

13             The conduct charged in the indictment is

14   illegal under federal law.  The only issue for you to

15   decide is whether or not the defendant has violated the

16   law and in order to determine the guilt or innocence of

17   the defendant solely on the basis of the evidence and --

18   and the law as I'm about to charge you or what the

19   elements of the offense are.

20             If you find that the law has not been

21   violated, you should not hesitate for any reason to return

22   a verdict of not guilty.  If on the other hand, you find

23   beyond a reasonable doubt that the law has been violated

24   as charged, you should not hesitate to render a verdict of

25   guilty.

1           I don't think really twenty-five is an

2     issue either, Counsel, and it's confusing.

3     (unintelligible) principle of evidence that I don't think

4     we involve ourselves with here.  And I'm not going to

5     submit the indictment to the Jury.  I'm just going to

6     explain what the elements of the offense so I will pass

7     over twenty-six.

8           Now, instruction twenty-seven it has -- it

9     has to do, you'll see in the verdict form.  There is

10    language that asks you whether the crime was committed on

11    or about a certain date.  And there's a range of dates

12    that will appear on the verdict form that match the

13    indictment, the charges in the case about when the conduct

14    that the Government alleges occurred.

15          The Government does not have to prove with

16    certainty, the exact date of the alleged offense.  It is

17    sufficient if the government proves beyond a reasonable

18    doubt that the offense was committed on a date reasonably

19    near the dates alleged.  And again, there's dates to be

20    set forth in the verdict form for you.

21          Similarly, when I get to defining the

22    elements of the offense.  You're going to see that there

23    are four elements all of which need to be established.  So

24    it's this, this and that.  So all four have to be

25    established.  But within some of the elements there'll be

1      the word or.

2                       So when the word and is used, it means they

3      all have to be there.  And or means it has to be one or

4      the other.  All right.  And so you'll see that in the

5      definition of the elements of the offense.  You've --

6      you've heard some testimony about acts committed and where

7      they were committed.

8                       And the government alleges in the

9      indictment that some act in furtherance of the offense

10     charged occurred here in the Eastern District of

11     Pennsylvania.  There is no requirement that all aspects of

12     the offense have taken place here in the Eastern District

13     of Pennsylvania.

14                      But for you to return a guilty verdict, the

15     government must persuade you that some act in furtherance

16     of the crime charged took place here within the Eastern

17     District.  Now, unlike the elements of the offense and

18     everything else in the case which is beyond a reasonable

19     doubt.

20                      As to whether some act occurred in the

21     Eastern District of Pennsylvania.  The Government's burden

22     is by a preponderance of the evidence.  So preponderance

23     of the evidence just means you find it more likely than

24     not that one of the acts relevant to the case occurred

25     here in the Eastern District of Pennsylvania.

1          If so, then they've established venue here

2     in the Eastern District.  The rest of the elements,

3     though, as I mentioned, have to be beyond a reasonable

4     doubt.  So those are sort of general instructions about

5     process and rules of evidence and then some preliminary

6     thoughts on -- on how to look at the verdict sheet.

7          And -- and I'm now going to move to the

8     substance of the offense charged, all right.  And as I

9     said before, you will have in writing this aspect of my

10    instructions for you to consult along with the verdict

11    sheet.

12         So this is a prosecution that arises in

13    part of the Federal Food, Drug and Cosmetic Act, which is

14    part of the United States Criminal Code and has an

15    underlying purpose of the protection of the public health

16    and welfare.  And the elements, there are four.

17         There's only one charge before you.  And

18    the defendant is charged with the introduction of

19    misbranded drugs into interstate commerce.  And here are

20    the four elements, one, that the charged substance, 2,4-

21    Dinitrophenol, DNP, is a drug.  That's number one.

22         Number two, the drug was misbranded in at

23    least one way.

24         Three, the defendant introduced or caused

25    the introduction of the drug into interstate commerce.

1            And four, the defendant acted with intent

2    to defraud or mislead.  If all of these elements have been

3    proved beyond a reasonable doubt, then you must find the

4    defendant guilty of the crime charged.  Otherwise, you

5    must find the defendant not guilty.  All right.

6            So as I mentioned before, you need to find

7    all four elements that if you look at element four, it

8    says whether the defendant acted with the intent to

9    defraud or mislead, so there would be one or the other and

10   use of the word or.

11           Now, having given you a summary of the four

12   elements, I'm going to go through them one by one.  And

13   again, you'll have them with you in the jury room as

14   follows.  I'm now going to talk about how the statute

15   defines what is a drug.

