# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :

      v.                 :        **CRIMINAL NOS. 19-717**
                                                     **22-228**

WILLIAM A. MERLINO      :

## GOVERNMENT'S SENTENCING MEMORANDUM

From at least November, 2017 to March, 2019, defendant William A. Merlino, a retired physician, sold the dangerous chemical 2,4- Dinitrophenol ("DNP") for use as a human drug, despite the fact that DNP has never been approved by the FDA for human consumption. During the 17 months that he marketed the drug, the defendant sold and distributed DNP as a weight loss drug to hundreds of individuals across the United States, Canada, and the U.K., and received approximately $54,000 in return. One consumer to whom the defendant distributed DNP died of DNP overdose.

While Merlino was awaiting trial, the 56-year-old spouse of Merlino's friend received a sudden and terrible diagnosis of pancreatic cancer. Merlino was provided patient medical records to provide trusted medical counsel in light of this unexpected and terminal diagnosis. Instead, Merlino forged his name onto those medical records, fabricated two letters in the name of a legitimate "treating" oncologist, and provided them to his unwitting former counsel, all to obstruct justice and delay his trial for almost a year.

As explained below, the government contends that defendant's misbranding crime involved conscious or reckless risk of death or serious bodily injury and was orchestrated through sophisticated means and therefore objects to Probation's calculation as to the misbranding count.  The government acknowledges that because the defendant went to trial on the misbranding charge (19-717) and then pleaded guilty, pursuant to a plea agreement, to a separate obstruction charge (22-228), he has obtained the unforeseen benefit of a lower guidelines range.  For all these reasons, as well as for the reasons provided below, the government recommends a sentence within and near the top end of the guideline range of 30 to 37 months' imprisonment.

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.
>
> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted).

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors, which support a sentence at the top end of the final advisory range of 30 to 37 months.

I.   **BACKGROUND.**

**UK investigation/death of J.K.**

In June, 2018, United Kingdom's National Food Crime Unit, Food Standards Agency ("Food Crime Unit") notified the U.S. Food and Drug Administration-Office of Criminal Investigations that an eBay user "simcare," later determined to be defendant Merlino, had been listing the compound DNP for sale. The Food Crime Unit was aware of sales to customers in the United Kingdom, as well as customers in the United States. The Food Crime Unit alerted eBay that the user "simcare" was selling DNP. EBay cooperated with the agency and removed the listings.

On July 10, 2018, the Food Crime Unit informed FDA about a death of a 21-year-old man named J.K. on March 23, 2018.  J.K. was a DNP customer of eBay user "simcare."

Defendant Merlino sold DNP to J.K. via eBay in February and March of 2018. Specifically, on March 13, 2018, J.K. purchased 200 DNP capsules-125mg through eBay. By email dated March 13, 2018, Merlino wrote to customer J.K., thanking him for his order and providing the USPS tracking number for the package.  *See* Government's Trial Exhibit 12A; PSR ¶ ¶ 28-30.  Merlino's email provided directions for agricultural use: "dilute one capsule in one gallon of water and used [sic] daily on your plants."  J.K. was instructed to write to simcare@gmail.com for questions and other ordering or payment methods.  The body of the email continues, with a description of DNP for human consumption:

> In the past when this was a legal diet medication in the US and sold over the counter, average dose was one capsule two or three times a day.  By short circuiting the energy [Krebs Cycle] sugar was converted to heat.  Dose was adjusted to tolerance of warming.
> *    *    *
> Patients may lost [sic] up to ten [10] pounds per month depending on muscle mass.

Merlino's email lists additional weight loss information, and closes with the following:  "I am a retired physician and have had extensive use of DNP on plants and people.  Please feel free to write regarding use of DNP for you [sic] plants.  Average dose was one or two capsules up to 3 times a day depending on response."  The email was signed Wm. A Merlino RPh, MD, FAAFP.

On March 21, 2018, J.K. wrote back to Merlino.  "I have a question regarding when DNP was used for human consumption.  Assuming the human's tolerance was quite high, would the amount of calories burned increase proportionately to the DNP dose?"  *Id.*[1]

On March 22, 2018, J.K. ingested the DNP he had been sold by Merlino,[2] and died in the early morning hours of March 23rd.  The autopsy concluded the cause of death was 2, 4- Dinitrophenol toxicity.