16           A drug is an article intended for use in

17   the diagnosis, cure, mitigation, treatment or prevention

18   of disease in man or animals and articles other than food,

19   intended to affect the structure or any function of the

20   body of man or an animal.  It also includes articles

21   intended for use as a component of either those first two

22   definitions.

23           Whether a product is considered to be a

24   drug will depend upon its intended use.  Intended use is

25   determined by the objective intent of the person

1    responsible for labelling the drugs.  The intent is

2    determined by such person's expressions or may be shown by

3    the circumstances surrounding the distribution of the

4    article.

5              Such objective intent may for example, be

6    shown by labelling, claims, advertising matter or written

7    or oral statements by such persons or their

8    representatives.  A product's intended use is what a

9    reasonable person would conclude the manufacturer or

10   seller intended based on all the relevant information.

11             You can determine the intended use of a

12   product by considering the label, accompaning labelling,

13   promotional material, advertising, all representations

14   made about the product, the circumstances surrounding the

15   distribution of the article and information from any other

16   source which discloses intended use.

17             The mere use of a product's name itself can

18   be a claim to diagnose, mitigate, treat, cure or prevent

19   disease.  You are not bound by any particular claims or

20   statements made by the supplier or seller that purports to

21   disclaim an intended use.  If there's other evidence

22   concerning intended use, that conflicts with those claims

23   or statements.

24             If you find that the defendant intended for

25   the D.N.P. product to be used for the diagnosis, cure,

1    mitigation, treatment or prevention of disease in people

2    or to affect the structure of any function or any function

3    of the body, then you must find that the 2,4-Dinitrophenol

4    is a product.  Dinitrophenol product is a drug under the

5    statute.  All right.  So that's the definition of -- of a

6    drug.

7                The second element is whether it was

8    misbranded.  First, a drug is misbranded within the

9    meaning of the statute if its labelling is false or

10   misleading in any particular way.  And the statute

11   provides two distinct definitions, the terms label and

12   labelling.

13               The term label means a display of written

14   printed or graphic material upon the immediate container

15   of any article.  The term labelling means all labels and

16   other written printed or graphic material that appears on

17   any product or appears on any of its containers or

18   wrappers or that accompanies the product.

19               Thus, the term labelling is broader than

20   the term label.  And labels are but one kind of labelling.

21   And it is unnecessary for the matter to have been

22   physically attached to the drug or to have been shipped at

23   the same time as the drug or with a drug to constitute

24   labelling.

25               Under the statute, as I just explained,

1    such matter can constitute labelling if it accompanies the

2    product.  And so if such material is provided as part of

3    an integrated distribution program, pertaining to a drug

4    and explains the uses of the drug.  Then it accompanies

5    the drug and constitutes labelling.

6              For example, information on a company's

7    website can -- can -- can constitute labelling if such

8    information is provided as part of an integrated

9    distribution program with respect to the drug.  You do not

10   need to find that the labelling is false or misleading in

11   its entirety.  You need only find that any single

12   representation in the labelling is false or misleading.

13   Any single misrepresentation is false or misleading.

14   Provided however, you must all agree as to which one.  So

15   the particular misrepresentation found false and mislead

16   -- and misleading you must agree upon as the jurors.

17             First two elements now the third,

18   interstate commerce.  Interstate commerce means commerce

19   between any state and any place outside of that state

20   including a foreign country.  To introduce a drug in

21   interstate commerce, the Defendant need not personally

22   transport the drug across the state line it is enough that

23   the defendant caused an interstate shipment of the drug or

24   one of its components.

25             And finally, the fourth element is intent

1    to defraud or mislead.  So the government has charged that

2    the defendant violated provisions of the F.D.C.A. with the

3    intent to defraud or the intent to mislead.  To act with

4    intent to defraud means to act with the specific intent to

5    deceive or cheat, ordinarily for the purpose of bringing

6    about some financial gain to oneself.

7             It is not necessary, however, to prove that

8    anyone was in fact defrauded as long as -- as it is

9    established beyond a reasonable doubt that the Defendant

10   acted with the intent to defraud.  You're instructed that

11   to act with intent to mislead means to act with the

12   specific intent to create a false impression by

13   misstating, omitting or concealing material facts.

14            And it is not necessary again, however, to

15   prove that anyone was in fact misled as long as it is

16   established beyond a reasonable doubt that the defendant

17   acted with the intent to mislead.  Ordinarily, there's no

18   way that a defendant's state of mind can be proven

19   directly because no one can read another person's mind and

20   determine what that person is thinking.

21            A defendant's state of mind can, however,

22   be proved indirectly from the surrounding circumstances.