**The Misbranding Case (19-717).**

On December 17, 2019, a grand jury in the Eastern District of Pennsylvania returned an indictment charging defendant William A. Merlino with one count of introduction of misbranded drugs into interstate commerce for having false and misleading labeling in violation of Title 21, United States Code, Sections 331(a), 352(a), and 333(a)(2).  After a delay during which Merlino faked a pancreatic cancer diagnosis that is the basis for separate obstruction of justice charges, Merlino proceeded to trial on Wednesday, August 3, 2022.  On August 5, the jury found the defendant guilty of the single count charged in the indictment.

---

[1]    While it is not known whether Merlino replied to this email, the paramedic patient notes state "Pt states he has taken 10x dinitrophenol  200mg tablets (2g) at 10 am this morning for weight loss – ordered from ebay, instructions told him to take between 5-10."  The paramedic patient notes, autopsy report, toxicology report, and death report are submitted under seal as Exhibit A.  The victim impact statements drafted by his parents are also submitted under seal as Exhibit B.

[2]    While J.K. purchased liquid DNP from a Russian supplier, it was located in a locked safe with the seal intact and unopened and determined not to have been ingested.

During three days of testimony, the jury heard from eight government witnesses, and the Court received almost 190 exhibits into evidence.  The overwhelming and largely uncontradicted evidence showed that from at least November, 2017 to March, 2019, defendant Merlino operated a business to encapsulate, package, label and distribute the chemical 2,4- Dinitrophenol ("DNP") for use as a human drug from his residence in New Jersey.

DNP is an industrial chemical with various commercial uses, including use in herbicides, dyes, wood preservatives, and explosives. In the 1930's, prior to the passage of the Federal Food, Drug, and Cosmetic Act ("FDCA") and its requirement that drugs be proven safe before they were marketed, DNP was sold as a weight loss drug.  DNP caused serious adverse events, including dehydration, cataracts, liver damage, and death. As more side effects were reported, FDA determined that DNP was too toxic to be used for human consumption.  FDA has never approved a drug that contains DNP. *See generally*, testimony of Dr. Arthur Simone, August 5, 2022 (19CR717);  PSR ¶ 17-19[3] ; PSR¶ 21.

Merlino sold and distributed the drug DNP to hundreds of individuals across the United States, and in at least eight foreign countries including Canada and the U.K. and

---

[3]     For unknown reasons, Probation  characterizes the law and regulatory status of DNP in other countries.  PSR¶ ¶ 20-21.  For example, the PSR at note 8 cites an article authored by Brazilian researchers regarding Alzheimer's research. Such matters were deemed irrelevant and trial and are not relevant here.  The undisputed facts are that the chemical DNP has legal industrial uses--such as explosives, pesticides, and wood preservatives—*and* that the FDA has never approved a drug containing DNP for human consumption.

received approximately $54,000 in return. Merlino knew that it was illegal to distribute DNP in the United States for use as a drug, so he used a variety of pretexts and tactics to avoid detection by authorities.  For example, he posted a tweet on January 3, 2018, that read "DNP for sale on eBay for weight loss. Is not legal in US so listed as fertilizer on eBay. #Diet #weightloss." *See* Government's Trial Exhibit 1.  Consistent with this ruse, Merlino used the eBay username "simcare" to advertise the DNP transactions on eBay such as "40 DNP [Crystaline] Capsules for Agriculture Use – 125 mg each."  Then, undeterred by the seizure of his bulk product by United States Customs and Border Protection (CBP), or by eBay's decision to discontinue sales of DNP on its website, Merlino continued to market and sell DNP for use as a human drug.

Merlino also knew DNP was toxic to humans. In an August 1, 2018 letter to CBP, in an attempt to recover his seized DNP, Merlino continued his ruse to avoid government detection of his illegal DNP diet drug business by writing "DNP is used as an herbicide and for preserving wood," and "This product cannot be consider [sic] a drug as it is toxic to human."  *See* Government's Trial Exhibit 5.  Merlino also sent the "Material Safety Data Sheet" (MSDS), which contained hazard statements including "Fatal if swallowed;" "Fatal if inhaled;" and "Causes damage to organs."  *Id.*

The defendant used a variety of sophisticated tactics to help ensure that his sale of DNP would go undetected and unregulated.  After eBay removed all listings of DNP for sale, defendant Merlino conducted transactions through his email address simcare@gmail.com and his website www.fortissupply.com.  Merlino encapsulated his DNP for a fee and communicated with customers about dosage for human consumption.