23   This includes obviously such things as what the defendant

24   said, what the defendant did, how the defendant acted and

25   any other facts or circumstances in evidence that you find

1      bear upon the defendant's intent.

2                    A defendant acts with intent to defraud or

3      intent to mislead under the statute if the defendant acts

4      with the intent to defraud or mislead another person in

5      order to sell a misbranded drug.  In addition to

6      individuals, a person can include the United States and

7      its agencies charged with regulating the sale of drugs, as

8      well as other identifiable governmental agencies.

9                    To act with the intent to defraud or

10     mislead the United States needs to act with the specific

11     intent to interfere with or obstruct a lawful governmental

12     function by deceit, craft or trickery or at least by means

13     that are dishonest.

14                    Intent to defraud or mislead the United

15     States can be established by proof beyond a reasonable

16     doubt that the defendant took affirmative steps in an

17     effort to conceal their activities from government

18     agencies charged with regulating those activities, such as

19     the Food and Drug Administration or U.S. Customs and

20     Border Protection.

21                    Now, in a moment, I'm going to discuss with

22     you the sort of mechanics of what you do when you go back

23     to deliberate but first, Mr. Henry, will you hand the Jury

24     the verdict sheet?  We have one for each of them, and then

25     there's two copies of the substantive part of the charge.

1     The verdict sheets we'll pass out the

2 instructions just hold on the end of the bar of the Court

3 there.  I gave you the whole stack so you're going to have

4 to give one back to me.  Members of the Jury, it's -- it's

5 one count on the form.  And it -- it -- it summarizes that

6 the charge it gives you the range of dates and then

7 provides a space for you to enter your verdict.

8     And then, as I said, the -- the four

9 elements and their definitions you'll have in writing when

10 you come back because it's with respect to the verdict

11 sheet, you have to find the Government has proven those

12 four elements in order to have a verdict of guilty, all

13 right.

14     So now let me talk about the logistics of

15 what happens in the first stage you're going to need to do

16 when you go back and say, who's going to be the

17 foreperson, all right.  Now, the foreperson is not the

18 boss of the Jury.  They're certainly the convener and the

19 facilitator of the Jury just as a point of communication

20 with the Court, and in terms of just putting together

21 whatever it is that you need.

22     Second and -- and I'm sure you already know

23 this, but your verdict has to be unanimous.  And so to

24 find the defendant guilty of an offense, every one of you

25 must agree that the government has overcome the

1    presumption of innocence with evidence that proves each of

2    the offenses beyond a reasonable doubt.

3            To find the defendant not guilty every one

4    of you must agree that the defendant has failed to

5    convince you beyond a reasonable doubt.  And again, if

6    there were to be a finding of guilt, you need not concern

7    yourself about sentencing that is ex -- exclusively my

8    responsibility.  I've already said enough times in your

9    evidence, your verdict must be based only on the evidence

10   and -- and the law.

11           And now's the time when you will be free to

12   talk about the case which I've asked you not to do up to

13   this point.  Exchange your views honestly, carefully,

14   respectfully, listen to one another.  Everyone keep an

15   open mind.  No one should abandon a view they hold just

16   because other people don't agree.  But just exchange your

17   views and see.

18           Often, jurors start out with different

19   perspectives and over the process of deliberation, then

20   they find some consensus.  No one should ever change their

21   mind just because another juror disagrees.  Every one of

22   you is free to consider the evidence and -- and consider

23   the verdict as you see fit.

24           And while it's important for us to try to

25   reach a verdict, you should only do so if you could do so

1    honestly and in good conscience.  And we will rely upon

2    you to exchange your views and -- and discharge those

3    duties fairly and impartially.  No one will know anything

4    about your discussions.  No one listens in.

5           If you took notes, remember they're just a

6    guide.  A notetaker does not have greater insight into the

7    evidence than a non-notetaker.  And they're not

8    transcripts, there's only one transcript.  And we don't

9    even have that printed yet.  So they're merely there to

10   help guide your recollection of -- of -- of the evidence.

11          And again, if there are disagreements as to

12   what the evidence shows, talk them through and see if you

13   can find consensus.  While you're deliberating if you need

14   anything, if you have a question, just -- Mr. Henry's

15   office is right there as you know.  Pass a note to him and

16   he will bring it to me.  All right?

17          Never in any communication say here's where

18   we are, Judge, that's none of our business.  Okay?  So you

19   should never reveal anything about the substance of your

20   deliberations and where you are.  Just tell me what you

21   need to know or tell me what you need.  And then I'll

22   respond.  Sometimes I bring in and we have a chat.