The defendant continued to label his drugs "Not For Human Consumption" and to describe it as fertilizer on his website and in communications, despite knowing and intending that the DNP was to be used as a human drug for weight loss.

The jury saw emails that on November 11, 2018, Merlino was contacted by a longtime customer, David F., requesting to do business with Merlino in exchange for free DNP. David F. described himself as a professional athlete from Canada who would be willing to promote Merlino's services to his contacts and other athletes on the pro circuit. David F. explained "[o]bviously this would be SUPER safely done" because he and other athletes were in the World Anti-Doping Agency testing pool. Therefore, David F. stated, Merlino "would never have to worry about anything like someone doing something stupid or even talking about the product for human consumption." The following day, on November 12, 2018, Merlino replied, "Interested ... could put a from your site[link] with reduced shipping costs etc and work out a % to you." Merlino further advised "[a]s you know needs to be shipped to Canada as Yellow Pigment 12 .. one of it uses." (sic). Within days, several new customers sent emails to Merlino looking to purchase DNP and referencing David F. as a referral source.

Merlino knew that his business was illegal and his product was dangerous. On November 27, 2018, he sent an email to his ex-wife, forwarding a news article describing the manslaughter conviction for a DNP diet pill dealer. Government's Trial Exhibit 151. The subject line of Merlino's email was "She took 8 pills at one time." The headline of the news article was "First manslaughter conviction for DNP diet pill dealer after toxic pills killed student." Government's Trial Exhibit 152. The article mentions the dangers

of DNP and deaths that were related to ingesting DNP.  *Id.*  The article noted that the dealer had used a defense that that he never intended the pills for human consumption, but as fertilizer in the garden.  *Id.*

Thus, according to his emails, beginning in December 2018, Merlino started to screen new customers in his illicit DNP business.  Specifically, Merlino started requesting that new customers ordering DNP acknowledge by email that the purchase of DNP was for agricultural purposes; encapsulated DNP was used for the purpose of making standardized dilutions for application to plants; DNP was not for consumption for weight reduction; and to acknowledge that customers have "reviewed the DNP MSDS [Material Safety Data Sheet] and understand that DNP is unsafe for human consumption."  He did not send this pretextual email to existing customers.

During the scheme, Merlino used a variety of return addresses for the hundreds of parcels he shipped daily out of his local Mays Landing Post office.  The packages from four undercover purchases of drugs did not include his name yet contained four different return address/name combinations:  Simcare Assoc Ltd, 4630 Catawba Ave; Agro Fortis Supply, 4630 Catawba Ave; Agro Fortis Supply 4630 Somers Point Road; and Agro Fortis Supply, 4630 Mays Landing Road.  Postal records showed additional sender names.  Postal records also showed the vast majority of shipments were made by an account under the name of Merlino's former employee, who had no knowledge of the account or the shipments.

**The Obstruction of Justice case (22-228).**

In summer, 2021, after trial continuances based on the Covid-19 pandemic, Merlino's misbranding case was listed for trial on October 25, 2021, almost two years after indictment.  Days after the denial of a defense request for another continuance, by letter and email dated August 6, 2021, Merlino's former defense counsel Borden requested a status call with the trial court to discuss scheduling.  Counsel's letter and email to the Court attached an August 6, 2021 letter, purportedly from defendant Merlino's treating oncologist, Dr. G., which described a diagnosis of metastatic carcinoma of pancreas.  The letter also stated "Please Contact me directly on my cell phone, 772.419.8002, if you require additional information." [sic].  On August 9, 2021, by email titled "Letter and discharge summary," counsel provided the government with a six page .pdf.  This .pdf contained the same August 6, 2021 letter purportedly from Dr. G., and an additional five page "discharge" summary, purportedly from Shore Medical Center.  The first copy of the discharge summary stated in the transcription that the patient was 56 years old.  At the time, defendant Merlino was 84 years old.

Later on August 9, counsel Borden sent another email to the government, with the subject line "FW: Corrected Discharge Summary."  Borden's transmittal email shows it was forwarding an email from defendant Merlino containing an attachment with a "corrected" discharge summary.  The six page .pdf contained the same Dr. G. letter and discharge summary, which now stated in the transcription that the patient "is 84 years old."