23   Sometimes I just get the lawyer's consent, send out a

24   written answer to a question.

25          If you have a question.  Keep deliberating

1          in the meantime.  Because if you do have, let's say a

2          legal question.  I need to talk to the lawyers.  So I get

3          them and we huddle and everything else.  So don't let's

4          say, let's wait till we get this answer.  Keep going and

5          see if you can make progress without the answer.

6                    If you can't, you can't.  But oftentimes,

7          jurors can figure out some other things.  And then we get

8          back to you as soon as we can.  But we'll – we'll be right

9          here standing by and try to respond to anything very

10         expeditiously.

11                   All right, Counsel, is there anything you

12         would like to discuss at sidebar?

13                   MR. GAMBURG:  No, Your Honor.

14                   MS. BURNES:  No, Your Honor.

15                   THE COURT:  All right, that's their chance

16         to say Judge you got this wrong.  So, so far, so good.

17         Now, Mr. Henry is going to take you back to the Jury room

18         and are the substantive instructions there with the Jury,

19         you still have those?

20                   MR. HENRY:  They're right here.

21                   THE COURT:  Okay, so you'll want two copies

22         of those.  I'm going to ask juror number fourteen please

23         to go into the Jury room now with Mr. Henry and retrieve

24         his belongings for the time being.  You're not discharged.

25         You're still here but I'll -- I'll explain in -- in a

1      moment what your role is going forward, all right?

2                          And for the rest of you, would you stand-

3      by.  We will shortly escort you to the Jury room.  If

4      you're wondering what the paintings are on the wall in the

5      Jury room they are the county courthouses of the nine

6      counties that make up the Eastern District of

7      Pennsylvania.  I got in framed when I took the bench.  I

8      figured it would bring everybody together.

9                          All right, so I'll ask you to just let your

10     companions out, sir.  Okay, so you could step down and

11     just the -- yes, it's standing nearby and Mr. Henry, can

12     you escort out the Jury?

13                          MR. HENRY:  Yes.  All rise.

14                          THE COURT:  We're still on the record.

15     I'll address juror number fourteen.  It's always a

16     difficult job for a judge as the Jury is about to

17     deliberate to reveal to some jurors that they are

18     alternate jurors.  And you are an alternate.  As you can

19     see, we needed one of our alternates so it's vitally

20     important that you are here.

21                          And actually, your service is not over

22     because we've had circumstances where deliberations begin,

23     a juror is lost, and we then need to bring you in from the

24     bullpen.  And so it's my practice, Counsel, to escort

25     alternate jurors into the secure (unintelligible) where

1      I'm responsible for their wellbeing and comfort.  While

2      the Jury deliberates?  Is there any objection to that?

3                      MR. GAMBURG:  No, Your Honor.

4                      MS. BURNES:  No -- no, Your Honor.

5                      THE COURT:  All right.  And then obviously

6      I don't discuss the case at all.  We discuss baseball and

7      if you need to make a phone call so since Mr. Henry is --

8      is dealing with the Jury and a C.S.O. will be up to

9      preside usually is the case.  I'll invite Mr.

10     (unintelligible) why don't you gather your belongings and

11     come on back with me.

12                      And with that, Counsel will obviously like

13     you to stand by for the rest of the afternoon.

14                      MR. GAMBURG:  Thank you, Your Honor.

15                      MS. BURNES:  Thank you, Your Honor.

16                      THE COURT:  I'll open the door from inside.

17                      (Off the record; 15:19:29 to 15:19:44)

18                      THE COURT:  Please raise your right-hand,

19     Officer?  You do swear or affirm that you will keep this

20     jury in a quiet convenient place for the deliberations

21     that you allow no one to speak to them or speak to them or

22     yourself touching on the issue before them unless it is to

23     inquire if they have agreed upon a verdict so help you God

24     or are you affirm?

25                      MARSHALL OATH:  I affirm.

1                    (Swears in C.S.O.)

2                    (Off the record; 15:20:18 to 15:53:44)

3                    THE COURT:  Counsel with -- with questions

4      from the Jury especially questions of this kind which are

5      more procedural in nature, my custom is to have -- reply

6      in writing.  And so I propose the following answer.  And

7      it bears the caption of the case and communication number

8      one.

9                    And it says when you have unanimously

10     reached a verdict only a single verdict sheet recording

11     the verdict signed by the foreperson is necessary.  I've

12     included the language when you have unanimously reached a

13     verdict, just to underscore the fact that it would have to

14     be the verdict of the entire jury as a safeguard for the

15     defendant.  Is that acceptable to the Government?