After a status telephone conference with the trial court on August 11, 2021, counsel Borden moved for a continuance, which was unopposed.  Docket 33, 34. Borden's motion represented that "Defendant William Merlino was recently diagnosed with a life-threatening medical condition. Documentation confirming the diagnosis was supplied to the Court and government counsel."  Docket 34.  The trial court granted the motion, finding "Defendant William Merlino is suffering from a serious medical condition requiring urgent treatment, and in support of that representation submitted a medical report to the Court and records for the Government to review."  Docket 35.  In sum, the trial court and the USAO accepted the records sent by counsel at face value and trial was continued as a result of the documentation defense counsel Borden provided. After a status inquiry from the government, on January 10, 2022, counsel Borden forwarded what was ostensibly a supplemental report from Dr. G. to the trial court and the USAO, showing that defendant Merlino continued to suffer from a life-threatening medical condition.  Defense counsel's January 10, 2022 transmittal letter sought to extend the continuance of trial based upon Merlino's health and attached a January 7, 2022 letter, purportedly from Dr. G.  In the unsigned January 7, Dr. G. letter described Merlino's diagnosis as "adenocarcinoma of pancreas;" his present status as "metastatic lesions to vertebral spine and pelvis;" and treatment as "Palliative."  It contained the same sentence "Please Contact me directly on my cell phone, 772.419.8002, if you require additional information." [sic]

The August 6, 2021 Dr. G. diagnosis letter; the August 5, 2021 Shore Medical discharge summary; the "corrected" August 5, 2021 Shore Medical discharge summary;

and the January 7, 2022 Dr. G. diagnosis letter were all sent to counsel Borden by defendant Merlino.  Moreover, each of those documents that counsel Borden submitted to the government and trial court on the defendant's behalf were falsified and fraudulent.

Specifically, Dr. G., a practicing oncologist, had no patient by the name of William Merlino.  Dr. G. had never diagnosed Merlino with pancreatic cancer or any other condition.  The letters submitted to the trial court were not from him, and contained many anomalies in the letterhead, the diagnosis, and the body of the two letters. Subpoenaed phone records showed that defendant Merlino was the subscriber to the cell phone number ending in 8002, listed in each of the two Dr. G. diagnosis letters supplied to the trial court.

The Shore Medical Center discharge document contained a Medical Record Number (MRN) that corresponded to M.M., a 56-year-old female who had been admitted for testing on June 2, 2021 because of abdominal pain.  She was diagnosed with terminal pancreatic cancer on June 4, 2021 and passed away on September 9, 2021.  Her widower husband, T.M., considered himself a friend of defendant Merlino, and supplied the hospital paperwork to Merlino.

Specifically, T.M. had known defendant Merlino for several years.  In June, 2021, after T.M. and his wife were confronted with a sudden and painful diagnosis, T.M. reached out to defendant Merlino to help T.M. understand the nature of this diagnosis. T.M. gave defendant Merlino all documents he received from the hospital and doctors pertaining to the medical condition.  At the time, T.M. had no knowledge that Merlino was being investigated for other matters.

Approximately three weeks before the misbranding trial, on July 12, 2022, a grand jury in the Eastern District of Pennsylvania returned an indictment charging defendant Merlino with one count of obstruction of justice in violation of Title 18, United States Code, Section 1503.

## II.   SENTENCING CALCULATION.

### A.   Statutory Maximum Sentence.

The maximum sentence for Count One of 19CR717 introduction of misbranded drugs into interstate commerce, is three years' imprisonment, one year of supervised release, a $250,000 fine and a $100.00 special assessment.  The maximum sentence for Count One of 22CR228, obstruction of justice is ten years' imprisonment, three years of supervised release, a $250,000 fine, and a $100 special assessment.  Thus, a total statutory maximum sentence that may be imposed on the defendant is thirteen years imprisonment.

### B.   Sentencing Guidelines Calculation.

The Probation Office suggests that the counts of conviction comprise two groups, one for misbranding and one for obstruction. For Group 1, the misbranding count (19cr717), the Probation Office suggests: a base offense level of 6, pursuant to USSG §§ 2N2.1(c)(1) and 2B1.1(a)(2); an increase of 6 levels because the defendant's gain was more than $40,000, USSG § 2B1.1(b)(1)(D); an increase of 2 levels for mass-marketing under § 2B1.1(b)(2)(A)(ii) & Application Note 4; and an increase of 2 levels because the defendant used a special skill, that is, his medical license, that significantly facilitated and

concealed the commission of the offense, USSG § 3B1.3. PSR ¶ 60a-c. The PSR assigns this group a total offense level of 16. PSR ¶ 63.