16                    MS. BURNES:  Yes, yes, Your Honor.

17                    THE COURT:  Is that acceptable to the

18     defense?

19                    MR. GAMBURG:  Yes, Your Honor.

20                    THE COURT:  With that then, I will dispatch

21     Mr. Henry with communication number one.

22                    (Off the record; 15:54:36 to 16:08:40)

23                    THE MONITOR:  All rise.

24                    THE COURT:  All right, members of the Jury

25     please be seated.  I'm told that you have reached a

1    verdict, is that correct?

2                      JUROR:  Yeah.

3                      THE COURT:  All right, Mr. Henry, will you?

4    All right, Mr. Henry, will you please take the verdict?

5                      MR. HENRY:  Yes.  First, I want to ask all

6    members of the Jury to please rise.  Members of the Jury,

7    have you all agreed upon your verdict?

8                      MEMBERS OF JURY:  Yes.

9                      MR. HENRY:  Thank you.  With all the jurors

10   panel please take your seat but the foreperson.

11   Indictment number nineteen dash seven one seven between

12   the United States of America and William A. Merlino as to

13   count one, introduction of misbranded drugs into

14   interstate commerce in or about November of 2017.

15                      Two, in or about March 2019, you

16   unanimously find William A. Merlino guilty or not guilty.

17                      JUROR:  Guilty.

18                      MR. HENRY:  Thank you.  Please be seated.

19                      THE COURT:  All right.  Is there any

20   request to poll the Jury, Mr. Gamburg?

21                      MR. GAMBURG:  Yes, Your Honor.

22                      THE COURT:  All right, ladies and

23   gentlemen, jury we're -- we're now just going to briefly

24   ask each member of the Jury to affirm that that's your

25   verdict.  So we'll begin with the foreperson juror number

1        one, is that your verdict?

2                        JUROR NUMBER ONE:  Yes.

3                        THE COURT:  Juror number two?

4                        JUROR NUMBER TWO:  Yes.

5                        THE COURT:  Juror number three?

6                        JUROR NUMBER THREE:  Yes.

7                        THE COURT:  Juror number four?

8                        JUROR NUMBER FOUR:  Yes.

9                        THE COURT:  Juror number five?

10                       JUROR NUMBER FIVE:  Yes.

11                       THE COURT:  Juror number six?

12                       JUROR NUMBER SIX:  Yes.

13                       THE COURT:  Juror number seven?

14                       JUROR NUMBER SEVEN:  Yes.

15                       THE COURT:  Juror number eight?

16                       JUROR NUMBER EIGHT:  Yes.

17                       THE COURT:  Juror number nine?

18                       JUROR NUMBER NINE:  Yes.

19                       THE COURT:  Juror number ten?

20                       JUROR NUMBER TEN:  ...

21                       THE COURT:  Number, Juror number eleven?

22                       JUROR NUMBER ELEVEN:  Yes.

23                       THE COURT:  Juror number twelve?

24                       JUROR NUMBER TWELVE:  Yes.

25                       THE COURT:  Juror number thirteen?

1             JUROR NUMBER THIRTEEN:  Yes.

2             THE COURT:  And the record will reflect

3     that that Juror thirteen is sitting as an alternate in

4     place of our missing juror who succumbed to illness.  So

5     is that acceptable, Mr. Gamburg?

6             MR. GAMBURG:  Yes, Your Honor.

7             THE COURT:  All right.  Thank you.  And Mr.

8     Henry will have the verdict recorded into the record.

9     Ladies and gentlemen of the jury, thank you again for your

10    service.  I will be joining you shortly in the Jury room.

11    I have to thank you personally for your service.  I've --

12    I've invited your colleague who did not deliberate to

13    rejoin you.

14             And so with that, by all means find your

15    way back and as I said I will be there shortly and once

16    again, let's all rise in recognition and respect for the

17    hard work of our fellow citizens.  You can go ahead back.

18    All right, Counsel, is there anything else that requires

19    the attention of the Court.

20             MS. BURNES:  Nothing from the Government,

21    Your Honor.

22             MR. GAMBURG:  No, Your Honor.

23             THE COURT:  All right, with that the

24    defendant will continue in custody and I will go and join

25    the jurors.

1                              (Off the record at 16:13:12)

2                                CERTIFICATION

3    I, Judith Spriggs, court approved transcriber, certify that

4    the foregoing is a correct transcription from the official

5    electronic sound recording of the proceeding in the above-

6    entitled matter.

7    _____/

8    Judith Spriggs
     Associated Reporters Int'l., Inc.   10th September, 2022

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25