For Group 2, the obstruction count (22CR228), the Probation Office suggests a base offense level of 14, pursuant to USSG § 2J1.2(a); increased by 3 levels because the offense resulted in the substantial interference with the administration of justice, USSG § 2J1.2(b)(a); and increased by 2 levels because the defendant used a special skill, that is, his medical license, that significantly facilitated and concealed the commission of the offense, USSG § 3B1.3. The PSR assigns this group an offense level of 19. PSR ¶ 70.

The PSR applies the grouping rules for a combined adjusted offense level of 21. PSR ¶ 74. Pursuant to the parties' plea agreement on the obstruction count, the PSR credits 3 levels for acceptance of responsibility, resulting in a total offense level of 18. PSR ¶ 78. With an offense level of 18 and a criminal history category of I, the PSR calculates the final advisory guideline range of 27 to 33 months imprisonment.

The government objects to the calculation as to the misbranding count. Specifically, as discussed in this memorandum, the government advocates application of a 2-level increase because the offense involved conscious or reckless risk of death or serious bodily injury within the meaning of USSG §2B1.1(b)(16)(A); and a 2-level increase because the offense involved sophisticated means under USSG 2B1.1(b)(10)(C). That results in a total offense level on the misbranding count of 20. When the obstruction group is added, the final offense level is 22, reduced to 19 upon credit for acceptance of responsibility. That produces an advisory guideline range of 30 to 37 months. The government supports application of that range.

C.    **The Government's Objections to Sentencing Guidelines Calculation.**

The government objects to the calculation of the misbranding guidelines.

a)    **The misbranding offense involved conscious or reckless risk of death or serious bodily injury within the meaning of USSG §2B1.1(b)(16)(A).**

The government contends that the PSR should assign two offense levels to the calculation of the misbranding felony because the offense involved the conscious or reckless risk of death or serious bodily injury within the meaning of USSG §2B1.1(b)(16)(A).  It is undisputed that DNP is toxic to humans.  *See* PSR; *see generally,* testimony of Dr. Arthur Simone, August 5, 2022 (19CR717).  And there is ample evidence that the defendant knew DNP was toxic to humans and thus selling DNP for human consumption amounted to the conscious or reckless risk of death or serious bodily injury within the meaning of USSG §2B1.1(b)(16)(A).

For example, in his August 1, 2018 letter to CBP, in an attempt to recover his seized DNP, Merlino wrote "This product cannot be consider [sic] a drug as it is toxic to human." *See* Government Exh 5.  He included an MSDS sheet which contained warnings including "Fatal if swallowed; Fatal in contact with skin; Fatal if inhaled; May Cause damage to organs through prolonged or repeated exposure." *Id.*

Moreover, on November 27, 2018, Merlino sent an email forwarding a news article describing the manslaughter conviction for a DNP diet pill dealer. *See* Government Exhibit 151.  It was clear that Merlino had read the article, not simply because he forwarded it, but because he drafted the subject line of the email from information in the article:  "She took 8 pills at one time." *Id.*  The headline of the article

- 15 -

was "First manslaughter conviction for DNP diet pill dealer after tox pills killed student." *See* Government Exhibit 152.

In addition, after eBay removed DNP listings and Merlino started to screen new customers, he required customers to acknowledge they have "reviewed the DNP MSDS [Material Safety Data Sheet] and understand that DNP is unsafe for human consumption;" and acknowledge "DNP is considered hazardous to human health and excessive exposure or ingestion has led to death." *See* Government's Exhibit 82.

And, of course, the predication of the government's investigation was that one consumer to whom the defendant Merlino distributed DNP died of DNP overdose.

The enhancement requires only that the offense "involved" a reckless risk of serious bodily injury, not that every instance of conduct in the course of the offense have done so. *See e.g. United States v. Kantete*, 610 F. App'x 173, 176 (3d Cir. 2015) (applying enhancement under prior guideline §2B1.1(b)(15)) (unpublished). There is ample support on the caselaw for application of the two-level enhancement where, as here the defendant's offense constituted a reckless disregard for the life and health of consumers and the public. *See United States v. Chin, 41 F.4th 16 (1st Cir. 2022)* (applying enhancement to pharmacist at company for shipments of contaminated drugs)*; United States v. Wright*, No. 6:19-cr-00134 (M.D. Fla. 2019–2020) (applying enhancement to DNP case); *see also United States v. Saffer*, 118 F.Supp.2d 546 (applying prior guideline 2F1.1(b) to conspiracy and making false statement to FAA); *United States v. Prigmore*, 1996 WL 464030 (D. Mass. 1996) (applying prior guideline 2F1.1(b) in conspiracy to commit fraud on the FDA for unapproved heart catheters).

It is disingenuous, at best, to claim that the enhancement should not apply because DNP is "not addictive" and many "consumers who purchased DNP knew what they were buying from the defendant had potentially deadly effects." *See* PSR. Merlino did not start sending the pretext emails about the MSDS until December 2018, after reading about a manslaughter conviction for a DNP diet pill pusher. There is no evidence that Merlino warned J.K. about potentially deadly effects of DNP in his February and March, 2018 sales. Rather, the evidence shows that Merlino wrote dangerously incomplete and contradictory information about his product: "About 1 in 500 can be allergic and develop hives. They just stopped DNP and took some Benadryl." *See* Government's Exh 12A. Merlino used his credentials to give his product legitimacy: "I am a retired physician and have had extensive use of DNP on plants and people." *Id.* And he signed emails as Wm. A Merlino RPh, MD, FAAFP. Merlino's advertisements on eBay used credentials to lie to potential consumers: "As a retired physician, I have used DNP for patients, when it was legal." *See* Government's Trial Exhibit 2.

The guideline is focused on the defendant's conduct, not the victims. Defendant's distribution of DNP constituted a reckless disregard for the life and health to the hundreds of consumers who ordered DNP from the internet.

### b)     The misbranding offense used sophisticated means under USSG 2B1.1(b)(10)(C)

Section 2B1.1(b)(10)(C) provides for a 2-level upward adjustment if "the offense otherwise involved sophisticated means." Application note 9 to Section 2B1.1 defines "sophisticated means" as "especially complex or especially intricate offense conduct

pertaining to the execution or concealment of an offense."  U.S.S.G. § 2B1.1, app note 9(B).

While the conduct must be "especially" complex or intricate, it need not be extremely complex, but only involve a "greater level of planning or concealment than a typical fraud of its kind." *United States v. Fumo*, 655 F.3d 288, 315 (3d Cir. 2011), *quoting United States v. Landwer*, 640 F.3d 769, 771 (7th Cir. 2011).  Moreover, the examples in the commentary are illustrative and not exhaustive, and "the enhancement properly applies to conduct less sophisticated than the list articulated in the application note." *United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013); *see also Fish*, 731 F.3d at 280 (recognizing that the examples are illustrative and not required).

Here, Merlino's scheme spanned seventeen months, until a government search warrant shut him down.  Merlino sold and distributed the drug DNP to hundreds of individuals across the United States, and eight foreign countries including Canada and the U.K., and received approximately $54,000 in return.

The defendant used a variety of sophisticated tactics to help ensure that his sale of DNP for human consumption would go undetected and unregulated.  DNP is not a controlled substances which possession or distribution alone is illegal.  Rather, it is the distribution of the drug for human consumption, with intent to defraud, which is illegal. First, defendant used eBay to distribute his DNP, advertising DNP "for agricultural use" and "not for human consumption" while promoting his product "As a retired physician, I have used DNP for patients, when it was legal."  When eBay removed all listings of DNP for sale, defendant Merlino conducted transactions through his email address

simcare@gmail.com.  However, he also used his website www.fortissupply.com,
describing his business as a "leading supplier of DNP fertilizers."  Merlino encapsulated
his DNP for a fee and communicated with customers about dosage for human
consumption.  Defendant Merlino continued to label his drugs "Not For Human
Consumption" and to describe it as fertilizer on his website and in communications,
despite knowing and intending that the DNP was to be used as a human drug for weight
loss.  For his international customers, Merlino routinely lied and shipped his product
under a different name "Yellow Pigment #12" to evade authorities.  *See e.g*
Government's Trial Exhibits 153, 158.

   Merlino used a variety of return addresses for the hundreds of parcels he shipped
daily out of his local Mays Landing Post office.  The packages from four undercover
purchases of drugs did not include his name yet contained four different return
address/name combinations:  Simcare Assoc Ltd, 4630 Catawba Ave; Agro Fortis
Supply, 4630 Catawba Ave; Agro Fortis Supply 4630 Somers Point Road; and Agro
Fortis Supply, 4630 Mays Landing Road.  Postal records showed additional sender
names.  Postal records also showed the vast majority of shipments were made by an
account under the name of Merlino's former employee, who had no knowledge of the
account or the shipments.

   By concentrating on each component part of the scheme in isolation, the PSR
vastly oversimplifies the offense conduct and the concealment and ignores the scope and
nature of the scheme.

**D.**     <u>**The Government's Final Guideline Range**</u>

The government advocates application of a 2-level increase because the offense involved conscious or reckless risk of death or serious bodily injury within the meaning of USSG §2B1.1(b)(16)(A); and a 2-level increase because the offense involved sophisticated means under USSG 2B1.1(b)(10)(C). That results in a total offense level on the misbranding count of 20. When the obstruction group is added, the final offense level is 22, reduced to 19 upon credit for acceptance of responsibility. That produces an advisory guideline range of 30 to 37 months. The government supports application of that range.

We recognize that this produces something of a windfall for the defendant, in that he receives a better result than if he had not been charged in the obstruction case at all. Without the separate obstruction charge, there would be a 2-level increase on the misbranding count, under § 3C1.1, for obstruction of justice, and there would not be any credit at all for acceptance of responsibility. That is because he went to trial on the misbranding charge, and § 3E1.1 app. note 4 provides that obstructive conduct "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct" and therefore does not allow an acceptance-of-responsibility credit except in an "extraordinary" case, which this case certainly is not. Thus, without the separate obstruction case, the final offense level here would be 18 (under the Probation Office's view) or 22 (under the government's view), leading to a range of 27-33 months (Probation) or 41-51 months (government). Instead, the defendant obtains the fortuity of

a credit for acceptance of responsibility for both charges because he was charged with obstruction in a separate case.

Nevertheless, it is the government that elected to bring a separate charge, and it is the government that entered a plea agreement in the obstruction case supporting a credit for acceptance of responsibility.  The government is bound by that agreement, and therefore supports the Probation Office's approach of grouping both counts and applying an acceptance credit in the final calculation.  As set forth above, with the addition of enhancements for reckless risk of death or injury and for sophisticated means, this leads to a final advisory range of 30 to 37 months.  The government proposes a final sentence within and near the top of that range, of 36 months (matching the statutory maximum for the misbranding offense), to recognize the anomaly in this case and afford some measure of punishment for the serious obstructive conduct.

**III.   <u>ANALYSIS.</u>**

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that a sentence near the top of the final advisory range of 30 to 37 months is appropriate in this case.

The Supreme Court has declared:  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range."  *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (quoting *Freeman v. United States*, 131 S. Ct. 2685, 2692

(2011) (plurality opinion); ellipsis in original).  "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 133 S. Ct. at 2084.  "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.*

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### **Consideration of the 3553(a) Factors.**

The defendant engaged in serious offenses.  For 17 months, knowing that DNP was not only illegal but dangerous, Merlino ignored the serious safety risks posed by his business.  Merlino did not stop when Customs seized his product; he did not stop when eBay removed his listings for sale; he did not stop when reading about a manslaughter conviction for distribution of DNP.  The misbranding scheme ended not due to any action

Merlino took, but by the fact that federal agents learned that one of Merlino's customers had died from DNP overdose and, after investigation, ultimately executed a search warrant at his home.

But the defendant's criminal conduct did not end.  While awaiting trial, the defendant forged the medical records of a friend whose spouse had received a devasting diagnosis:  pancreatic cancer. Having been entrusted with that medical information because of his medical background, Merlino instead used that tragedy to avoid trial.  He betrayed his friend (and the decedent spouse); he victimized a legitimate oncologist by forging his name; he betrayed his former trial counsel; and he disrespected the criminal justice system.  Thus, consideration of the nature of the offense, § 3553(a)(1), counsels in favor of the requested sentence of incarceration.

Further, the defendant's history supports the need for incarceration.  Merlino is clearly an intelligent person -- a retired physician who also has a pharmacy degree.  Yet Merlino's communications with his trusted customers shows that he operated his illicit DNP business brazenly in the United States and abroad.  His dangerous DNP sales were not a single lapse of judgement, but a calculated refusal to conform his behavior to the law.  Moreover, defendant was on bail and awaiting trial when he forged medical records and two different physician letters.  He has never truly expressed remorse for his conduct.

The defendant offers letters of support from family and former patients who describe him as "a healer" and someone never "known to demonstrate unethical behavior." *See* Defense Memorandum.  Sadly, these individuals must not be aware of defendant's serious crimes.  Such sentiments demonstrate that, unlike many defendants

appearing before this Court, Merlino is educated, intelligent, and capable of honest pursuits.  Instead, Merlino chose to spend his retirement years committing serious crimes which endangered the public, and betrayed friends and former counsel.

The need for a sentence to reflect the seriousness of the crime is particularly important for distribution of DNP.  As the victim impact statements describe in heartbreaking detail, J.K.'s parents lost their son, who was living in the family home, to a sudden, unexpected, and painful death by DNP overdose.  His family will forever be deprived of his companionship and support.  Yet there appears to be an attitude that the distribution of drugs which are not controlled substances, or are not demonstrated as "addictive," is not dangerous and serious.  The requested sentence of incarceration is needed to reflect the seriousness of Merlino's crimes.

The need for general deterrence is also clear.  If "entrepreneurs" like Merlino substitute their judgement for those of professionals, the FDA's regulatory oversight is thwarted.  A meaningful sentence of incarceration is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  § 3553(a)(2).  Furthermore, the recommended sentence of incarceration affords adequate deterrence to others who would commit a similar offense, and protects the public from further crimes of the defendant, for at least as long as he remains incarcerated.  *Id.*

Moreover, the recommended sentence would assure that the defendant's sentence is consistent with those imposed nationwide on similarly situated offenders, and thus complying with Section 3553(a)(6) and avoiding undue disparity.  *See e.g. United States*

- 24 -

*v. Cavell*, No. 2:19-cr-00033 (E.D. Cal. 2019) (statutory maximum 36 months imprisonment); *United States v. Wright*, No. 6:19-cr-00134 (M.D. Fla. 2019–2020) (statutory maximum seven years imprisonment).

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." § 3553(a)(2)(D). Also, restitution is not an issue in this case. § 3553(a)(7).

At the same time, the defendant has not set forth any persuasive argument for leniency.

The defendant asserts that his age and health call for a reduced sentence to time served. The facts do not warrant such leniency. Defendant was 80 years old in November, 2017 when he began his criminal business to encapsulate, package, label and distribute the dangerous chemical 2,4- Dinitrophenol ("DNP") for use as a human drug. Merlino was 80 years old in March, 2018 when his 21-year-old customer J.K. died of DNP overdose days after receiving DNP and discussing dosing with Merlino. In March, 2019 when federal agents searched his residence and effectively shut down his business, Merlino declined to take responsibility for his conduct. Thus, Merlino was 82 years old in December, 2019 when he was indicted. And he was 84 years old in August, 2021, when he faked pancreatic cancer, using a 56-year-old dying woman's medical records, to avoid trial.

The simple reason Merlino is being sentenced at an advanced age is that he chose to spend his retirement committing dangerous crimes. Given the severity of the

defendant's offenses and the need for the Court to avoid disparate sentences for like offenders, such sentencing leniency should not be afforded here. Rather, all of the appropriate considerations of sentencing favor the imposition in this case of a sentence of imprisonment within and at the top of the guideline range.

## IV.   CONCLUSION

Therefore, in sum, all of the appropriate considerations of sentencing favor the imposition in this case of a sentence at the top of the guidelines range.   As set forth above, with the addition of enhancements for reckless risk of death or injury and for sophisticated means, this leads to a final advisory range of 30 to 37 months.  The government proposes a final sentence of 36 months' imprisonment (matching the statutory maximum for the misbranding offense), to recognize the anomaly in this case and afford some measure of punishment for the serious obstructive conduct.

Respectfully submitted,

JACQUELINE C. ROMERO
Acting United States Attorney

*/s Joan E. Burnes*
JOAN E. BURNES
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Sentencing Memorandum has been served on the Filing

User identified below through the Electronic Case Filing (ECF) system:

Robert M. Gamburg, Esq.
Gamburg & Benedetto, LLC
1500 John F. Kennedy Blvd.
Suite 1203
Philadelphia, PA 19102
robert@gamburglaw.com

Counsel for William A. Merlino


*/s Joan E. Burnes*
JOAN E. BURNES
Assistant United States Attorney


DATED:  <u>May 25, 2023.</u>